IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

* * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | 19-CV-1435 |
| Plaintiff | : | |
| v. | : | Easton, Pennsylvania |
| | : | November 12, 2019 |
| | : | |
| MILLER'S ORGANIC FARM | : | |
| and AMOS MILLER | : | |
| | : | STATUS |
| Defendants | : | TELEPHONE CONFERENCE |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - -

BEFORE THE HONORABLE EDWARD G. SMITH
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:      GERALD B. SULLIVAN, ESQUIRE
                        UNITED STATES ATTORNEY'S OFFICE
                        615 Chestnut Street, Suite 1250
                        Philadelphia, Pennsylvania  19106

                        TRACEY MANOFF, ESQUIRE
                        United States Dept. Of Agriculture
                        Office of General Counsel

For the Defendants:     STEVEN LaFUENTE, ESQUIRE
                        LAW OFFICES OF JEREMY McKEY, PLLC
                        2695 Villa Creek Dr., Suite 155
                        Dallas, Texas  73234

                        - - -

Deputy Clerk/
ESR Operator:           Jennifer Fitzko

                        - - -

TRANSCRIBED BY:         Drummond Transcription Service
                        Haddon Heights, New Jersey  08035

     Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1        (Via telephone at 10:00 a.m. Easton Courtroom.)

2        THE COURT:  Good morning, it's is Ed Smith, who do we

3 have on the line?

4        MR. SULLIVAN:  Good morning, your Honor, Gerald

5 Sullivan, Assistant United States Attorney for the United States

6 and we also have on the line, Tracey Manoff, who is an attorney

7 with the Office of the General Counsel at the U.S. Department of

8 Agriculture.

9        MS. MANOFF:  Good morning, your Honor.

10        THE COURT:  Good morning.

11        MR. LaFUENTE:  Good morning, your Honor, Steven

12 LaFuente on behalf of the defendant Miller's Organic Farm and

13 Amos Miller.  And I believe, we have on the line, my client, Mr.

14 Amos Miller.

15        THE COURT:  Very well, good morning -- good morning to

16 both of you.

17        MR. MILLER:  Good morning, your Honor.

18        Mr. Miller, as you know this originally was scheduled

19 as a time for oral argument on the motion for summary judgment.

20 But there was several phone calls last week -- two to be exact

21 -- with counsel for both you and the farm and for the Government

22 as to exactly, how you wanted to proceed in this case.  And it

23 was made clear that you definitely wanted to be heard but you

24 didn't want to travel here to be heard and that's -- that's

25 fine, I understand that completely.

1    But it also -- given the response to the motion for

2 summary judgment that's been filed for the Government -- it

3 appeared that your -- it was questionable -- whether there was

4 any opposition to the proposed order by the Government.

5    So, the purpose of this call today, it is not so much

6 oral argument on the motion for summary judgment, as it is an

7 opportunity for you to be heard.  And then, I'd need the

8 position of the defense with respect to the Government's

9 proposed order.

10    Now, Counsel, Mr. Sullivan, is that, essentially, what

11 happened last week?

12    MR. SULLIVAN:  That's my understanding, your Honor,

13 that through Mr. LaFuente and Mr. LaFuente stated that Mr.

14 Miller didn't wish to testify, you know and be under cross-

15 examined and have to the summary judgment record reopened, but

16 merely to make a statement for your Honor's consideration.

17    THE COURT:  And Mr. LaFuente, do you -- do you think,

18 I have properly summarized what happened last week?

19    MR. LaFUENTE:  I do, your Honor.

20    THE COURT:  Okay.

21    MR. LaFUENTE:  I -- I believe that's my position and I

22 hope -- I hope that Amos is -- I hope, we're on the same page.

23    THE COURT:  Okay.

24    Mr. Miller, this is your opportunity to be heard with

25 respect to this matter, if you're in agreement with the order

being entered that has been proposed by the Government, this

case, essentially, is closed today.  But you would have

continuing obligations to comply with the law and to comply with

the provisions of the -- the permanent injunction that's in the

order until that would be vacated.

What did you want to say about this whole -- because I

know, this has been a long, long case for you and not just

starting in 2019 -- but it's been going on for many years before

that -- what did you want to say, sir?

MR. MILLER:  Okay.

So, what -- what did you want me to -- to cover up

here?

THE COURT:  Well, there is a motion for summary

judgment that you haven't really opposed but what you've

suggested is that you're voluntarily intending to comply with

the provisions of the order in any case.

MR. MILLER:  Hm-hmm.  Well, ah, that --

(Pause at 10:03 a.m.)

MR. MILLER:  -- that's certainly -- our goal is to

satisfy the -- the U.S. Department Agriculture --

MR. SULLIVAN:  Your Honor --

MR. MILLER:  -- that's what I --

MR. SULLIVAN:  -- your Honor, I -- this is Mr.

Sullivan, I -- I should say that this is a civil action and it

has a civil purpose, I am in the Civil Division of my office.

1      But because Mr. Miller and his farm have engaged in

2  misbranding conduct, that I understand could be criminally

3  prosecuted -- prosecuted -- under a strict liability theory,

4  although I am not aware of any open criminal investigation on

5  the part of any federal agency in to Mr. Miller or his farm.

6      And also, because the Court has the power under 18

7  USC, Section 4013 to punish by a fine or -- a fine imprisonment

8  or both -- the contempt of any of its authority, I'd just ask

9  the Court to consider whether to advise Mr. Miller -- even if

10  he's not testifying today and just making a statement -- that

11  under the Fifth Amendment to the U.S. Constitution, he has the

12  right to refuse to make any statement or answer any questions

13  that might tend to incriminate him.

14      And everything that's being said today, I -- I assume

15  is being recorded and can be used against him in this or another

16  proceeding, including in any criminal proceedings, even though

17  I'm not aware of any one being contemplated at this point.

18      THE COURT:  Understood.

19      Mr. LaFuente, what are your thoughts?

20      MR. LaFUENTE:  I -- I think, that that would be in --

21  and -- and Amos and -- Amos and I have spoken, you know,

22  essentially, about the Fifth Amendment and the -- you know --

23  the implications of invoking the Fifth in a civil matter.  But I

24  think, it would be better if he heard it from the Court as well,

25  your Honor.

1    THE COURT:  Certainly.

2    And Mr. Miller, this is not to discourage you from

3    making a statement, but as you are probably aware, this is all

4    on the record.  And even though you're not sworn, you don't need

5    to be sworn for a statement to be used against you in some later

6    proceeding.  And in criminal proceedings, of course, you'd have

7    the absolute right to remain silent and you can't be compelled

8    to testify against yourself.

9    But by virtue of making statements now, those

10   statements can be used against you in a later criminal

11   proceeding, if there were a later criminal proceeding.

12   So, the purpose of the caution is to make sure, you're

13   aware --

14   (Coughing at 10:05 a.m.)

15   THE COURT:  -- of that, that anything you say now,

16   could be used against you in a later criminal proceeding.  But

17   as the Assistant United States Attorney has indicated, right now

18   there are no criminal proceedings, that he is aware of or even

19   contemplated criminal proceedings.  But he believes, some of

20   your conduct may, in fact, fall under the criminal provisions of

21   the statutes that we're dealing with here.

22   So, I am just cautioning you, that whatever statements

23   you may make here, could later be used against you, if there

24   were a criminal proceeding and do you understand that, sir?

25   MR. MILLER:  Yes.

1          THE COURT:  Okay.

2          You are free to make your statement.

3          MR. MILLER:  Okay.

4          Ah, well, we were down to Philadelphia a couple of

5     weeks ago with the USDA and, of course, they did -- ah -- I

6     forget, what you'd call it --

7          MR. LaFUENTE:  A deposition.

8          MR. MILLER:  -- ah -- in the United States office.

9          MR. LaFUENTE:  That was a deposition, then, the

10    deposition?

11         MR. MILLER:  Yeah, the deposition.  I am assuming,

12    you've read that, correct, Judge Smith?

13         THE COURT:  I do not have -- I -- the deposition has

14    been reviewed as part of the summary judgment motion, but I

15    don't have the deposition here today.

16         MR. MILLER:  Okay.

17         Well, I'm not sure how much detail that I -- I should

18    go into here, but as you may know that we tried to look into the

19    USDA's slaughtering facilities to see if we can go through them

20    or if we can set up one here.

21         And on that deposition it -- it states the reason why

22    we might not have a -- an interest in doing that.  So, we did

23    look into those possibilities of going into the USDA and, of

24    course, ah, to inspect the facilities.

25         And of course, there's things that, ah, they don't do

1  like, ah, saving the brains and some things that they do that,

2  our members aren't appreciative of.

3        So, it didn't seem like that would be a very good

4  option to fulfill my members needs to go through one of those

5  facilities.

6        Ah, and then we were considering looking into a custom

7  exemption, which I'm still going to pursue that, but I guess, my

8  concern is that, we tried Judge Heffley's office to come to an

9  agreement and it didn't seem to go anywhere.

10        And that's my biggest concern that we can continue

11  making these special needs available for -- for people that have

12  special needs, ah, where I'm not sure that they can find

13  anywhere else.

14        So, I feel I have duty to make sure that they'd get

15  their -- their needs to sustain their livelihoods --

16        THE COURT:  Well, you --

17        MR. MILLER:  -- but if the Government says that we

18  don't have that option through custom exemptions, I'm not sure

19  where to go from here.

20        Ah, if this injunction does apply and -- and the USDA

21  is not willing to -- ah -- give us any lead way here in -- in

22  custom exemptions, then my livelihood will be -- ah -- in

23  jeopardy.  And plus, a lot of other farmers that play a role in

24  this operation.

25        Ah, we -- we know that farmers are struggling all

1   across the United States and currently, it may be for one

2   reason, it's 'cause the -- the rules and regulations are -- are

3   quite burdensome.

4       And I feel, I have a -- a great opportunity to fulfill

5   my members needs and they are watching us as a -- as sharp as a

6   hawk to make sure that their feed doesn't get into -- ah, taken

7   away from them, the special needs that they -- I'm not sure that

8   they can get anywhere else, citric-acid fee, solutionized

9   without any chemicals, because this is a very sensitive -- a

10  chemical-sensitive group.

11      And they -- they get -- they get reactions from

12  certain things, so they do their -- ah -- their education and --

13  and then, they find out where they can get these products and --

14  and I'm really concerned that we can continue our mission on

15  making these things available for them.

16      THE COURT:  Now, I -- I will note, but you're probably

17  already aware of this, the proposed order by the Government

18  contemplates that you would, in fact, be seeking approval of a

19  custom-exempt plan, so, it -- it does contemplate that.  And I

20  don't know whether that will be successful or not, but it is all

21  provided for in this order.

22      MR. MILLER:  So, you're saying that it did give us an

23  option?

24      THE COURT:  No, it -- it's provided for in here, that

25  you are going to apply for it and what happens if you are, in

1  fact, approved.

2         MR. MILLER:  Right.

3         So, I thought that's what we tried to do down in Judge

4  Heffley's office, but we didn't seem to get anywhere, so should

5  we try it again?

6         THE COURT:  Well --

7         MR. SULLIVAN:  Can I step in, your Honor?

8         THE COURT:  You -- it would -- who -- who is best to

9  explain to Mr. Miller, the provisions of this order that as they

10  address the custom-exempt operations?

11         MR. SULLIVAN:  Well, if you --

12         MR. MILLER:  And --

13         MR. SULLIVAN:  -- and Mr. LaFuente, you don't mind if

14  I'd just start.

15         I think that the order contemplates three pathways,

16  Mr. Miller could come under federal inspection and he would have

17  to apply for that.

18         The second option is that, he could take his product

19  to federally-inspected facilities, his meat and poultry

20  products, the livestock and the poultry to be slaughtered and

21  processed and that -- and there are two nearby facilities.

22         And then, he could sell them at the retail store, if

23  he -- if he fulfills the obligations of what's called, the

24  retail-exemption, he could continue to sell those products

25  through Miller's.  So, that's the second option.  And, you know,

1    that's something that he could do right away.

2         And then, the third option is that he can make an

3    application to FSIS for a proposed -- a proposed model that

4    would come under the custom exemption.  FSIS would then, make a

5    decision on that.

6         If Mr. Miller didn't like the initial decision, then

7    that would have to be administratively exhausted -- exhausted --

8         MR. MILLER:  Can I say one thing --

9         MR. SULLIVAN:  -- and that's consistent with USDA and

10   FSIS regulations requiring administrative exhaustion.

11        And then, if at the end of the day, he gets the final

12   agency decision on that and he's not happy with that, he could

13   seek judicial review under the Administrative Procedure Act.

14        MR. LaFUENTE:  Correct.  That's my understanding.

15        MR. MILLER:  Didn't we -- didn't we try that proposal

16   in Philadelphia's office, wasn't that tested?

17        MR. LaFUENTE:  May -- may I interject?

18        THE COURT:  Sure.

19        MR. LaFUENTE:  Okay.

20        The answer is no, Amos, because that was just -- all

21   that was, was just a conference --

22        MR. MILLER:  Okay.

23        MR. LaFUENTE:  -- that's just a sit down to toss some

24   ideas around and that's it, that's all that that was.

25        And that is what I have been trying to explain to you,

1　is that this is a process that's going to take -- it's going to

2　take some time.  I mean, we -- we literally, have to put this

3　stuff on paper, you know, we'd need to show them the invoices.

4　And -- and we've got to show them that -- that what I'm creating

5　for you -- what we're going to present to them -- is going to

6　satisfy all the rules that allow us to become a custom-slaughter

7　exemption.

8　　　　　And as Mr. Sullivan said, if we'd get to the point

9　where there is an impasse and we just can't agree on something,

10　we'd have to address all the administrative remedies through the

11　USDA first, because if we'd try to petition for a declaratory

12　judgment now, this Court would not have juris -- it wouldn't --

13　we wouldn't have standing.  We wouldn't -- you know, we'd have

14　to resolve all of the administrative remedies first, before we

15　could ask Judge Smith or any other district judge to, basically,

16　tell us whether you are exemption of the -- a custom-slaughter

17　exempt operation or not.

18　　　　　So -- so, the short answer is, is that what happened

19　in Philadelphia was just a conference, it was by no means, a --

20　order of responsibility.  The Court is giving us an avenue to --

21　to actually put this on paper and actually get it done.

22　　　　　MR. MILLER:  Okay.

23　　　　　MR. LaFUENTE:  It's not -- it was just a conference.

24　　　　　MR. MILLER:  All right.

25　　　　　Well, the opinion I got that day is, even -- even

1  though I wasn't involved in the conference a whole lot, I was in

2  a separate room, which was kind of odd, because the USDA had

3  their -- their attorney was there trying there -- and although,

4  I wasn't allowed to be in there, according to the ruling that I

5  got from some of the people there.

6      But nonetheless, the -- the ruling, I -- the -- the

7  opinion I got that day, it was, either, it's -- it's you come to

8  the USDA and do it our way or the highway.

9      So, I am just a little concerned that we can move

10  forward but I am willing to give it a try, ah, if -- if that's

11  still an option.

12      MR. SULLIVAN:  Well, and I -- this is Mr. Sullivan.

13      I should be clear that the Government remains

14  skeptical that the model -- and I am not going to into the

15  details of the model that you've discussed that day -- because

16  it was discussed in settlement proceedings.

17      But the -- the model that was proposed, the Government

18  and the agency does not believe that that is going to fly, that

19  that is going to work under the law.  But there is the process

20  for proposing it, if you feel that it could work under the law

21  or a different model could work and for that -- for getting a

22  decision on that.

23      But that the burden on Miller's in the meantime, it's

24  not that you would not be able to continue to sell products, you

25  would just have to take them to, either, come under federal

1  inspection yourself or take them to a meats or Smucker's or

2  another federally-established facility, get the products

3  processed and slaughter there and then, sell them under the

4  retail exemption in Miller's Farm.

5       MR. MILLER:  Yeah, we did consider becoming USDA

6  inspected here at the site, because that's what the members

7  want, they'd prefer to have it on the farm and not intermingled

8  with other animals that could be coming from conventional farms.

9       So, we did consider the FDA exemption or the FDA

10 federal inspected here and I did some research in what the cost

11 would be and the costs are extremely high, ah, with -- it was

12 have the pass-up plans and everything to fulfill our members

13 needs, it's gonna take lots and lots of pass-up plans, mem --

14 ah, paperwork.

15      MR. SULLIVAN:  Ah --

16      MR. MILLER:  It requires a federal inspector to be on

17 the -- ah, on the property and, of course, that's from the

18 outside.  It's not someone within our own community, so we have

19 a concern with that.  So, we did consider that.

20      THE COURT:  All right.

21      Mr. Miller, was there anything else, you wanted to say

22 about this proposed order?

23      MR. MILLER:  Ah, yeah, one -- one concern I have is

24 that -- ah -- right now, we do have a -- I would say, quite a

25 large inventory in -- in stock here, that we were hoping the

1    members could have access to till we'd get this custom exemption

2    in place, so that we can get under the law.

3        Usually, we'd have around eight months up to a year of

4    inventory, so if there is anything that we can do to -- so, the

5    members aren't without the -- the special -- ah -- meats that

6    they are -- that are -- that they are -- ah -- depending on, I

7    would like to have something like that in place.

8        THE COURT:  Assistant United States Attorney Sullivan,

9    what are your thoughts?

10       MR. SULLIVAN:  Your Honor, do you mind if I ask Mrs.

11   -- Ms. Manoff for her input on that?

12       THE COURT:  Not at all

13       MR. SULLIVAN:  Ms. Manoff, if you could state the

14   agency's views.

15       MS. MANOFF:  Sure.

16       I just would have one question for Mr. Miller when

17   he's talking about the special needs, ah, what -- what he's talk

18   -- what he's referring to.  Is he referring to the ordinary cuts

19   of meat and processed meat or is he talk -- or are you talking

20   about the brains?

21       MR. MILLER:  Ah, well, the brains is one thing, the

22   special cuts is not as big of an issue.  The -- the main thing

23   is the -- the solution-free, the citric-acid free meats that our

24   members are depending upon.

25       MS. MANOFF:  Okay.

1          And how long do you -- would you expect that you could

2  -- ah -- sell these products or discard --

3          MR. MILLER:  Well --

4          MS. MANOFF:  -- yes.

5          MR. MILLER:  -- well, that's -- that's a good

6  question.  We -- we usually slaughter chickens in the summertime

7  when the grass is green --

8          MS. MANOFF:  Hm-hmm.

9          MR. MILLER:  -- 'cause that's what our customers depend

10  on, is the grass -- grass-fed animal chickens.  So, we usually

11  stop -- well, we actually, don't slaughter chickens hardly

12  after, let's say, October.  So, we have to supply -- or fill the

13  freezer for an inventory till the grass next year starts growing

14  and of course, any -- that's used, twelve weeks or so, ah, till

15  they're -- till they finished out.

16          So, we usually figure eight -- eight -- at least,

17  eight months and, maybe, ah, up to ten or twelve months till the

18  inventory is completely gone.

19          MS. MANOFF:  Okay.

20          Are -- are you saying, that they's stockpiled now in a

21  freezer?

22          MR. MILLER:  Yes, hm-hmm.

23          MS. MANOFF:  Okay.

24          And how much -- how much pounds are you talking about?

25          MR. MILLER:  Oh, I would have no idea, I never -- and

1    the other thing that --

2           MR. SULLIVAN:  How about your livestock, Mr. Miller,

3    how about you inventory from livestock?

4           MR. MILLER:  From livestock?

5           MR. SULLIVAN:  Yes.

6           MR. MILLER:  Ah, the chickens, we don't have any --

7    ah, right now.

8           MR. SULLIVAN:  I'm sorry, do you have inventory of

9    livestock as well that you were referring to?

10          MR. MILLER:  No, I'm just taking about the

11   slaughter.

12          MR. SULLIVAN:  But are you -- of poultry.

13          MS. MANOFF:  Are you talking about chickens?

14          MR. MILLER:  Poultry.

15          Ah, the other thing about this -- one question I have

16   is the custom exemption as -- well, this -- this might not need

17   to be discussed now, I'm not sure, you can stop me if I need to

18   -- if it doesn't refer to today.  But if we do those -- the

19   custom --

20          MR. LaFUENTE:   Well --

21          MR. MILLER: -- exemption and we have mem --

22          MR. LaFUENTE:  -- Amos -- Amos, can I stop you real

23   quick --

24          MR. MILLER:  Sure, go ahead.

25          MR. LaFUENTE:  -- because I feel like, I'm missing an

1    opportunity right here.

2              I feel like, there's -- there's some confusion as to

3    what you have in stock and what you're concerned about.

4              MS. MANOFF:  Right.

5              MR. LaFUENTE:  Do you have -- because you just said,

6    that you have frozen chickens.

7              MR. MILLER:  Hm-hmm.

8              MR. LaFUENTE:  Okay.

9              And the question was, what live -- what -- do you have

10   an inventory of livestock meaning beef or --

11             MR. MILLER:  Oh.

12             MR. LaFUENTE:  -- anything other than poultry?

13             MR. MILLER:  Yes, yeah, we -- we do -- ah, have -- the

14   inventory is chicken, beef, pork, you name it.

15             Ah, but as far as livestock, we do -- we do slaughter,

16   like, ah, two -- ah, two beef and two pigs a week, but we still

17   have inventory of that in the freezer as well, which sometimes,

18   can -- it's not as high as the chicken, but it's still -- it's

19   still there.

20             MR. LaFUENTE:  And I think, right now, our concern is

21   what do you have frozen in inventory right now?

22             MR. MILLER:  Right.

23             Yeah, there's -- there's -- I would say, quite a --

24   quite an amount.

25             MS. MANOFF:  Yeah, I  -- you know, Jerry, I couldn't

1  say that FSIS -- they might give him a short window to sell the

2  product, only because he has been doing it, you know, for the

3  last couple of years and it might seem kind of Draconian to say,

4  now that the order is entered, you know, you are going to

5  immediately, stop selling any kind of product.

6         He may have to have -- I -- I would have to find out

7  from FSIS, as he may have to have, like, a fire sale where --

8         (Laughter at 10:21 a.m.)

9         MS. MANOFF:  -- by a certain time period, the

10  inventory is gone or -- or that -- that's it.  But I know that

11  they don't want it to go on indefinitely and they don't want it

12  to go on for months and months, either, you know.

13         MR. MILLER:  Yes.

14         Well, the next question I wanted to branch out to --

15  is that, there's new members coming on board, ah, and they get

16  -- they have a certain element and they go to a doctor or a

17  nutritionist and the nutritionist is trying to help them with a

18  certain -- certain illnesses.

19         And then, the nutritionist says, well, this is what

20  you -- we should look for, ah, according to the nutritionist's

21  knowledge, that you need these certain types of foods and then,

22  it would be nice if they wouldn't have to wait till we

23  slaughtered the next batch of chickens which could be four or

24  five months down the road.  So, somehow, we need to figure out,

25  how they can have access to these types of feeds, ah,

1    immediately.

2         (Pause at 10:23 a.m.)

3         MR. SULLIVAN:  Ms. Manoff, do you want to address

4    that?

5         MS. MANOFF:  I would say, that this -- I would say to

6    Mr. Miller, that unfortunately, this has been an ongoing issue

7    for some time and you may not be able to accommodate these new

8    members while you are in the state of transition.  They --

9         MR. MILLER:  Right, what I --

10        MS. MANOFF:  -- they will have to look for a --

11        MR. MILLER:  -- what I have --

12        MS. MANOFF:  -- they will -- well, let me finish.

13        They will -- they might have to look for it somewhere

14   else and somewhere else, locally.  You know, the whole point of

15   the custom-exemption slaughter when the Act was -- when these

16   Acts were promulgated, be it poultry or livestock were that, you

17   know, farmers and ranchers could -- could get their products

18   brought to a local custom-slaughter person.  It wasn't meant to

19   be nationwide.

20        So, you're a new -- you may have to advise these new

21   members, that at this point in time, this service is not

22   available to them, it's just that simple.

23        MR. MILLER:  Although they -- they need it and there's

24   hardly any other places to find this?

25        MS. MANOFF:  I am sure that they would be able to find

1    it.  I -- I'd -- there are -- there's chickens everywhere and

2    there's livestock everywhere and -- and so, that you just can't

3    provide for it right now, Mr. Miller.

4         MR. MILLER:  Well, I can certainly -- ah, I can

5    certainly run that by the membership.

6         MS. MANOFF:  Well, unfortunately, the membership is

7    not in court, you are and so, you can't -- you can't deflect it

8    to the membership at this point in time.

9         MR. MILLER:  Well, my heart -- my heart and my goal is

10    to make sure that the people can fill their needs to sustain

11    their livelihood, because I've been under some health issues as

12    well and I have -- I have a passion for -- for what I'm doing --

13         MS. MANOFF:  Sure and we --

14         MR. MILLER:  -- and I appreciate you reminding me of

15    -- of course, where we'd stand.

16         MS. MANOFF:  Okay.

17         Well, sure, well, we -- we understand and appreciate

18    your passion as well and it may be that you just have to stop

19    providing that particular special service until you get, you

20    know, all -- all of your ducks in a row as far as the meat, your

21    -- your poultry and meat slaughter operations.

22         MR. SULLIVAN:  So, Ms. Manoff, am I right that what --

23    what the Government is proposing here is that, you know, that

24    there would be a ceasing of sales of non-federally inspected

25    products, apart from, maybe, the inventory with a brief

1    reasonable window to sell the remaining inventory?

2         MS. MANOFF:  That would seem reasonable.

3         (Pause at 10:25 a.m.)

4         THE COURT:  Okay.

5         MR. MILLER:  And -- and I'd --

6         THE COURT:  Mr. LaFuente, what do you think?

7         MR. MILLER:  -- I mean, I --

8         MR. LaFUENTE:  I'd certainly appreciate that and I can

9    -- you know, I can understand what -- where Mr. Miller is coming

10   from and I appreciate the Government giving us an opportunity to

11   continue, so, it's not a undue hardship on Mr. Miller to get

12   this process going.

13        Ah, I certainly, you know, I -- I feel confident that

14   we're going to be able to get this done.  And I feel, like, we

15   get there, it's just going to take -- it's just going to take

16   some -- some back and forth and some compromise, but I think we

17   can get there.

18        MR. SULLIVAN:  And Mr. LaFuente, when you say, get

19   this done, what do you mean your discussions with Mr. Miller

20   about how to tee up the custom-exempt proposal to the agency?

21        MR. LaFUENTE:  Yes, your Honor, I -- I mean, I intend

22   to be right there with every step to prepare it -- you know, to

23   prepare the proposal and submit it.

24        Ah, you know, just in all -- in all such places, I --

25   I envision a situation where if we do run into -- and we

1    probably, will we hope -- but there may be certain things that

2    they're not going to be able to agree on.

3            Ah, my understanding is, is that, you know, we would

4    have the right -- once we've exhausted the administrative

5    remedies and we convinced this -- the Court for the judicial

6    review, I -- and at that point in time, whatever constitutional

7    arguments, Mr. Miller has, he can lodge them then.

8            And I think, that that's another part of what's been

9    lost here, it's that -- you know, it's -- the members want to be

10   able to be heard on their freedom of choice and I -- I've

11   explained to them that those issues are not ripe right now, this

12   is an injunction --

13           (Laughter at 10:27 a.m.)

14           MR. LaFUENTE:  -- this is not the time to make those

15   arguments.

16           And so, you know, I -- I'm willing to hold this -- to

17   be a part of this -- because I feel, like, it's a -- to go

18   forward and reach a compromise.  And I think, there are -- there

19   were areas of common ground that we were able to find.

20           And once you'd get the process going, I -- I really,

21   honestly, believe that we could get Miller's Organic Farm

22   operating and it just has to be part of the exemption.

23           You know what, we -- and it what might take a judicial

24   review, but I think, we can get there.

25           THE COURT:  So, as I understand it, if I enter this

1    injunction, the Department of Agriculture through the Food

2    Safety and Inspection Service will continue to work with Mr.

3    Miller to address these issues that he is raising right now?

4         MS. MANOFF:  Yes, your Honor.

5         We have our -- our agency has spoken with Mr. Miller

6    at length about these issues.  They've spoken with him about the

7    use of citric acid and whether he -- he -- you know, if he

8    needed to use it or not.

9         So, they -- they have -- he has raised these issues

10   before to our FSIS agency and they have done their best to

11   respond to his questions --

12        THE COURT:  Okay.

13        And that will con --

14        MS. MANOFF:  -- and will continue to do so.

15        THE COURT:  Okay.

16        But this case would be -- this case would be closed,

17   even though the Court still retains jurisdiction?

18        MR. SULLIVAN:  I -- I --

19        MS. MANOFF:  I'm not prepared to answer that.

20        MR. SULLIVAN:  -- ah, I -- I guess, that would be the

21   case, I mean, I -- I'm -- if we were to find out, you know, two

22   weeks from now that Mr. Miller is still slaughtering and

23   processing on his farm, livestock and poultry without a federal

24   inspection -- without a fine for a federal inspection -- I

25   guess, we would come to the closed case and -- and apply to your

1    Honor for enforcement.

2              THE COURT:  Right.

3              MR. MILLER:  Well, you know, it's --

4              MS. MANOFF:  Right.

5              MS. MILLER:  -- it's going to take a while to get this

6    custom exemption in place.

7              MS. MANOFF:  Right.

8              MR. MILLER:  And I just got finished saying that, it

9    doesn't seem that going to a USDA inspected facility, which is

10   I've tried hard to see if we can work -- work something like

11   that out, because that's going to limit us, ah, some special

12   needs for the special group here.

13             MS. MANOFF:  Okay.

14             MR. SULLIVAN:  But that is going to be the framework

15   that we're proposing, your Honor, that if Mr. Miller doesn't

16   want to become a federally-inspected facility, that unless and

17   until he fits within the custom exemption, that he would have to

18   take his products going forward for slaughter and processing to

19   a federally-inspected facility, there are two nearby him.

20             And then, once they're slaughtered and processed at

21   those federally-inspected facilities, Miller's could then sell

22   the products, if -- you know, within the retail exemption and

23   the provisions are spelled out in our proposed order for that.

24             So, yes, it would require an immediate change at the

25   facility in terms of the way that things are slaughtered and

1    processed offsite, but we don't see this being an unreasonable

2    hardship.

3           And it certainly is treating Mr. Miller and it has

4    been treating Mr. Miller differently from everyone else in the

5    Amish and other community in that the agency has not seized or

6    detained any of its products as it would be doing otherwise with

7    these other facilities.  You know, it hasn't taken immediate

8    action, it's been very patient and indulgent and given plenty of

9    notice about these being the requirements for -- for years now.

10          And this is sort of the end of the -- the line as far

11   as we're considering it in terms of it's time now to come into

12   compliance.

13          But you know, if the -- the order were modified to

14   allow a reasonable window for existing inventory, you know,

15   where there has already been slaughtering and processing and

16   it's frozen, you know, for that to be sold, we -- we don't see

17   this being an unreasonable hardship in any way.

18          MR. MILLER:  Right.

19          Depending -- depending if you'd talk to -- who you'd

20   talk to, the members or whatever, because they have these

21   special needs and I'm sure -- I don't have to say that again --

22   for certain types of the animals as -- as a nutrition or

23   medicine for their feed.

24          THE COURT:  Right.  The --

25          MS. MANOFF:  And -- and, Jerry and your Honor, we

1   would need access to Mr. Miller's facility, so that our agency

2   people can see exactly how much product he has, because Mr.

3   Miller said, he doesn't know how much frozen product he has,

4   sometimes, our agency people have had a problem in getting

5   access to his facility.

6        And we'd want to make sure, that he's only going to be

7   selling this frozen product that is in the inventory and that it

8   is not being commingled with any new slaughter -- slaughtering

9   -- ah -- and processing operation.

10       THE COURT:  And, Mr. Miller, what are your thoughts on

11  that?

12       MR. MILLER:  Are you talking to me?

13       THE COURT:  Yes, sir.

14       MR. MILLER:  Ah, well, I'd have no problem giving them

15  access, it's that my concern is that it's -- how long is it

16  going to take for us to come to an agreement that these customs

17  are -- custom exemption is -- is what the -- how -- that the

18  custom exemption is to what they consider satisfied and what

19  we'd consider satisfied.  I'd see that as, maybe, a challenge to

20  overcome.  And at the same time, fill the needs for our -- our

21  members --

22       THE COURT:  Right.

23       MR. MILLER:  -- so depending on how long it takes to

24  get this custom exemption in place, I'm -- I'm more than happy

25  to work with them in any way possible to get this custom

1   exemption in -- in place.

2         But I can see that as a -- as a -- going out a --

3   because I know, we tried it down in -- in Philadelphia and it

4   seemed that it -- it -- it's gonna need some compromization (ph)

5   for -- for me and for them.  But I think, I feel -- I feel, I

6   have a duty to make sure that, my members get what they need to

7   fulfill their -- their special needs for their livelihood --

8         THE COURT:  Well --

9         MR. MILLER:  -- they -- they shouldn't be --

10  depending, I want to do whatever I can to -- to get in

11  compliance with the --

12        THE COURT:  -- I am encouraged by the Department of

13  Agriculture's representation that they intend to continue to

14  cooperate with Mr. Miller in trying to both come into compliance

15  with the law and allow you to continue to operate, provided that

16  you can come into compliance with the law.

17        I -- and I have to reiterate something that Assistant

18  United States Attorney Sullivan said, while this seems like it's

19  an immediate issue, because this order is the permanent

20  injunction, this has been a long time coming.

21        And I'm of concern that over the years that this has

22  been going on and in particular, since April when this complaint

23  was filed, that it's been business as usual and there have been

24  no efforts to come into compliance and I could be wrong about

25  that.

1       And I'm certainly not accusing you, Mr. Miller, of not

2    coming into compliance, because I know you have serious

3    reservations as to whether what you're doing warrants further

4    regulation.

5       And I also know that you have a very serious

6    responsibility that you take very seriously, the responsibility

7    to your members and you don't believe, you are selling anything

8    that's harmful.  And, in fact, you believe, it's actually a very

9    valuable product and you're providing a service to these members

10   and to the people that you're providing this food to.  So, I do

11   understand all of that.

12      But I don't want it to seems as though, this is all of

13   the sudden, you're being told, you'd have to come into

14   compliance, because what I have observed is, literally, years --

15   years of this going on, where the Department of Agriculture has

16   been very accommodating to try to bring the -- the Miller's

17   Organic Farm around to being compliant, whether that would be

18   through a custom exemption, whether that would be through -- you

19   know, just following the proper regulations, *et cetera*.

20      So, what I see today as, I mean, there is no question

21   in my mind, having reviewed the motion for summary judgment and

22   the response, that the Government is entitled to a motion for

23   summary judgment, which includes this permanent injunction.  I

24   don't see this as being something sudden nor do I see it as,

25   necessarily, being the end.  I think, it's just now, there is a

1    -- you must follow one of these three paths in order to bring

2    the farm compliant.

3          And it sounds as though, the Food Safety and

4    Inspection Service will continue to be accommodating with

5    respect to your inventory and to try to continue to assist you

6    as opposed to trying to shut you down, try to assist you in

7    becoming compliant.  But it's -- it's been a long time and they

8    have to take action.

9          MR. MILLER:  But how can -- how can the Miller Organic

10   Farm and the USDA come on the same page, I mean, we -- we have

11   all of these disagreements and I'm trying to figure out we can

12   come to an agreement.  So, that -- that's the challenge that we

13   face here today.

14         THE COURT:  Well, I would agree with you to the extent

15   that this has been going on for so long and if you haven't come

16   to an agreement by now, it may be because you are insistent on

17   continuing to operate as you have operated in the past.  And I

18   don't blame you for that, I assume that's because it's been a

19   very successful operation both for you and for the members and

20   so, I don't blame you for wanting to continue business as usual.

21         It's just unfortunate or fortunate depending on which

22   side you're looking at, that there are regulations involving

23   food safety and that the regulations apply to you.  And your

24   current operation is not in compliance with those regulations.

25         (Pause at 10:37 a.m.)

1          MR. SULLIVAN:  And, your Honor -- this is Mr. Sullivan

2     again, just -- you know, we've stated before, the agency has

3     impressed on me throughout, that -- you know -- they want Mr.

4     Miller to be successful.  They want to have a working

5     partnership with him going forward.  But it has to be done

6     within the context of the law as it exists now.

7          And I know, Mr. Miller has been in touch with his

8     congressional representative and that's great, you know, he --

9     to seek, maybe, a change in the law, if that's what he's

10    interested in.

11          But the law as it exists right now, we've tried to

12    think of the different pathways that would work for Mr. Miller

13    to be legally compliant going forward.  And I think, the agency

14    is going to continue to be there and willing to work with him as

15    it works with other farmers in the community, you know, to try

16    to have him comply with the law in the least burdensome way,

17    that also assures, you know, the safety of the products and all

18    of that.

19          THE COURT:  Okay.

20          Does the Department of Agriculture wish to be heard

21    any further?

22          MS. MANOFF:  No, your Honor.

23          We would say that the custom-slaughter exemptions as

24    we've said, historically, are for local operations.  And so, Mr.

25    Miller would have a -- a hill to overcome, if he has a custom-

1  exempt slaughter operation that would be acceptable to FSIS but

2  they're willing to see what kind of program he and his counsel

3  would propose to us.

4          THE COURT:  Okay.

5          MR. MILLER:  Well, I --

6          MS. MANOFF:  And -- and the other thing, your Honor,

7  is that I have sent the message to FSIS as to their agency

8  people, to see if they would agree to the -- if they'd also

9  concur, ah, that we can sell off -- that Mr. Miller -- can sell

10  off the frozen inventory and I'm just waiting for a response

11  from them.

12         THE COURT:  Okay.

13         Now, the -- but Mr. Miller does not owe anything to

14  the Department of Agriculture, is that true?

15         MR. SULLIVAN:  Your Honor, when you say, owed do you

16  mean --

17         MS. MANOFF:  Owed, yeah.

18         MR. SULLIVAN:  -- like, the penalty or --

19         THE COURT:  Right.

20         MR. SULLIVAN:  -- or something like that.

21         THE COURT:  Correct.

22         MS. MANOFF:  No --

23         MR. SULLIVAN:  No.

24         MS. MANOFF:  -- no, he does not.

25         THE COURT:  And the order provides that each party

1 shall bear its own costs and attorneys fees?

2 MR. SULLIVAN: Correct.

3 MS. MANOFF: Yes.

4 MR. SULLIVAN: And, your Honor, the only provision of

5 the order that we had included with the hope that it could be

6 converted into a consent agreement, it would not apply as -- if

7 it's entered as an order -- it would be Paragraph 19 at the

8 beginning with the:

9 Defendants is hereby waive and shall no assert any

10 defenses they may have to criminal prosecution or

11 administrative action.

12 Both waivers would have been included if we could have

13 had our way, at least, in the consent agreement, but I don't

14 think, they're appropriate for any order, that the Court would

15 enter it.

16 MR. LaFUENTE: Well, correct, as far as --

17 THE COURT: And Mr. -- Mr. LaFuente, do you see any

18 advantage to Mr. Miller entering into a consent order as opposed

19 to the Court granting the motion for summary judgment?

20 MR. LaFUENTE: Well, your Honor, I think, that Mr. --

21 Mr. Sullivan just hit on it from our perspective and I think,

22 that one thing it's very important under the eyes of the law,

23 but as -- as you'd recall, Mr. Miller -- ah -- indicated to the

24 Court that he is being watched like a hawk by his association

25 members.

1      So, from our perspective, there's an advantage to that

2    and that's not a legal advantage, but it's -- you know, not

3    waiving and not acquiescing in a waiver of any defenses that he

4    may have, it's important to the association.

5      So, the -- so, the really big advantage is -- is the

6    fact that, it would make our members feel a lot more comfortable

7    in knowing that we're here -- we're here fighting for them and

8    that we're not giving away anything.  You know, that we are --

9    we are trying to -- to comply -- we're trying to get in to

10    compliance.  It's just that they're a very sensitive about --

11    about having access to their feed, so, they have to be very

12    careful to not -- in the eyes the law, that in -- you know, from

13    Mr. Miller's commitment to his members, if that makes sense.

14      THE COURT:  Okay.

15      So, under those circumstances, he would prefer not to

16    enter a consent order but, rather, to have the Court rule on the

17    motion for summary judgment?

18      MR. LaFUENTE:  And that's my understanding, but Amos,

19    if -- if I'm mis-speaking, please let me know and let the Court

20    know.

21      MR. MILLER:  So, what's the summary judgment, I'm lost

22    there?

23      THE COURT:  Well, the -- the big difference between

24    the two, is the consent order means the two parties have come to

25    an agreement and they've consented to a resolution of it.  The

1    other make it appear as those you've -- you've fought it.

2           The advantage of a consent order, that makes it seem

3    as though, it's something that you're just agreeing to as

4    opposed to something that's being enforced upon you.  Normally,

5    that's preferred, the consent order is preferred over the Court

6    edict.

7           But in your particular case, it may not be, it may be

8    better for you to have the -- go through the summary judgment

9    proceedings which are complete and just ruled on them as a

10   summary judgment motion.

11          MR. MILLER:  Hm-hmm.  Ah --

12          THE COURT:  Because I assume the -- and Assistant

13   United States Attorney Sullivan, you are still willing to

14   convert this into a consent order?

15          MR. SULLIVAN:  Your Honor, if the -- if it wouldn't

16   result in a long negotiation process, you know, if it could be

17   done within a day or so, yes, sure.

18          MR. LaFUENTE:  Would that mean, if we signed a consent

19   agreement, we'd be getting back those waivers?

20          MR. SULLIVAN:  Ah, not necessarily, I don't think

21   that's -- I don't think the provision here.

22          MR. LaFUENTE:  Okay.

23          THE COURT:  Well, I think if -- if it were a consent

24   decree, the only additions I could see, were the discussions

25   that were had here on the record today about inventory,

1 cooperation, *et cetera*. I don't think any of the -- of the

2 substance would be changed at all.

3      MS. MANOFF: Your Honor, if I may, I am just trying --

4 and I'm sorry, if there seems to be a reverberation in my line,

5 so I apologize --

6      THE COURT: I'm sorry.

7      MS. MANOFF: -- if people can't hear me.

8      But I have been in contact with our FSIS people --

9 agency people -- as far as selling the frozen invent -- selling

10 the inventory that is frozen. It seems to me, there is some

11 disagreement whether he can or he can't sell the frozen product

12 or not.

13      Is -- is that something that we could just put on hold

14 for a little while until I'd get a consensus from my agency

15 people as to whether he can or can't do it?

16      THE COURT: Absolutely.

17      Here's -- here's what I would suggest, it is that Mr.

18 Sullivan, in order to -- so, that it appears as an order of the

19 Court, which it is based on the summary judgment motion -- if

20 you could just modify your order to remove that Paragraph 19,

21 which would not apply here, if it's not a consent decree.

22      And add a provision that talks about the fact that the

23 parties may modify or clarify the provisions of this preliminary

24 injunction by agreement -- however, you would word that -- that

25 it keeps the Department of Agriculture and the Food Safety

1 Inspection Service within the bounds of the law, but allows them

2 to cooperate with Mr. Miller during this transition period to

3 address issues, such as, the sale of the -- the frozen chicken.

4        I'd -- I'd like to give the Department of Agriculture

5 more power to work -- to work with Mr. Miller during this

6 transition phase, is that possible?

7        MR. SULLIVAN:  Yes, I could craft some language like

8 that, sure.

9        THE COURT:  And if you could pass that by Mr. LaFuente

10 and of course, the Department of Agriculture, I think that would

11 certainly go along with the idea of what we're talking about

12 here today, which is while this is not immediate by any means

13 and it's been going on for some time, what's been represented to

14 me --

15        MR. SULLIVAN:  Well --

16        THE COURT:  -- is the Department of Agriculture

17 intends to continue to cooperate and Mr. Miller intends to

18 cooperate with the Department of Agriculture in trying to make

19 this -- this whole case resolved justly, that the members are

20 getting good food at the same time, it's -- they're protected

21 with respect to the regulations.  And of course, that the farm

22 comes in to compliance with these regulations, whatever path it

23 takes and of course, come in with -- as quickly as possible now

24 that this has been going on for so long.

25        So, there are two main issues here, one is the safety

1   of the public with respect to the food supply.  And the other is

2   that Mr. Miller has been operating this farm for some time, the

3   members depend on it, it's important to them and it's important

4   to Mr. Miller.  And we don't want to arbitrarily, essentially,

5   destroy it, if there is no need to destroy it.

6       So, if you could put some provision in there, that

7   there's going to be a continued cooperation or at least, that

8   the Department of Agriculture has the ability to continue to

9   cooperate and allow Mr. Miller to function without violating the

10  terms of the preliminary injunction, just so that this can

11  continue to be a work in progress as opposed to, we've got this

12  one document and it's the be all and end all right there.

13      MR. SULLIVAN:  That sounds perfect.

14      And, your Honor, may I ask, you had asked whether --

15  even though the Court would retain jurisdiction -- whether the

16  matter would be closed.  If there were some violation of the

17  order, such as, you know, Mr. Miller not cooperating with an

18  inspection at his facility or -- or something else.  If the

19  matter were closed, we wouldn't have to file a new complaint

20  then, right?

21      THE COURT:  No, no, we'd close it only for statistical

22  purposes.

23      MR. SULLIVAN:  Okay.

24      THE COURT:  We'd retain jurisdiction by -- pursuant to

25  the order -- we would retain jurisdiction over it, all you would

1   have to do is, file it right back with me and we'd have a

2   motion.  In a close case, I may or may not reopen --

3          (Coughing at 10:47 a.m.)

4          THE COURT:  -- the case.  I don't need to reopen the

5   case, but I may, because sometimes, people feel more

6   comfortable, if it's reopened.

7          MR. LaFUENTE:  If it would please the Court, I wanted

8   to kind of clarify this for myself and also to clarify it for

9   Mr. Miller.

10         If we have the language of compliance -- a mutual

11  compliance -- that we're both bound to comply and I'm not

12  saying, that this would happen, but it -- let's just say,

13  hypothetically speaking, that we've a proposal to FSIS and they

14  just didn't get back to us for another six months.  In my view,

15  that would be not complying with the -- with the order -- would

16  we then -- could we have the opportunity to seek enforcement of

17  the injunction, if -- if FSIS for some reason, would drag their

18  feet in responding to us?

19         THE COURT:  I -- I think that makes sense.

20         Mr. Sullivan, what are your thoughts?

21         MR. SULLIVAN:  Your Honor, and would that mean if the

22  agency were to sort of, not act in the ordinary course in terms

23  of reviewing administratively, a proposal and you know, were

24  acting in bad faith to drag things out, I don't -- I don't know

25  how that would be established, but Tracey --

1    THE COURT:  I --

2    MR. SULLIVAN:  -- do you have any sense for how

3 quickly, the agency reasonably could be expected to review a

4 proposed custom-exempt model?

5    MS. MANOFF:  I would say, because this issue has been

6 going on for some time, that they would probably make it a pri

7 -- not that they'd probably -- they would make it a priority to

8 review the -- the custom exempt order.  But I -- I don't know

9 how long that would take, I don't think it would take months,

10 but he would have to have -- he would have to all of his

11 paperwork in place and --

12    MR. SULLIVAN:  Okay.

13    MS. MANOFF: -- and unfortunately, since he has been

14 proposing this custom-exempt model for some time, you know, I

15 would think, that he would have his paperwork ready to give to

16 them tomorrow.  But if it's going to take Mr. Miller and his

17 attorney several weeks to get all of the appropriate paperwork

18 in order for their custom-exempt model, it may take longer for

19 them to review.

20    MR. SULLIVAN:  Right.

21    But I think, the question is, once they make the

22 proposal to the USDA, is there a number of months we could --

23 including the agreement -- to say, USDA will reach a decision no

24 longer than a certain number of months?

25    MS. MANOFF:  I -- I think that we could find one.  I

1    -- I don't -- I don't want to speak for FSIS, because I don't

2    know, but I think we can leave it -- I think, that we can ask

3    them and we can come to an agreed -- an agreed time period.  I

4    don't think that would be hard to do.

5          MR. SULLIVAN:  Okay, okay.

6          THE COURT:  But I do think, it -- it makes sense for

7    both parties to have a way to get back before the Court for

8    whatever reason.

9          Certainly, with the Government, it would generally be

10   to enforce the terms of the preliminary injunction.  With

11   respect to the defendant, I can think of reasons where they

12   would want to get back before the Court, just to try to get some

13   clarification on one issue or another.

14         MR. SULLIVAN:  Right.

15         THE COURT:  So, it does -- it does make sense that

16   both parties would have the opportunity get back before the

17   Court.

18         And I think that, Mr. LaFuente that's really what you

19   were looking for, correct?

20         MR. LaFUENTE:  Yes.  That's exactly what I was looking

21   for, your Honor.

22         (Laughter at 10:50 a.m.)

23         THE COURT:  Yes.  Okay.

24         MR. LaFUENTE:  I just wanted to make sure, we'd have

25   vehicle.

1       THE COURT:  Exactly.

2       MR. LaFUENTE:  I just wanted to make --

3       THE COURT:  All right.

4       Mr. Sullivan, do you think, you could revise this

5 order to remove that Paragraph 19, I would keep it still as a --

6 an order pursuant to the motion for summary judgment, add that

7 cooperation paragraph, that would provide a vehicle for either

8 side to get back before the Court.  Pass it by Mr. LaFuente to

9 see if he has any objection to it.

10      Do you think that -- that is a possibility that we

11 would get that done this week?

12      MR. SULLIVAN:  Yes, I'll aim to draft that today and

13 get something to Mr. LaFuente tomorrow and then, if we could get

14 it to your Honor, maybe, the following day, that -- that could

15 be a goal.

16      THE COURT:  Okay.

17      And Mr. Miller, do you -- do you have anything else

18 you would like to say?

19      MR. MILLER:  No, I -- I don't think so.

20      I was just wondering, 'cause what you're talking about

21 the following day, does that mean a conference call, again, or

22 what?

23      THE COURT:  I was not contemplating a conference call.

24 If -- if anybody believes that we'd need one, all you'd have to

25 do it let me know and I'd be glad to schedule another conference

1 call.

2          MR. MILLER:  Okay.

3          And I was just going to say, I -- I'll be out on

4 Thursday, so I won't believe available at that time and I'm just

5 a little bit lot here about the --

6          MR. LaFUENTE:  I --

7          MR. MILLER:  -- this -- but --

8          MR. LaFUENTE:  No, I -- I think, what's most -- what's

9 most important, Amos, for me, is I'm going to make sure that you

10 still have that with your e-mail with your neighbor, because

11 that's -- you know, I'll need to be e-mailing you what was given

12 to me.

13          MR. MILLER:  Sure.

14          THE COURT:  All right.

15          I will look for that revised order and if there are

16 any issues that come up, as I've said, do not hesitate to get me

17 on a -- on a conference call.

18          MR. SULLIVAN:  Thank you, your Honor.

19          MR. LaFUENTE:  Thank you, your Honor.

20          THE COURT:  And -- and everyone have a great week.

21          MR. SULLIVAN:  You, too.

22          MS. MANOFF:  Okay.  Thank you.

23          THE COURT:  Thanks.

24          MR. SULLIVAN:  Bye-bye.

25          MS. MANOFF:  Bye.

1        (Adjourned in this matter at 10:52 a.m.)


                            * * *

                    C E R T I F I C A T E

        I, a court-appointed transcriber, certify

that the foregoing is a correct transcript from the

electronic-sound recording of the proceeding in the above-

entitled matter.



                                Date: <u>March 4, 2020</u>
_____
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270