IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : CIVIL ACTION
                       : 19-CV-1435
           Plaintiff   :
                       :
       vs.          : Easton, Pennsylvania
                       : April 12, 2022
                       :
MILLER'S ORGANIC FARM   :
and AMOS MILLER, et al.  :
                       :
       Defendants   : MOTIONS HEARING
- - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE EDWARD G. SMITH
UNITED STATES DISTRICT COURT JUDGE
THE HOLMES BUILDING

APPEARANCES:

For the Government:     GERALD B. SULLIVAN ESQUIRE
                         UNITED STATES ATTORNEY'S OFFICE
                         615 Chestnut Street, Suite 1250
                         Philadelphia, Pennsylvania  19106

For the Defendant:      STEVEN LAFUENTE, ESQUIRE
                         THE LAFUENTE FIRM, PLLC
                         Thanksgiving Tower
                         1601 Elm Street, Floor 33
                         Dallas, Texas  75201
                         (Via Telephone)

Also Present:          Paul Flanagan
                         U.S. Department of Agriculture

                         George Lapsley,
                         Court-Appointed Master

                         Scott Safian, FSIS
Deputy Clerk/
ESR Operator:         Jennifer Fitzko

TRANSCRIBED BY:       Drummond Transcription Service
                         Haddon Heights, New Jersey  08035

     Proceedings recorded by electronic sound recording, transcript produced by computer-aided transcription service.

1          (At 1:22 p.m. in Easton Courtroom.)

2          DEPUTY CLERK:  All rise.

3          THE COURT:  You may be seated.

4          UNIDENTIFIED SPEAKER:  Thank you.

5          THE COURT:  The Court is called to order in the matter

6    of United States of America versus Miller's Organic Farm and

7    Amos Miller, this is Civil Action No. 19-1435.  Present in the

8    courtroom is the defendant, Mr. Miller.

9          And Mr. Miller, you don't have anyone here on behalf

10   of Miller's Organic Farm, is that correct, sir?

11         THE DEFENDANT:  (No audible verbal response.)

12         THE COURT:   Okay.

13         But you are Miller's Organic Farm, so --

14         On behalf of the United States appears, Assistant

15   United states Attorney Gerald Sullivan, good afternoon, sir.

16         MR. SULLIVAN:  Good afternoon, your Honor.

17         THE COURT: And from the U.S. Department of

18   Agriculture, Mr. Paul Flanagan, good afternoon.

19         And our court-appointed Master, George Lapsley,

20   good afternoon, sir.

21         MR. LAPSLEY:  Good afternoon, your Honor.

22         THE COURT:  The Court convenes today in and -- I'm

23   sorry, Mr. Lafuente, we have you available by phone, still with

24   your --

25         MR. LAFUENTE:  Yes.

1          THE COURT:   -- still with your -- withdrawal pending,

2    good afternoon, sir.

3          MR. LAFUENTE:  That is correct, good afternoon.

4          THE COURT:  The purpose of this hearing, of course,

5    was to determine the status of compliance with respect to the

6    existing court orders here.  And this was -- it was also to,

7    essentially, get a report from Mr. Lapsley as to how things

8    have gone since his appointment in this case, as the court-

9    appointed expert.

10          Assistant United States Attorney Sullivan, from the

11    standpoint of the Government, how have things gone in this case?

12          MR. SULLIVAN:   Your Honor, I think, we've -- we've

13    come today, your Honor, had stated on March 9th in our telephonic

14    hearing, that this could be a status conference today, it could

15    be contempt hearing, it could be any number of things.

16          I think, we've come in today -- we smile -- because

17    receiving some information from the USDA/FSIS through Mr.

18    Flanagan and his colleagues, not really having heard anything

19    from Lapsley, other than when he wrote to the Court two days

20    after the last telephonic conference at which Mr. Miller had

21    said, he would cooperate with Mr. Lapsley, when Mr. Lapsley

22    wrote to the Court and asked the Court to -- or asked my office

23    -- to then propose an order that would allow him to gain access

24    with the Marshal's assistance, since he had been denied access

25    on March 11th, two days after our last hearing.  Apart from that,

1    we really haven't had any information from Mr. Lapsley, other

2    than second-hand through Mr. Flanagan.

3          So, as we foresee, you know, what would happen today,

4    it's -- it's mostly, us wanting to hear from Mr. Lapsley, us

5    wanting to put on testimony from Mr. Flanagan.

6          And if Mr. Miller is actually receiving Fifth

7    Amendment rights advisement, wishes to testify and state

8    anything, to listen to that.  But certainly, in advance of that,

9    before we get to that point, I could summarize where I think we

10   are in terms of where we were at the last hearing, what my

11   knowledge is of generally, of what hasn't been done.

12         My distillation of Mr. Miller's recent submission to

13   the Court, if you'd want to hear that from me before the

14   testimony or after it, either way, I can present that.

15         THE COURT:  Well, I think, before, I -- and I

16   certainly want to hear from Mr. Miller about the documents that

17   he has submitted and what his perspective is on it as far as

18   compliance with what the orders are.

19         But why don't you state from the Government's

20   standpoint, how you believe things have done and what the status

21   is.

22         MR. SULLIVAN:  Your Honor, so when we appeared

23   telephonically on March 9th, one thing that really stuck out in

24   my mind and reminded me of the valuable role that I believe Mr.

25   Lafuente continues to play in this case, even though my

understanding is, that his communications with Mr. Miller are

limited, because Mr. Lafluente said -- and I have the transcript

ordered, so I -- I reviewed the transcription yesterday, he

said, in part regarding the activity that was the subject of the

second contempt sanctions order on February 7th, which involved

Mr. Miller's conduct with poultry slaughter and processing on

his adjacent farm at 672 Mill Creek School Road, Mr. Lafuente

said:

> These are crimes and I will not be a party to it.  I
> have in no way counseled my client to continue to thwart
> Court's orders in the way that he has done.

That's -- that's really strong language from Mr.

Lafuente, we believe that he continues to be the conscious here

for Mr. Miller in many ways and believe he continues to serve a

role -- an important role -- and the Government in no way thinks

that Mr. Mill -- Mr. Lafuente has counseled Mr. Miller in any

direction, other than compliance with the law to date.

The one commitment that Mr. Miller -- Mr. Miller made

at that hearing beyond saying that he would cooperate with Mr.

Lafuente, your Honor asked him that twice, was his promise to

pay -- make what was called, a good-faith payment towards the

money that had been due on March 9th and those monies, included

reimbursement by way of a civil contempt sanctions fine of

FSIS's investigative costs through the second contempt sanctions

order in the amount of $55,065.72 due on March 9th.

1    And the -- the order was the $250,000.00 civil

2  contempt fine, that was to be to the Court's registry by March

3  9th.

4    So, the one thing that I had raised and your Honor

5  then, proposed to Mr. Miller and Mr. Miller said, he would do,

6  was make a good-faith payment of $50,000.00 towards the civil

7  contempt sanctions fine into the Court's registry by March 18th.

8  That has not been done.

9    Mr. Lafuente advises me, that he's had communications

10  with Mr. Miller, that Mr. Miller had mailed a check that it --

11  because initially, Mr. Miller had issues with the wiring

12  instructions to the Court's registry -- Mr. Miller had mailed a

13  check to Mr. Lafuente's previous address, so it went to the

14  wrong place.  So, it's mixed up still.

15    And to the Government's ears that sounds exactly like

16  what happened with the civil contempt -- excuse me -- the civil

17  penalties that was due several years ago and it took forever to

18  get to Mr. Lafuente before the payment was actually made, that

19  was for $2500.00 or something like that.  But in any event, that

20  has not been paid so far as far as I understand.

21    The Court had asked the Government whether the

22  Government can collect on Mr. Miller's Go-Fund-Me site.  My

23  understanding is that depends on who controls the Go-Fund-Me

24  site's money and whether Mr. Miller can directly access and

25  withdraw from those cities.

1      So, we don't have sufficient information about that at

2    this point to know whether we can directly collect against those

3    Go-Fund-Me sites' funds. I think, Mr. Flanagan will testify

4    today, that he look at the Go-Fund-Me sites yesterday and

5    they're -- I believe -- at $160,000.00 or so, but he can testify

6    to the precise details about that.

7      But in any event, Mr. Miller has sizable assets apart

8    from that, that the Government could certainly seek to collect

9    on. And I'll -- I'll make -- discuss those in a moment.

10      One thing Mr. Miller said at that March 9th hearing

11    was, if Prairie -- started helping me is not an option, we

12    always look for other options.

13      And that's certainly, the Government sense, that when

14    Mr. Miller is faced with an order from the Court or with the

15    law, he's always looking for another way to accomplish what he

16    wants to accomplish and our concern remains that he's looking

17    for illegal, non-compliant ways to -- to move forward as he has

18    in the past.

19      Mr. Miller did say:

20     I would like to take a little more time to change the

21     website and the source of the funding to pay the

22     liabilities in full.

23      Our understanding is, that hasn't happened.

24      Again, Mr. Lapsley was denied access just two days

25    after that last hearing when Mr. Miller said, he would comply.

1      Mr. Miller filed on March 31st, it's Docket Entry No.

2    156, a submission saying that he had directed his website

3    managers to mark products not for sale and you'll hear some

4    testimony about the website.

5      And he also said that his March 18th newsletter to

6    customers said, there would be no more sales of meat and poultry

7    products until further notice.  So, we'll hear from our -- Mr.

8    (indiscernible) about that.

9      And then, he also realized, I'm -- I'm reading Robert

10    Louis Stevenson's *Dr. Jekyll and Mr. Hyde* right now -- and Mr.

11    Miller in this recent submission, talks about the internal

12    struggle which he's facing between -- sort of the dark side --

13    and his side that may be inclined towards compliance and he

14    talks about his need to subordinate his struggle -- those were

15    his words -- to the Court's orders because of the real

16    possibility of being held in criminal contempt and losing his

17    farm.

18      So, it sounds -- I don't know if Mr. Miller actually

19    wrote those or somebody else wrote that for him -- but if so, it

20    sounds like he's appreciating the real risks that he's not

21    facing.  And we -- we are concerned about actions rather than

22    just words, but we're certainly interested in hearing anything

23    that Mr. Miller wants to say along those lines today, after he

24    gets his Fifth Amendment advisement.

25      Mr. Miller also said that he has formed an independent

1    three-member board of governors to oversee the operations of the

2    farm, including sales and shipments to assure the Court that the

3    order will be strictly followed.  And he also refers to those

4    three board members as volunteers with integrity.

5         So, we certainly, would like to hear about the details

6    of that, I do a lot of compliance work in the heath care area

7    and usually, when there is a compliance board, they are

8    independent folks, so that you don't just have a echo chamber of

9    compliance people, who are choir boys and choir girls, but

10   people who will be a check and balance on an operation.

11        So, anything that Mr. Miller wants to share with us --

12   with us -- about that setup we're, certainly, all ears on, but

13   if it's -- for example, the equivalent of Sam's Club having

14   three of its buyer's club members, who have no ownership or

15   employee status within Sam's Club, just sharing their views with

16   Mr. Miller, we do question, you know, the value of this.  But

17   certainly Mr. Miller listening to sound voices and reasonable

18   voices is always a good thing.

19        So, again as -- as envisioned today, the plan would be

20   to hear from Lapsley, I understand that, maybe, he has submitted

21   some reports to the Court, we have not seen those and hear about

22   whether he's had continuing issues with access and has made any

23   findings.

24        To hear from Mr. Flanagan regarding any issues since

25   the last hearing that FSIS has heard and to hear from Mr.

1  Miller.

2       We will listen today as we'd consider our next step.

3  I am the attorney in the Civil Division of the U.S. Attorney's

4  office, I can't speak for the Criminal Division.  I have been in

5  consultation with our Collections Unit, if we'd proceed to

6  collection against -- against Mr. Miller's assets for the

7  outstanding sums, that would be a different Assistant U.S.

8  Attorney from my office, who would handle that.

9       And if we were to proceed in that direction fairly

10 soon, what we would do, your Honor, is we would propose an order

11 to your Honor that would elaborate on there being an actual

12 judgment, we think that's already in the -- in the contempt

13 sanctions order, but it would spell it out in greater detail,

14 that there would be a judgment for these outstanding funds that

15 could be collected against Mr. Miller's assets.

16      We would likely seek to add Mr. Miller's wife, Rebecca

17 Miller, as a party to this case under Federal Rule of Civil

18 Procedure 19, because it's our understanding and your Honor has

19 already make findings in this case, that she is a co-owner of

20 Miller's Organic Farm and she is also on the farm's deed, at

21 least, that's my understanding.

22      And we've already identified Mr. Miller's assets that

23 -- against which, the Government could execute a judgment.

24      We believe that compliance oversight is seen here, but

25 again, we need competent, objective individuals with real

1    authority and we haven't heard any detail on that yet.

2        I could go through the key provisions of the second

3    contempt sanctions order for your Honor in terms of the

4    injunction provisions there that the witnesses will be

5    testifying about today, but otherwise, I -- I'm done at this

6    point.

7        THE COURT: And Mr. Lafuente, are you in agreement

8    with the idea of Mr. Lapsley giving his report followed by the

9    Government calling, Mr. Flanagan to provide whatever testimony

10    he might have and then, Mr. --

11        MR. LAFUENTE: Yes -- yes, your Honor, I --

12        THE COURT: -- Mr. Miller would then be given an

13    opportunity?

14        MR. LAFUENTE: -- I --

15        THE COURT: And Mr. Miller, that's agreeable to you?

16        THE DEFENDANT: Yes.

17        THE COURT: Very well, sir.

18        Mr. Lapsley, if would please come up to the stand, we

19    are going to have you sworn, even though you're my expert in

20    this case and then, we're going to have you give your report.

21        (Pause at 1:36 p.m.)

22        THE COURT: Good afternoon, sir.

23        GEORGE DAVID LAPSLEY, SWORN.

24        THE WITNESS: Yes, ma'am.

25        THE COURT: Thank you very much, ma'am.

1          Sir, please be seated.

2          MR. SULLIVAN:  Your Honor, if you would prefer, I can

3     try to lead Mr. Lapsley through some questions or I -- I don't

4     know if you'd want just to narrate the report?

5          THE COURT: I'll leave that up to him.

6          First of all, I'm going to have you state your full

7     name for the record, sir.

8          THE WITNESS:  George David Lapsley.

9          THE COURT:  And you are the Court's appointed expert

10    in this matter?

11         THE WITNESS:  Correct.

12         THE COURT:  Would you feel more comfortable if the

13    Assistant United States Attorney led you or are you prepared to

14    give your report?

15         THE WITNESS:  Ah, I'd rather Mr. Sullivan.

16         THE COURT:  Very well.  Counsel, you may proceed.

17                        DIRECT EXAMINATION

18    BY MR. SULLIVAN:

19    Q.   And Mr. Lapsley, Mr. Lafuente, of course, will have a

20    chance to ask you questions as well and the Judge may ask you

21    questions, but -- when I'm done, if you'd want to -- I'll give

22    you a chance to add anything that I don't cover.

23    A.   Very good.

24    Q.   Am I right that you've been submitting reports to the

25    Judge?

1  A.   Each visit, yes, sir.

2  Q.   And for some of the questions, I am asking you, we haven't

3  had discussions before today, apart from the discussion about

4  your wish that we'd propose an order to the Judge about the

5  Marshals accompanying you --

6  A.   Correct.

7  Q.   -- earlier in March?

8        So, I am relying on what FSIS has told me, based on,

9  maybe, two discussions they have had with you for some of these

10  questions.

11        You testified at the telephonic hearing on March 9th of

12  this year, am I right, that on February 11th, 2022, you went to

13  Miller's Organic Farm?

14  A.   Correct.

15  Q.   And one of Mr. Miller's employees, Levi -- and the last

16  name, again, with an R -- said that you were not able to access

17  the farm without Mr. Miller's permission, is that right?

18  A.   Correct.

19  Q.   On that date, you saw two women at the farm packing frozen

20  meat and poultry products, is that right?

21  A.   Correct.

22  Q.   And was that the farm at six -- the main farm at 648 Mill

23  Creek School Road?

24  A.   Yes, sir.

25  Q.   And then, you testified on that date, that on February

1   19th, which was a Saturday, you went to the farm but no one was

2   working on that date and the doors were locked, is that right?

3   A.   No, the doors were open, sir.

4   Q.   Okay.

5        Did you go into the facility?

6   A.   Yes, yes, I did, I went in, there was no activity.

7   Q.   Anything that looked disturbed that's remarkable --

8   A.   No, sir.

9   Q.   -- on that date?

10       You also testified on March 9th, that on March 4th, a

11  couple of days before, when you went to the farm, Mr. Miller

12  said, that you had to contact his legal team at first, is that

13  right?

14  A.   Correct.

15  Q.   And then, you did have some sort of discussions with

16  somebody, right?

17  A.   Yes, sir.

18  Q.   And then, Mr. Miller stated that, they wanted to know if

19  there was a compelling public interests for your visit, is that

20  right?

21  A.   Yes, sir.

22       And Mr. Miller was speaking to somebody on the phone,

23  wrote down a -- a note from that person and the note said:

24       What are the compelling public interest for you to be

25  here, please respond by paper.

1    Q.   Were you able to conduct any sort of oversight on that

2    occasion?

3    A.   No, sir.

4         Mr. Miller would not permit me to go in.

5    Q.   And you've testified that on that date, March 4th, you again

6    saw women packing frozen meat and poultry products, is that

7    right?

8    A.   Correct.

9    Q.   Were you able to observe anything in particular about what

10   -- what sorts of meat and poultry products, I mean, they were

11   frozen, anything else, labels, anything like that?

12   A.   Ah, one was labeled, ground beef.

13   Q.   Okay.

14   A.   And I -- I asked the young lady, what it was and she showed

15   it to me.

16   Q.   Did you ask any questions of those employees about when

17   that had been slaughtered, anything like that?

18   A.   No, no.  They -- they were -- ah -- avoiding contact with

19   me, the young ladies.

20   Q.   You testified -- excuse me -- two days after you testified

21   on March 11th, you communicated to the Judge and to Mr. Lafuente

22   and myself by email, I believe, that you tried to access Mr.

23   Miller's farm but were denied.

24        And you wrote asking, that I'd submit a proposed order

25   that the Marshals assist you for a visit on March 17th, is that

1  right?

2  A.    Correct.

3        And -- and then, I want to make it very clear, I made

4  it very clear in the order -- well, in the request, rather --

5  there was no threats by Mr. Miller, by any of Mr. Miller's

6  personnel, I did not feel my safety threatened, I just was not

7  permitted access to the facility -- well, I was not permitted

8  access to speak with the personnel.

9  Q.    So, you showed up on March 11ᵗʰ and who said what to you, if

10 you remember?

11 A.    Ah, oh, I told -- I told Mr. -- Mr. Miller said, are we

12 gonna do the inventory today?  I said, not today, we're going to

13 take a tour and I am going to interview some people.  He said,

14 who are you gonna interview?  I said, I want to speak -- speak

15 -- start with the young ladies doing the packing.  And he said,

16 he had to have that cleared with his wife and he went to

17 wherever his wife was in the house.

18       And he came back and said, you can talk to the men,

19 but you can't speak to the ladies.  I asked, why?  He said,

20 because the girls are afraid of outsiders.  And I said, I'm

21 supposed to speak with everybody and he said, you -- you're not

22 speaking with the girls, in any way, shape or form.

23 Q.    This was on March 11ᵗʰ?

24 A.    Ah, yes.

25 Q.    Were you able to conduct any sort oversight on that

1  occasion?

2  A.   Ah, I took a tour of the facility and I asked to speak with

3  some people and he said, you can only speak to the men.  I said,

4  I wanted to talk to them up in the kitchen, there is a kitchen

5  area upstairs, I've been -- he said, no, they're -- they're

6  talking right down here.

7        I told Mr. Miller, I needed some kind of privacy as it

8  were and he said, no, I -- I have to protect my personnel.  I

9  said, what are you protecting them from, Mr. Miller?  He said,

10 from your intimidation and your threats.  I'd spoke quickly with

11 three people, I was getting nowhere and that was the end of it.

12 Q.   Is it your understanding that -- that court order

13 appointing you and/or the second contempt sanctions order that

14 the Court entered on February 7th, expressly states that you were

15 allowed to have those sorts of private-interview conversations

16 with Miller's employees and staff members?

17 A.   Yes, sir.

18        I highlighted that in the order I showed Mr. Miller

19 and he said, that's -- you're not gonna do that.

20 Q.   So, you reached out to the Court and to my office and

21 probably, Mr. Lafuente, asking for the Marshal's assistance, at

22 that point, why were you asking for the Marshall's assistance?

23 A.   So, I -- when I set up the inventory, I wanted to make

24 sure, I could get into the facility and perform the inventory.

25 Q.   So, the date you suggested you had suggested you would be

1  going back was March 17th, did you go back on March 17th?

2  A.   Correct.

3  Q.   And what happened then?

4  A.   Ah, Mr. Miller had two personnel in the back working with

5  me pulling product out of the freezer, we'd tag it, we'd count

6  it and these gentlemen would put it back.

7         I -- with the Mar -- because I had the Marshals there,

8  we went next door to the other property --

9  Q.   The other property being 672 Mill Creek School Road?

10  A.   Correct.

11         There were two trailers there, we accessed the

12  trailers, one was completely empty and no refrigeration running.

13  The other trailer was set up for a processing-type -- ah --

14  facility.  There was no activity going there, there was no

15  indication of any activity.

16         We -- we checked the out buildings and there was no

17  storage or activity going on at that time.

18  Q.   Did you observe at the 672 Mill Creek School Road property

19  in either of the trailers, any product -- poultry products --

20  with red stickers, U.S. -- USDA -- their stickers on them?

21  A.   No, sir.

22         The -- the one was complete -- the one trailer was

23  completely empty and the other trailer just had tables in the

24  processing area, no product, no -- with stickers or without

25  stickers.

1   Q.   We'll come back to that.

2        Anything else that is noteworthy that happened on

3   March 17th?

4   A.   Ah, no -- ah, not at all.

5   Q.   Did you then return without the Marshals to Miller's

6   Organic Farm on March the 23rd?

7   A.   Hmm, let me --

8   Q.   Or I'll just ask you, what was the next occasion that you

9   returned?

10  A.   The 19th, then.

11  Q.   Okay.  What happened then?

12  A.   Ah, we had an announced visit and we finished the -- I'm

13  sorry, that wasn't the 19th, excuse me for one second, that's

14  when we had the Marshals with us.

15  Q.   And I'm relying on second-hand information, I --

16  information from FS -- FSIS that you returned on March 23rd, but

17  that may be incorrect?

18  A.   Yes, it -- March 23rd, I did -- yes, sir, I did return.

19  Q.   Okay, all right.

20  A.   And --

21  Q.   And that occasion, was -- by the end of that day, had you

22  finished half of the inventory?

23  A.   Yeah, we finished -- finished most of the inventory.

24       And then, I observed some packing going on and at that

25  time, I observed, ah, four instances where meat and poultry were

1   being shipped, two -- ah -- personnel, I have their names.

2          Mr. Miller requested that their names not be made

3   public and I assured Mr. Miller that they would not be made

4   public by me, I just turn over everything to the Court.

5          Also at that time, Mr. Miller's personnel -- ah --

6   circled me as it were, again, not in a threatening manner but in

7   a manner, that let me know they were there and a number of them

8   expressed concerns, if I was there to put them out of business.

9   My reports would put them out of business.

10          And again, I'd just assured them that I was only there

11   taking an inventory and writing down information.

12          I went and looked in another building with Mr. Miller

13   and two of his personnel, I said, let's see what's over there, a

14   large garage-like building and Mr. Miller says, we have weddings

15   here and we store stuff upstairs.  We looked upstairs and it was

16   mostly packaging material that Mr. Miller's personnel prepared.

17          And he said, do you want to know why these two -- two

18   men are here?  I said, sure.  Then, he said, well, they're here

19   to make sure, you don't put me out of business today, because

20   they're very concerned, you would put me out of business and he

21   -- I said, Mr. Miller, again, I'm just here to write down

22   numbers and look around.

23   Q.   These two individuals, did they give their name?

24   A.   Ah, one was Samuel and one was John, they were working with

25   me in the free --

1   Q.   Were they -- understanding of whether they are Miller's

2   employees or staff members or members --

3   A.   They -- they are -- well, I assume they're Miller's

4   employees, because they were helping me with the inventory.

5   Q.   And when you had referred to the individuals that had been

6   circling you before, are those two individuals, two of those

7   people that were doing that?

8   A.   They were there -- they were present also, yes, sir.

9   Q.   And everyone who was present, was an employee to your

10  knowledge or a staff member?

11  A.   Everybody was working in that facility at one time or

12  another, yes, sir.

13  Q.   Without giving the names of the individuals to whom those

14  products were being sent or entities, can you give us a general

15  description of -- do you know -- could you tell whether these

16  were Miller's Organic Farm customers, whether they were food

17  club, whether they were entities, transportation entities?

18  A.   No, they just were being shipped to -- ah -- individual

19  addresses, they weren't being shipped to a club, *per se.*  I

20  don't know if they claimed a membership, ah, but one was sent to

21  a house in Plano, Texas, one in Hot Springs, Arkansas, ah,

22  Othallo, Missouri and Scottsdale, Arizona.

23  Q.   And were these boxes or were they --

24  A.   They were -- they were packages in larger boxes and they

25  had other materials in there, like, a butter or a cheese or some

1   other things that Mr. Miller sells, I did not record those,

2   like, we're not interested in those, I understand.

3   Q.   Did each package have, at least, some meat or poultry?

4   A.   Ah, these four packages did, yes, sir.

5   Q.   Any other observations from March 23rd or any other concerns

6   you had, based on that visit?

7   A.   Ah, no, sir.

8   Q.   Did you review any invoice-type records, sales records on

9   that occasion?

10  A.   Well, yeah, they -- those -- that's where I got these --

11  these names from, I -- I initially asked Mr. Miller for shipping

12  records and Mr. Miller gave me his UPS book.  And I said, I

13  would like something more specific.  He went into a house or an

14  office and got some more records and that's where these names

15  came from.  And again, he expressed his concern that the -- the

16  purchasers' names aren't made public.

17  Q.   Did you determine by that point, anything about the

18  location of the approximately, 15,340 pounds of frozen product,

19  poultry, that are a product that FSIS detained on September 8th,

20  2021?

21  A.   Ah, I -- I don't know the weights, but there was product

22  detained by the USDA/FSIS in the back freezer, there was cases

23  of it, as soon as you walked in on the right and the tags were

24  still present and there were barrels in the aisles, that still

25  had tags on it.

1  Q.   That was -- that was all at 648 Mill Creek School Road?

2  A.   Yes, sir.

3  Q.   Did you next return to Miller's Organic Farm on April 4th?

4  A.   Yes, sir.

5  Q.   And on that date, did you continue conducting the

6  inventory?

7  A.   Yes, sir.

8        And -- and prior to the inventory starting, I just

9  took a quick tour and I saw that they were -- that, ah, chicken

10 backs and necks were being processed.

11       And a -- a gentleman named Henry told me that was

12 going for broth, which then, I don't know if it was brought to

13 -- depending on the content, however, I do know that it would

14 probably invalidate the inventory, if I had already counted

15 those necks and backs or if I hadn't counted them, it was

16 invalidated in the -- (indiscernible).

17 Q.   And I -- I've distinguish between Miller's employees and

18 staff, because my understanding is, that Miller's makes that

19 distinction as well, is it your understanding that Henry was a

20 Miller's employee or a staff member?

21 A.   Yes, he was.

22 Q.   And did anybody tell you anything more about why they were

23 making broth at that -- on that occasion?

24 A.   No, they just said, it's -- they make a lot of broth and

25 it's good for you and they do process quite a bit of it.

1    Q.   And are you aware of the part of the second contempt

2    sanctions order, that talks about findings about broth being

3    made at Miller's Organic Farm?

4    A.   Ah, I -- yes, sir.

5    Q.   Any -- from your visit to Miller's Organic Farm on that

6    occasion that was noteworthy?

7    A.   Not at all.

8    Q.   Okay.

9         Did you then return to Miller's Organic Farm

10   yesterday --

11   A.   Yes.

12   Q.   -- April -- April 11th?

13   A.   Yes, we -- yes, I did.

14   Q.   And before we talk about yesterday, any other visits that

15   we haven't covered?

16   A.   No, sir.

17   Q.   Okay.

18        What happened yesterday?

19   A.   Yesterday, I went to finish the inventory at the farm, Mr.

20   Miller was not present.  Mr. Miller told me, he would not be

21   present, last week when we spoke.  He said, I'll make somebody

22   available and he did.  We finished the inventory with a Samuel,

23   who I worked with before and who had always been very

24   cooperative.  The inventory took, maybe, an hour to complete.  I

25   took a tour around the building, quickly and the -- the grounds.

1  Nothing noteworthy as far as this Court is concerned.

2  Q.   Did you say, you finished the inventory, is the inventory

3  done?

4  A.   The inventory is done, it would be -- ah -- consolidated by

5  the end of this week.

6  Q.   And does that include observations to your knowledge of all

7  Miller's facilities where product is located?

8  A.   Ah, if -- if everything that I saw was presented to me, I

9  saw nothing at 72 and we looked around a little bit at 48 and

10  that's everything I saw.

11  Q.   Now, that second contempt sanctions order at Paragraph 122,

12  127 and 128 states that, Mr. Miller was to provide you

13  cooperation with marking, separating and segregating inventory,

14  otherwise -- in other areas of the order, he's required to

15  identify products for you at locations, to your knowledge, has

16  he done all of that?

17  A.   Yeah -- yes, sir.

18  Q.   You're not aware of product at other locations, then?

19  A.   No, sir.

20       And Mr. Miller did make it a point -- ah -- after we

21  had seen the trailer, he said, we still have the -- the freezer

22  towards the front of the building, make sure you get that.

23  Q.   Have you observed any FSIS/USDA red container tags that

24  look like what I'm holding up right now (indicating) in any

25  freezer at Miller's Organic Farm?

1  A.  No, sir.

2      I saw -- I saw the Miller ones, I -- and I'm not

3  saying, they weren't there, 'cause some of them the -- the tape

4  holding them had fallen down, they might have been there and

5  fallen off, but I -- I did not notice them.

6  Q.  At any time, have you noticed anything about how shipping

7  boxes at Miller's Organic Farm are labeled or marked, apart --

8  A.  Just --

9  Q.  -- apart from what you've already told us?

10  A.  No, just with the -- the address of the person or the

11  traditional shipping label printed out.

12  Q.  Have you seen any labeling, any invoicing to food clubs?

13  A.  Yes.

14      And I -- I can't remember the name, ah, or there was

15  some food clubs and Mr. Miller pointed out their names to me,

16  which I forget at the moment here.

17  Q.  Have you heard any reference or seen anything in writing at

18  Miller's Organic Farm, referring to a farm or an entity known as

19  Sunrise View Farm?

20  A.  No, sir.

21  Q.  Have you made any obser -- other observations about how Mr.

22  Miller is selling or distributing meat or poultry products since

23  February 7th?

24  A.  Ah, on his website on the Miller's -- and again, the

25  Miller's Organic website, I saw, in March, they had a big

1    blowout sale as it were and meat and poultry were listed on

2    there while supplies last and I -- provided a copy of that to

3    the Court.

4    Q.   I'll ask you about that in a second.

5         As you've been assessing the inventory, have you

6    noticed whether the inventory is going down in volume?

7    A.   No, sir, I have not.

8    Q.   Do you have a belief as to whether Mr. Miller, Miller's

9    Organic Farm are currently selling and distributing meat and

10   poultry products?

11   A.   I've seen them do it, yes, sir.

12   Q.   Have you observed whether the retail store at the 648 Mill

13   Creek School Road property is opened or closed on days when

14   you're there?

15   A.   It's open.

16   Q.   Have you seen customers coming in?

17   A.   Yes, sir.

18   Q.   Have you seen any customer at that site at the retail store

19   purchasing meat or poultry?

20   A.   No, sir.

21        I've -- an observation I've made is there -- on the

22   front door of the -- Mr. Miller's operation, there is supposed

23   to be an FSIS-approved statement saying that they're not

24   permitted to sell meat and poultry and that has never been

25   there.

1   Q.   It's never been posted?

2   A.   No, sir.

3   Q.   And you are referring to Paragraph 120 of the second

4   contempt sanctions order, February 7th, which enjoins Mr. Miller

5   by February 17th to have placed an FSIS-approved agent on the

6   front of all retail store doors, right?

7   A.   Correct, that's never been there.

8   Q.   And when you referred to the website -- ah, Paragraph 119

9   of the second contempt sanctions order enjoining the defendants

10  here by February 17th to have posted on their website, the social

11  media pages, an FSIS-approved statement, regarding the cessation

12  of the poultry sales and also that, some of those sites would be

13  removed by that date, February 17th, any refer -- references to

14  meats and poultry, correct?

15  A.   Correct.

16  Q.   And you've gone on the website for Mr. Miller's farm, is

17  that right?

18  A.   Yes -- yes, sir.

19  Q.   And you have made an observation about whether he's still

20  offering meat and poultry on the website, is that right?

21  A.   Ah, in -- in March, he was, two days after the last

22  hearing, he -- he was.

23       In, ah, April, he posted something -- not FSIS

24  approved that he is asked to stop selling meat and poultry, but

25  he's also still advertising it.

1   Q.   And when was the last time, you looked at the website?

2   A.   Yesterday.

3   Q.   And he's still advertising meat and poultry products?

4   A.   Yes, sir.

5   Q.   And those are amenable -- meat and poultry products?

6   A.   Yes, sir.

7   Q.   And to your knowledge, the statement that he posted, it was

8   not FSIS approved?

9   A.   Correct.

10  Q.   Have you -- and if you'd -- strike that.

11          THE COURT: One -- one second -- consulting.

12          (Discussion held off the record at 1:58 p.m.)

13          THE COURT: Okay.  We -- we think, we just lost Mr.

14  Lafuente, so we're going to try to get him back on the line.

15          (Pause at 1:59 p.m. while reconnecting via telephone.)

16          THE COURT:  Mr. Lafuente, are you on the line, sir?

17          MR. LAFUENTE:  I am here now, your Honor --

18          THE COURT:  Okay.

19          MR. LAFUENTE:  -- I think, I got cut off.

20          THE COURT:  No problem, sorry about that.

21          Assistant United States Attorney Sullivan, you may

22  continue with your question.

23          MR. SULLIVAN:    Yes.

24  BY MR. SULLIVAN:

25  Q.   I'm almost done, Mr. La -- Mr. Lapsley.

1          Mr. Lapsley, when you were conducting your visits at

2   648 Mill Creek School Road, the main farm, did you enter,

3   observe the contents of a refrigerated trailer next to the main

4   building there?

5   A.   Yes, sir.

6   Q.   Did you observe any products there with these sorts of red

7   container tags that I'm holding up, (indicating)?

8   A.   None at all, sir.

9   Q.   Did you observe any product in milk crates in the trailer?

10  A.   Yes, sir, quite a few.

11  Q.   Half full, a quarter full, do you recall?

12  A.   Ah, that -- and we inventoried all of that, but it was in

13  milk crates, yes, sir.

14  Q.   Do you recall if those were poultry products, new products,

15  mixed?

16  A.   Yes, sir.  And --

17  Q.   Which one?

18  A.   I'm -- I'm sorry?

19  Q.   Mixed?

20  A.   It -- it was mostly poultry products, almost -- I would

21  say, almost exclusively poultry products, there might have been

22  one or two red meat, but it was almost exclusively poultry --

23  Q.   Did Mr. --

24  A.   -- and -- and potato chips.

25  Q.   -- did Mr. Miller or any of his employees tell you anything

1   about the contents of that trailer?

2   A.   No, sir.

3   Q.   Can -- can you approximate poundage of the products you saw

4   in there?

5   A.   Oh, no.

6   Q.   Okay.

7        And at 648 Mill Creek School Road, where was the

8   detained product -- we've talked about 672 Mill Creek School

9   Road a second ago, but did you observe products in a particular

10  area or areas at the 648 property with these red tags?

11  A.   Ah, I noticed that -- there was detained product in the

12  freezer in the back past the kill floor, ah, again, on the right

13  as soon as you walked in and in the -- in a little hallway in

14  the freezer in bags.

15  Q.   And your inventory will state where the location of all of

16  that is?

17  A.   I did not inventory that --

18  Q.   Okay.

19  A.   -- 'cause it was already -- it was already accounted for, I

20  did not detain -- ah, I did not inventory that.

21  Q.   Did you observe at either property, any postings from the

22  U.S. Marshal Services regarding products being arrested or

23  anything else?

24  A.   No, sir.

25  Q.   Have you had any interactions with anyone identifying

1  himself or herself as a Miller's Organic Farm board member?

2  A.   No, sir.

3  Q.   Am I right, that you have not been permitted by Mr. Miller

4  to interview any of his employees or staff outside of his

5  presence?

6  A.   Correct.

7  Q.   Have you been allowed to interview any female employees or

8  staff members, even in his presence?

9  A.   I was specifically instructed, I would not be allowed to

10 speak with any females.

11 Q.   And it's your understanding, though, that that direction

12 came from Mr. Miller's wife, Becky?

13 A.   Mr. Miller told me, it came from his wife, yes, those

14 instructions.

15 Q.   So, Mr. Lapsley, at this point, have you recently had any

16 issues with access to the farm?

17 A.   No, sir.

18 Q.   But you have had issues with access to employees and staff

19 members to conduct interviews, is that right?

20 A.   Correct.

21 Q.   At this point, what is your opinion as to whether Mr.

22 Miller has been complying with Paragraph 118 of the second

23 contempt sanctions order, which enjoined his meat and poultry

24 operations and activities to cease?

25 A.   Mr. Miller is not complying.

1   Q.   And that -- and when you say, he's not complying, he's not

2   complying as to amenable meat and poultry products?

3   A.   Correct.

4   Q.   What is your opinion at this point as to compliance with

5   Paragraph 119 of the second contempt sanctions order, enjoining

6   the FSIS-approved statement on websites and social media pages

7   on the removal of references to meat and poultry products?

8   A.   That is not present.

9   Q.   And your view is that, he has not complied with Paragraph

10  120 of the order, which required the FSIS-approved statement on

11  retail-store doors, right?

12  A.   Correct.

13  Q.   What is your opinion on Paragraph 121 of the second

14  contempt sanctions order, which enjoins the defendant from

15  moving any inventory without notice to you and FSIS and FSIS's

16  approval?

17  A.   He is not compliant.

18  Q.   In what way is he not complying, he's removed it?

19  A.   He's -- he used it, he used it and he shipped it.

20          (Pause at 2:04 p.m.)

21  BY MR. SULLIVAN:

22  Q.   And did Mr. Miller sufficiently segregate product, so that

23  you could conduct an appropriate inventory, do you believe?

24  A.   Yeah -- yes, Mr. Miller's personnel were quite -- ah --

25  quite helpful and cooperative in that process.

1   Q.   And I could save this question for the Judge, if he wants

2   to ask it today or at another point, but my question to you at

3   this point would be, what do you foresee your role being at --

4   at this stage going forward, do you feel that you are still

5   serving a meaningful purpose or not, what would you propose if

6   the Court were to allow me to ask that?

7   A.   It -- it depends on what is determined today.  I can

8   continue to go back and observe or if the Court and Mr. Lafuente

9   or yourself, feel you have enough information, I can step aside.

10  Q.   Do you have anything specifically in mind, that you feel

11  that you can accomplish over the next month, for example, where

12  you feel like you're meaningfully engaging with Mr. Miller or

13  providing meaningful oversight and you can play a constructive

14  role over the next several weeks or do you -- on the contrary,

15  feel frustrated in your efforts to comply -- I mean, to

16  meaningfully over -- overview this whole situation?

17  A.   If -- if the -- the previous behaviors as it were,

18  continue, it would be a waste of -- ah -- my time and the

19  Court's time to -- to go out, unless Mr. Miller will comply with

20  the Court orders, which he has not complied fully with.

21          MR. SULLIVAN:  No further questions at this time, your

22  Honor.

23          THE COURT:  Thank you, Assistant United States

24  Attorney Sullivan.

25          Mr. Lafuente, do you have any questions for Mr.

1    Lapsley?

2            MR. LAFUENTE: Just a couple.

3                        CROSS-EXAMINATION

4    BY MR. LAFUENTE:

5    Q.   Mr. Lapsley, so if I understand your testimony correctly,

6    you're not testifying that Mr. Miller is just being flagrantly

7    defiant, I mean, he is complying to some extent, right?

8    A.   I didn't hear the last part, sir.

9    Q.   Mr. -- Mr. Miller had been complying to -- to some extent,

10   right?

11   A.   I didn't understand it.

12           THE COURT:  Is Mr. Miller being compliant to some

13   extent?

14           THE WITNESS:  Yes.

15           He -- he permitted me to do the inventory, yes.

16   Q.   Okay.

17           And the inventory is done, correct?

18   A.   Correct.

19   Q.   All the arrested product has been accounted for, correct?

20   A.   I don't know that, sir, what was put in front of me was

21   counted, but I did see some product being shipped and I saw some

22   product being processed, I don't know where that shows up in the

23   inventory.

24   Q.   Okay.  That's fair enough.

25           Now, was -- your communications with Mr. Miller, when

1  you noticed that the places -- the times that he was not being

2  compliant, did you confront him with that, did you tell him,

3  that he wasn't compliant?

4  A.   Yes, sir.

5  Q.   And -- and was he willing to -- to listen to you on how to

6  come about getting into compliance?

7  A.   No, sir.

8  Q.   Okay.

9       He just told you, he's not gonna do that?

10  A.   Ah, Mr. Miller would say, ah, he didn't believe that or he

11  would just walk away and refuse to answer my questions.

12  Q.   Okay.

13       But are -- are you willing to help him -- bring him

14  into compliance?

15  A.   If directed, yes, sir.

16  Q.   Okay.

17       I have no further questions, Judge.

18       THE COURT:  Okay.

19       Assistant United States Attorney Sullivan, do you have

20  any redirect?

21       MR. SULLIVAN:  Nothing further at this time, other

22  than just to ask Mr. Lapsley, if there is anything, we didn't

23  cover that he wants to state?

24       THE WITNESS:  No, sir.

25       THE COURT:  And Mr. Lapsley, when you say that you

1   would be willing to assist Mr. Miller in becoming compliant, do

2   you see that as feasible?

3          THE WITNESS:  I don't know.

4          THE COURT:  And when you say, you don't know, is that

5   because right now, we are anticipating that, at least, until it

6   can be done in accordance with the appropriate regulations and

7   the law, he would have to shut down the sale of meat and

8   poultry?

9          THE WITNESS:  Correct.

10         THE COURT:  And he cannot do that or will --

11  apparently, will not do that --

12         THE WITNESS:  Well, he has not shown, he will do that.

13         THE COURT:  Okay.

14         Anything else, that he will not do in your opinion?

15         THE WITNESS: Yes.

16         I cannot speak with his employees, ah, there is --

17  nothing is forthcoming and even with very short answers and --

18  and no answers.

19         THE COURT:  Did you notice any change from the

20  beginning of March to the beginning of April?

21         THE WITNESS:  Ah, Mr. -- yes.

22         Mr. Miller's attitude did change with the inventory

23  and there were certain things, that Mr. Miller is not going to

24  permit me to do, such as, speak to his personnel or speak with

25  his personnel alone.

1          THE COURT:  Okay.

2          Now, can you accomplish your purpose without talking

3    to the women?

4          THE WITNESS:  No.

5          THE COURT:  Okay.

6          So, you believe in order to fulfil your role, you

7    would need to be able to talk with all of the employees?

8          THE WITNESS:  Yes, sir.

9          And these were women and the women do all the packing,

10   they do the majority of the packing.  There's gentlemen at the

11   mill, but there are between four and six women doing the packing

12   and the orders and I am not permitted to speak with them.

13         THE COURT:  And based on what you saw, can you

14   quantify the operation, how large is this operation?

15         THE WITNESS:  In what -- what sense, sir?

16         THE COURT:  Amounts being sold, amounts being --

17         THE WITNESS:  No, I -- I can't, there's -- there's

18   constant flow through there.

19         THE COURT:  Constant flow?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  How about slaughtering?

22         THE WITNESS:  There's none -- I did not witness any.

23         THE COURT:  Of anything, not even birds, chickens,

24   anything?

25         THE WITNESS:  Ah, water buffalo only --

1              THE COURT:  Okay.

2              THE COURT:  -- which is non-amenable.

3              THE COURT:  Okay.

4        And do you -- other than the -- other than shutting

5    down the meat and poultry, if -- if that were to shut down, what

6    impact would that have on his overall operation?

7              THE WITNESS:  I -- I don't know how much he does of

8    other products, so I can't guess.

9              THE COURT:  Okay.  All right.

10        Assistant United States Attorney Sullivan, do you have

11   any questions in light of the Court's questions?

12             MR. SULLIVAN:  I -- I have one.

13                      REDIRECT EXAMINATION

14   BY MR. SULLIVAN:

15   Q.   And that is what -- if you could ballpark your expenses and

16   your fees and the costs to date?

17   A.   Ah, ten -- ten thousand plus or minus.

18   Q.   Okay.

19             THE COURT:  And Mr. Lafuente, do you have any further

20   questions of Mr. Lapsley?

21             MR. LAFUENTE:  Nothing for me, your Honor.

22             THE COURT:  And Mr. Lapsley, I appreciate your

23   continued service to the Court in this matter.  You may step

24   down and rejoin counsel at counsel table.

25             THE WITNESS: Thank you.

1    (Witness excused at 2:11 p.m.)

2    THE COURT:  And Assistant United States Attorney

3 Sullivan, I understand you wanted to call Mr. Flanagan to make a

4 record with respect to him?

5    MR. SULLIVAN:   Yes, with the Court's --

6    THE COURT:  Very well.

7    MR. SULLIVAN:   -- the Court's permission.

8    THE COURT:  Mr. Flanagan, if you would please

9 approach.  Good afternoon, sir.

10    MR. FLANAGAN: Thank you.

11    THE COURT:  And sir, if you would please raise your

12 right hand to be sworn.

13    PAUL FLANAGAN, GOVERNMENT WITNESS, SWORN.

14    THE WITNESS:  Yes.

15    THE COURT:  Thank you very much, sir, and sir, please

16 be seated.

17    And would you please state your full name, spelling

18 your last name for the record?

19    THE WITNESS:  My name is Paul Joseph Flanagan, F-l-a-

20 n-a-g-a-n.

21    THE COURT:  Thank you very much, sir.

22    Assistant United States Attorney Sullivan, you may

23 proceed, sir.

24    MR. SULLIVAN:  Your Honor, if I could have permission

25 to lead the witness?

1           THE COURT:  Certainly.

2           Mr. Lafuente, do you have any objection?

3           MR. LAFUENTE:  None, your Honor.

4           THE COURT:  All right.

5                       DIRECT EXAMINATION

6  BY MR. SULLIVAN:

7  Q.   Mr. Flanagan, you've testified previously, I believe, that

8  you're a compliance investigator with the Compliance and

9  Investigation Division at FSIS, is that right?

10 A.   Yes.

11 Q.   And you're in the Philadelphia Compliance sub-office for

12 the Northeast Region, is that right?

13 A.   Yes.

14 Q.   Did you have occasion to look at the Go-Fund-Me site

15 raising money for the defendant yesterday?

16 A.   Yes, sir.

17 Q.   And what were the balances at that time?

18 A.   Three -- there's three Go-Fund-Me sites that I'm aware of,

19 one has $6,410.00 in it, one has $65,286.00 in it and a third

20 account has $88,609.00 in it, all three total $160,305.00 and

21 that was as of yesterday evening.

22 Q.   Do you have any sense for whether Mr. Miller can directly

23 access any of that money?

24 A.   I -- I don't, there is one account that's listed -- ah --

25 as Amos Miller on behalf of Amos Miller, but previous testimony

1   and being at Miller's, he does not have a computer, so I don't

2   believe, he could set them up himself.

3   Q.   Did you visit Miller's Organic Farm on February 8th, 2022?

4   A.   I did.

5   Q.   What was the purpose of your visit?

6   A.   Ah, to verify the status of the detained and arrested meat

7   and poultry products.

8           And we also used the opportunity to provide Mr. Miller

9   with a copy of the February 7th, 2022 sanction order.

10  Q.   Under the Court's orders in this case and the law, the

11  Federal Meat Inspection Act and the Poultry Products Inspection

12  Act, was Mr. Miller or Miller's Organic Farm permitted to move

13  detained or arrested products at the farm?

14  A.   No, sir.

15  Q.   In fact, is moving the detained or arrested products, a

16  violation of both -- both Acts?

17  A.   Yes, it is.

18  Q.   It's a prohibited act?

19  A.   It is.

20  Q.   And potentially, it could subject the individual moving

21  that sort of product to criminal liability, correct?

22  A.   That's correct.

23  Q.   Did all of the detained product at Miller's Organic Farm

24  have those -- I'll hold it up (indicating) -- one of these

25  bright red USDA detained tags on it?

1   A.   It did.

2   Q.   Did the product that the Marshal Service had arrested have

3   any sort of tag or other label?

4   A.   It did, it has the same, detained tag, because we had

5   detained the product prior to it being arrested.

6   Q.   And product had been detained and/or arrested on several

7   occasions at Miller's Organic Farm and to your knowledge at that

8   time, you were able to access the sites, that product was still

9   in these locations?

10  A.   The arrested product, the last time, I believe, I was in

11  there, it was with the Marshals for the arrest of the product.

12  Q.   Okay.

13       And the last time, you actually were able to go in and

14  observe that was when?

15  A.   Off the top of my head, I honestly couldn't tell you.

16  Q.   This year?

17  A.   Ah, no, I don't believe so.

18  Q.   Okay.

19       So, we'll just go through your visits this year.

20       So, we're on February 8th, were you denied access on

21  that occasion?

22  A.   I was.

23  Q.   And who denied access?

24  A.   Ah, Mr. Miller.

25  Q.   What did he say?

1   A.   He said, it was private property and handed me two dockets

2   or two documents on a Prairie Star National letterhead.

3   Q.   Did anything on that occasion, raise a concern for you,

4   that any of the detained or arrested product had been moved?

5   A.   Yes, the -- the six -- it's the 678 property, the adjacent

6   farm, there was a trailer that I personally had detained product

7   on -- a refrigerated trailer that was parked alongside Mill

8   Creek School Road, that trailer was no longer there.

9   Q.   And detained product had been in that trailer?

10  A.   Correct.

11  Q.   Did you go to Miller's Organic Farm on February 17th of this

12  year with a Notice of Warning?

13  A.   I did.

14  Q.   And was the Notice of Warning regarding the denial of

15  access on February 8th?

16  A.   It was.

17  Q.   Was the business open on that occasion?

18  A.   It was.

19  Q.   Did you observe any customers in the retail store?

20  A.   Yes.

21  Q.   With the denial of access, were you able to observe

22  anything else?

23  A.   No.

24  Q.   Have you been reviewing Mr. Miller's websites?

25  A.   I have.

1  Q.  And what have you observed?

2  A.  Ah, I observed two mail websites from food clubs, Moo to

3  You and FarmMatch and Miller's continues to offer meat and

4  poultry products for purchase on all but the FarmMatch site.

5  Q.  And the last time you looked at those, was when?

6  A.  Last night.

7  Q.  Has FSIS approved the sort of statement that their second

8  contempt sanctions order contemplated regarding the cessation of

9  meat and poultry sales --

10  A.  Ah --

11  Q.  -- for the -- for the websites and social media sites?

12  A.  -- no.

13  Q.  No such statement has been presented to FSIS?

14  A.  Not that I'm aware of.

15  Q.  Did FSIS issue a second Notice of Warning on March 1st, 2022

16  to Mr. Miller?

17  A.  Yes.

18  Q.  And was that regarding non-compliance on the website?

19  A.  Ah, yes.

20  Q.  And the failure to post the required statement on the

21  retail store front doors?

22  A.  Correct.

23  Q.  And a failure to disclose product locations?

24  A.  Yes.

25  Q.  And did you attempt to serve Mr. Miller with that Notice of

1  Warning on March 2nd of this year?

2  A.   I did.

3  Q.   Were you able to do so and were you able to gain any access

4  to the farm on that date?

5  A.   On March 1st, no, I --

6  Q.   March 2nd?

7  A.   -- or March 2nd, yes.  We -- I handed it to Mr. Miller.

8  Q.   Did you attempt to gain access to the farm on that date?

9  A.   Yes.

10  Q.   Were you allowed access?

11  A.   No.

12  Q.   And who denied you access?

13  A.   Mr. Miller.

14  Q.   Did he say, why?

15  A.   No.  I'm sorry, I'm looking.

16          (Pause at 2:18 p.m.)

17  Q.   And do you recall that Paragraph 117 of the second contempt

18  sanctions order that the Court issued on February 7th, enjoined

19  Mr. Miller to cooperate with FSIS and to -- to grant access?

20  A.   Yes.

21  Q.   Did you have occasion to review a post that was made on Mr.

22  Miller's Facebook page on March 22nd?

23  A.   Yes.

24  Q.   Does that post mention, a several week period of meat and

25  poultry sales being halted?

1   A.   It does.

2   Q.   And does it say, that there would be no orders for amenable

3   products made?

4   A.   Correct.  They wouldn't be accepted.

5   Q.   Did you then go to Dutchland, D-u-t-c-h-l-a-n-d,

6   Refrigerated Transportation on March 25th?

7   A.   I did.

8   Q.   Where is that located?

9   A.   Ah, oh, I can't -- I can't think of the name of the town.

10  Q.   In Pennsylvania?

11  A.   It is.  Newmanstown, Pennsylvania.

12  Q.   Is it near Lancaster?

13  A.   Ah, not far, probably, about forty minutes away.

14  Q.   Had the vice-president of that company told you anything

15  when you went?

16  A.   Ah, he told me that, Miller was still shipping products

17  through using his -- ah -- his facility, basically, as a cross

18  stocking, the product would be picked up at Miller's Organic

19  Farm, brought there and then, separated to go to different

20  shipment points.

21  Q.   Brought to Dutchland?

22  A.   Correct.

23  Q.   So, on March 25th, did you observe anything and if so, what?

24  A.   Ah, I did.

25       I observed three shrink-wrapped pallets, one destine

1  for Florida and two for Colorado, each pallet contained thirty

2  to forty individual boxes containing various Miller's product.

3        The Florida pallet had a piece of paper taped to it

4  addressed, ah, to the manager of the Moo to You Food Club and it

5  was addressed from Sunrise View Farm, P.O. Box 86, Bird-in-Hand,

6  Pennsylvania, 17505.

7        The pallets to be sent to Colorado, were addressed to

8  two individuals from Miller's Organic Farms.

9        Ah, I opened several of the boxes --

10  Q.   Addressed to --

11  A.   Oh, I'm sorry.

12  Q.   -- two individuals from Miller's Organic Farm, you mean,

13  two customers?

14  A.   Ah, they were addressed to -- yeah, two -- two people, two

15  customers from Miller's Organic Farm.

16  Q.   Did you observe fresh beef liver?

17  A.   I did.  I opened -- oh, sorry.

18  Q.   Go ahead.

19  A.   I opened several boxes from each pallet and saw fresh beef

20  liver with a -- a pack date of 2/7/22.

21        And some products were produced by Olde Tyme Meats and

22  products with no minimum labeling including broths, I saw meat

23  and poultry products both being shipped on that day.

24  Q.   And one of the pallets was from Sunrise View Farms,

25  correct?

1    A.    Correct.

2    Q.    Did you go to the Bird-in-Hand post office, the next day,

3    March 26th?

4    A.    I did.

5    Q.    And did you speak to an employee there, who told you that

6    the P.O. Box for Sunrise View Farms is associated with Amos

7    Miller?

8    A.    Correct.

9    Q.    And you're aware that the second contempt sanctions order

10   enjoined Mr. Miller from any further meat and poultry sales and

11   from moving product?

12   A.    I am.

13   Q.    So, in your view when -- after Mr. Miller posted that post,

14   I mentioned on Facebook on March 22nd, talking about halting meat

15   and poultry sales and no orders being made for amenable

16   products, do you have a view as to whether he has complied with

17   that since March 22nd?

18   A.    He has not.

19   Q.    Did you have occasion to review, a newsletter Mr. Miller

20   sent to his members in April stating, we have appointed a three-

21   man board to guide us in the right direction?

22   A.    I did.

23   Q.    Do you have any additional information about that three-

24   member board?

25   A.    No, sir.

1  Q.   Did FSIS prepare an April 6th Notice of Warning to Mr.

2  Miller?

3  A.   Yes.

4  Q.   And was that regarding Sales invoices from late March?

5  A.   It was.

6  Q.   What about those sales invoices, was that what you had

7  observed at Dutchland?

8  A.   Yes, sir.

9  Q.   Did you yesterday go to Miller's Organic Farm, April 11th to

10 deliver that Notice of Warning?

11 A.   I did.

12 Q.   Were you able to deliver it?

13 A.   Ah, Mr. Miller was not at the farm and I left it on a

14 custom -- desk labeled, customer service inside the -- the

15 retail area.

16 Q.   Did you try to get access to the farm yesterday, beyond

17 just serving that?

18 A.   I did.

19 Q.   Okay.

20 A.   Ah --

21 Q.   Were you denied?

22 A.   I was told, Mr. Miller wouldn't be back until Wednesday,

23 that he was out of town and he wouldn't be back, they said,

24 until Wednesday.

25         I asked the gentleman, who I believe was -- is Mr.

1   Miller's brother, if he would allow us to go in and look at the

2   product that we had detained and he said, no, we are not

3   allowed.

4   Q.   Have you asked Mr. Miller or has Mr. Miller produced to

5   you, any information about the locations of his meat and poultry

6   products at Miller's Organic Farm?

7   A.   Ah, at one point in -- I want to say, in March, he said it,

8   I think, it's still there, but I don't know.

9   Q.   But you have not been able to get access to determine that?

10  A.   No, we've been denied every time.

11  Q.   Have you had any relevant discussions with any local

12  community member about Miller's Organic Farm or Mr. Miller,

13  like, Olde Tyme Meats or Belmont Meats, facilities that at which

14  Mr. Miller for a time in 2021 or so, maybe, 2020, was bringing

15  products for a federally-inspected slaughter?

16  A.   I have.

17  Q.   Can you tell us about those?

18  A.   Belmont Meats hasn't slaughtered for Mr. Miller in, I

19  believe, over a year, if not longer.

20       And Olde Tyme Meats has not had any contact with Mr.

21  Miller since the fall of 2021.

22  Q.   And you are stating that based on discussions you've had

23  with knowledgeable individuals at those establishments?

24  A.   Yes, the managers of both facilities.

25  Q.   And how recent were those discussions?

1   A.   Within the last three weeks.

2   Q.   Can you draw any inference from those discussions -- any

3   reasonable inference -- about whether Mr. Miller has been

4   slaughtering products without -- amenable products -- without

5   federal inspection?

6   A.   I would --

7             MR. LAFUENTE:  Object, it calls for speculation.

8             THE COURT:  Excuse me, Mr. Lafuente?

9             MR. LAFUENTE: I'm gonna object, the -- the question

10  calls for speculation, your Honor.

11            THE COURT:  Assistant United States Attorney Sullivan?

12            MR. SULLIVAN:  Your Honor, I would say that Mr. -- and

13  Mr. Flanagan has sufficient experience, that he could express a

14  -- a view on whether that sort of slaughtering has occurred and

15  the basis for his view.

16            THE COURT:  Right.

17            I think, this goes more to the weight to the Court to

18  the opinion, I'm going to overrule the objection and allow you

19  to answer the question, sir.

20            THE WITNESS: I would think based on -- on what we had

21  observed before being slaughtered at the federal establishments,

22  if Mr. Miller had continued -- ah -- selling that product, he

23  would not have any of that product available or very little of

24  it available.

25  BY MR. SULLIVAN:

1    Q.    Mr. Miller had for a time, been operating at 672 Mill Creek

2    School Road using the name that the Court has so found, Bird-in-

3    Hand Meats or some equivalent of that name.  Have you seen any

4    product with that name on it in recent months?

5    A.    I did, I saw some of that product at -- at Dutchland, ah,

6    when I --

7    Q.    On March 25th?

8    A.    Yes.

9    Q.    Do you have any -- have you made any observations  -- do

10   you have any concerns based on the testimony today and/or your

11   observations -- about whether previously USDA detained or the

12   Marshal Service arrested product at Miller's that had been moved

13   in any way?

14   A.    Yes, because the one trailer at the adjacent farm is no

15   longer there and that -- the only product that was in there that

16   was detained.

17   Q.    To your knowledge, has FSIS ever encountered this situation

18   before, where detained and arrested product was moved without

19   permission?

20   A.    No, sir.

21   Q.    Does FSIS view any such moving of product as an end run

22   around its enforcement authority?

23   A.    It does.

24   Q.    Anything that I have asked you about, that you'd want to

25   add today?

1   A.   No, sir.

2              MR. SULLIVAN:  No further questions at this time.

3              THE COURT:  Mr. Lafuente, do you have any questions

4   for Mr. Flanagan?

5              MR. LAFUENTE:  Briefly, your Honor.

6                         CROSS-EXAMINATION

7   BY MR. LAFUENTE:

8   Q.   With regard to the arrested product, Mr. Flanagan, did you

9   -- did you confront Mr. Miller about that?

10  A.   I did ask him at one point, when we were there, that we

11  wanted to see the  -- not the arrested product, the detained

12  product.

13             And Mr. --

14  Q.   Okay.

15  A.   -- said, I think it's still there but I don't know.

16  Q.   But did you -- did you confront him about the trailer that

17  was missing, that had had the detained product in it?

18  A.   No.

19  Q.   Okay.

20             So, he -- he hasn't been given the -- to explain where

21  the trailer is or what's happened to it, right?

22  A.   One would assume that he moved the trailer, so, I don't see

23  any gain for me asking, he was told, that he could not move the

24  product and apparently, the product --

25  Q.   Yeah, but --

1    A.    -- was moved.

2    Q.    Okay.

3          But we don't know that he moved the product, right?

4    A.    I'm sorry?

5    Q.    We don't know that he, himself, moved it right, he never

6    admitted that he moved it, right?

7    A.    It was on his property, it was --

8    Q.    That's not my -- so --

9    A.    -- it was east of him, he was paying the fuel bill for the

10   trailer.

11   Q.    Okay, I understand that, but -- but you don't have -- I

12   guess, what I'm getting at is, my -- well, Mr. Miller, himself,

13   never said, yeah, I moved the product, right?

14   A.    Ah, Mr. Miller never allowed us access to verify if any of

15   the products were there.

16   Q.    Okay.

17          MR. LAFUENTE:  No further questions.

18          THE COURT:  Thank you, sir.

19          Assistant United States Attorney Sullivan, any

20   redirect?

21                    <u>REDIRECT EXAMINATION</u>

22   BY MR. SULLIVAN:

23   Q.    Mr. Flanagan, despite the Court's plain orders authorizing

24   FSIS to access the property, Mr. Miller has consistently denied

25   FSIS's access that would have allowed you to verify with eyes

1  on, you know, to see whether these very obvious plain red tags

2  were still on the products and the products were still in the

3  location, that it was not to be moved from, correct?

4  A.   Yes.

5           Mr. Miller doesn't even want us inside his retail area

6  when we'd come in, he -- he asks that we'd leave and stand in

7  the parking lot.  So, we could never ever observe if something

8  is being shipped.

9           MR. SULLIVAN:  No further questions, your Honor.

10           THE COURT:  Okay.

11           Mr. Lafuente, anything further of Mr. Flanagan?

12           MR. LAFUENTE:  Nothing further, your Honor.

13           THE COURT:  Okay.

14           Mr. Flanagan, you've been with case for years now.

15  And you had previously said, that never have you been as

16  deferential and allowed a farm to continue to operate and a

17  slaughter house to continue to operate, you've given Mr. Miller

18  every -- every opportunity and every chance to become compliant.

19

20           He is obviously running a very profitable farm and I

21  think, the primary profit comes from the meat and poultry, is

22  that correct?

23           THE WITNESS:  I would think, the other products that

24  he sells, actually, are more profitable.

25           THE COURT: They're -- is there any way, he becomes

1  compliant with respect to the slaughtering and the sale of meat

2  and poultry?

3          THE WITNESS:  No, I -- I don't think, Mr. Miller is

4  ever gonna change, it's his way and that's it.

5          THE COURT:  Okay.

6          But he could come -- become compliant, he just

7  doesn't --

8          THE WITNESS:  It would be very easy to become

9  compliant.

10          THE COURT:  And when you say, easy, we've been working

11  at this for a long time and it really would be -- be easy?

12          THE WITNESS:  It should be incredibly easy.

13          He was partially doing it --

14          THE COURT:  When he was taken the other --

15          THE WITNESS:  -- at one point, when he was taking it

16  to the federal establishment.

17          He spent more money -- I would guess -- with Mr.

18  Lafuente and fighting this, that he could have built his own

19  slaughter -- federal slaughterhouse.

20          THE COURT:  He could have built his own federal

21  slaughterhouse --

22          THE WITNESS:  Based on his estimates, yes --

23          THE COURT:  -- that --

24          THE WITNESS:  -- that he provided.

25          THE COURT:  -- that would have been in compliance with

1    all regulations?

2              THE WITNESS:  Absolutely.

3              And could have sold meat anywhere in the world.

4              THE COURT:  And poultry, meat, *et cetera*?

5              THE WITNESS:  Yes.

6              And at this point in time, it's actually -- even if

7    Mr. Miller was only slaughtering a few animals of his own, if he

8    brought animals in from other local producers, he would allow

9    them to have a market to sell federally-inspected product

10   anywhere they wanted to.

11             THE COURT:  Now, did we -- you're saying, if he sets

12   up his own slaughterhouse in compliance with the law, then, not

13   only could he sell his own products, he could sell other

14   people's product --

15             THE WITNESS:  He could bring in -- I could bring a

16   steer to him, he could slaughter it, process it under federal

17   inspection and then, I can sell it, because it's federally

18   inspected.

19             THE COURT:  And how much is the administrative cost to

20   him to run a proper facility?

21             THE WITNESS:  Administrative as far as the USDA, it's

22   free, we're free for eight hours day for slaughter and

23   processing inspection.

24             Ah, administrative as far as running the business, it

25   would all depend on how many head of cattle or hogs or chickens

1    that he wishes to slaughter and how big he wishes to be.

2         THE COURT:  And now, there's a -- a dual regulatory

3    scheme here, can you comment on the Pennsylvania Department of

4    Agriculture and its requirements?

5         THE WITNESS:  As far as, if Mr. Miller was

6    slaughtering and processing under federal inspection on his farm

7    or bringing in federally-inspected individual cuts of meats, ah,

8    the Pennsylvania Department of Agriculture would probably, want

9    to look at the retail end.

10        Ah, and that's, I think, more so, if he -- if he is

11   cutting meats, usually, at the federal establishment, you're

12   slaughtering and processing and selling for distribution or

13   selling to restaurants, the state doesn't get involved in that.

14        THE COURT:  So, he has been -- all this time, he could

15   have easily become compliant and has not?

16        THE WITNESS:  Absolutely.

17        THE COURT:  And do you believe that is because of a

18   special way, he wants to slaughter his meat and poultry?  Is

19   there anything -- anything about complying with the regulations

20   and still being allowed to make sure his product is unique, the

21   way he wants it to be?

22        THE WITNESS:  I, personally, believe, Mr. Miller's

23   motives are -- are money.

24        THE COURT:  But would it cost that much to do it

25   legally?

1          THE WITNESS:  No.

2          THE COURT:  Okay.

3          Assistant United States Attorney Sullivan, do you have

4     any questions to add to the Court's questions?

5     BY MR. SULLIVAN:

6     Q.    Just that -- the main thing that Mr. Miller raised over the

7     years, was the application of citric acid to his meat but I

8     think, we're established through your testimony over the years,

9     that that's a red herring, right, that that's not necessarily a

10    Government requirement, it's just a -- a requirement that there

11    would be something in place to make sure that there are no

12    pathogens?

13    A.    It -- it is, there are -- you have to -- ah -- an

14    intervention, but an intervention can be trimming, an

15    intervention can be steam.

16          Ah, Mr. Lapsley is probably well more versed at that

17    than I am, but citric acid is not a requirement.  And when Mr.

18    Miller was having his livestock slaughtered at Belmont Meats in

19    speaking with their management, they never used citric acid, but

20    Mr. Miller continues to tell his customers, we can't have citric

21    acid on our food, but it was never used.

22    Q.    Is it the case, that Mr. Miller over the years has sent

23    newsletters to his members, that includes polls of his members'

24    views, but that those polls, for example, include leading

25    questions, he's sort of suggesting the response that he wants to

1  get and is telling them, his views through his question?

2  A.   Yes, absolutely, they're leading questions.

3  Q.   Okay.

4       THE COURT:  Mr. Lafuente, do you have any questions in

5  light of the Court's questions?

6                      RECROSS-EXAMINATION

7  BY MR. LAFUENTE:

8  Q.   I -- I want to get to the catch phrase, again, the term,

9  nutrient-dense food.

10 A.   Explain nutrient-dense food?

11 Q.   Well, are you familiar with that term?

12 A.   I am.

13 Q.   And -- and isn't it true, that Mr. Miller's big -- you

14 know, the biggest thing about his product is that, his customers

15 want nutrient-dense foods, right?

16 A.   And I'm not being smart when I say that, but we all eat

17 nutrient-dense food.  I have not --

18 Q.   The -- the --

19 A.   -- I've not been able to get a definition of nutrient-dense

20 foods from anyone.

21 Q.   Right.

22       In other words, I guess, what I'm -- what I'm getting

23 at is -- is there anything about the federal regulations, if

24 Mr. Miller were to become a federally-inspected -- ah --

25 slaughterhouse, is there anything about the regulations that

1   prohibit him from, say, presenting the products the way he wants

2   it as nutrient-dense, the way he defines it?

3   A.   I'm not sure if Ag. Marketing Services has a -- a

4   regulation on using the term, nutrient-dense as they do with

5   organic or grass-fed.

6   Q.   Okay.

7        And have you had discussions with Mr. Miller about --

8   about all of this stuff, about -- about -- about, you know,

9   coming into -- about getting a license?

10  A.   With Mr. Miller, oh, multiple times.

11  Q.   Yeah.

12  A.   I've supplied him with every possible bit of information, I

13  can, this has been going on now, we're starting in our seventh

14  year.

15  Q.   Right.

16       MR. LAFUENTE:  I have no further questions.

17       THE COURT:  Thank you.

18       And one of the line of questioning was on the arrest

19  and the detained meat, was that all meat that was arrested and

20  detained?

21       THE WITNESS:  It was -- without having it in front of

22  me, I know it was pork -- pork carcass and I believe, there was

23  some beef involved.

24       THE COURT:  And is it your belief that that's gone?

25       THE WITNESS:  No.

1        The arrested product from the U.S. Marshals, I believe

2   it is still there.  When Mr. Lapsley explained that he saw a few

3   barrels in the freezer, carcasses were put in -- cut up and put

4   in those barrels.

5        And then, there were boxes of products stored under,

6   basically, we could consider it, like, a pallet rack on the

7   first level, that product was there.  And Mr. Lapsley said, he

8   observed that.

9        The detained products that we're not able to see is --

10  one is at the trailer at the -- the adjacent address, that's no

11  longer there, that was product, I personally, detained.

12       And then, product in the -- in the freezer trailer

13  alongside the barn, where Mr. Lapsley did his inventory, and

14  observed the poultry products in the milk crates and there were

15  no detained tags observed on there.  And when you walked in, you

16  would absolutely know, there's product detained.

17            THE COURT:  All right.

18            Any further questions of Mr. Flanagan, Assistant

19  United States Attorney Sullivan?

20            CONTINUED REDIRECT EXAMINATION

21  BY MR. SULLIVAN:

22  Q.   Mr. Flanagan, the items that were detained late last year,

23  a good deal of poultry, photographs of those items were included

24  in our submissions in support of the motion for a show-cause

25  order late last year, is that right?

1    A.    That's correct.

2              MR. SULLIVAN:   Nothing further, your Honor.

3              THE COURT:  Mr. Lafuente, any further questions?

4              MR. LAFUENTE:  Nothing further, your Honor.

5              THE COURT:  Very well.

6              Mr. Flanagan, thank you again, you may step down, sir.

7              THE WITNESS:  Thank you, your Honor.

8              (Witness excused at 2:38 p.m.)

9              THE COURT: Assistant United States Attorney Sullivan,

10   does the Government have any further evidence, it wished to

11   present in this matter?

12             MR. SULLIVAN:   No, your Honor.

13             THE COURT:  Mr. Lafuente, does the defense have any

14   evidence, you would like to present in this matter?

15             MR. LAFUENTE:  Your Honor, I'm gonna give Mr. Miller

16   his opportunity to -- to speak if he so chooses.

17             THE COURT:  And Mr. Miller, it's -- as we've discussed

18   before, the law is very clear, as a separate organization,

19   Miller's Organic Farm to the extent it is a -- its own person,

20   its own entity, you cannot represent that entity in court, at

21   least, be represented by counsel.  You personally, however, can

22   represent yourself in court.

23             So, what we have been permitting, is a somewhat hybrid

24   representation when it comes to you, where Mr. Lafuente is

25   representing your interests, but you also are permitted to

1  represent your own interests, it's unusual to permit that type

2  of a hybrid representation, but I have been doing that.  And I

3  want to continue that only because at one point, you seemed to

4  want to excuse Mr. Lafuente from any further representation of

5  you.

6        I didn't do that, because I didn't think it would be

7  in the best interest of you or the Court to not have some legal

8  representation involved in here.  But at the same time, the *quid*

9  *pro quo* for that, is that you should be given the opportunity to

10 -- to decide on your own as well, trial strategy, what evidence

11 you wish to present, *et cetera.*

12       So, Mr. Lafuente has suggested at this point, it is up

13 to you whether you'd wish to be heard.  I know the Assistant

14 United States Attorney is going to ask that you'd be cautioned

15 regarding your Fifth Amendment rights against self-incrimination

16 to the extent you may say something that might be incriminating

17 and I'd be glad to do that.

18       But do you wish to be heard, sir, do you wish to be

19 given the opportunity to present evidence or to say anything

20 here today?

21             THE DEFENDANT:  It would probably be good.

22             THE COURT:  Excuse me, sir?

23             THE DEFENDANT:   It would probably be good.

24             THE COURT: You -- you would like to say something?

25             THE DEFENDANT:   If you don't mind.

1          THE COURT: I don't mind at all.

2          Now, again, I know, the Assistant United States

3     Attorney is about to say, caution.  I don't believe in the times

4     that you have spoken before this Court, that you've said

5     anything incriminating as such.

6          And what that means is, whenever you -- you speak --

7     and I'm going to put you under oath, but you're -- whenever you

8     speak, your words can be used against you, if in fact, you are

9     admitting -- in essence, confessing -- to the commission of a

10    crime.  And you have an absolute right to never be forced to --

11    to -- testify against yourself, to give testimony against

12    yourself.

13         So, when you do make statements here in open court,

14    those statements can be used against you in a later proceeding,

15    whether it would be in civil contempt or more importantly, if

16    it's a criminal contempt or if certain other actions are

17    brought, such as perjury, *et cetera,* do you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT: Okay.

20         So, sir, if you would please stand and raise your

21    right hand, my Deputy will swear or affirm you, whichever you'd

22    choose, do you understand?

23         THE DEFENDANT: (No verbal response.)

24         AMOS MILLER, DEFENDANT, AFFIRMED.

25         THE COURT:  Thank you very much, sir.  And you may be

1   seated.

2          And -- and Mr. Lafuente, you have no problem with Mr.

3   Miller providing whatever evidence he wishes to present here?

4          MR. LAFUENTE:  None, whatsoever, your Honor.

5          THE COURT:  Very well.

6          Mr. Miller, you may proceed, sir.

7          THE COURT:  Thank you very much.

8          First of all, I apologize for all of the inconvenience

9   I'm causing all -- everyone.  I -- I don't feel good in this

10  position, I know, nobody does, either.  I'd like to express my

11  apologies, if I have been misleading, it's not my intention to

12  be evil.  Although the state in which there's an evil spirit,

13  there's -- there's something good going along, he wants to be

14  involved and maybe, that has taken place and please accept my

15  apologies for being deceiving or making agreements and not

16  holding up to that, I apologize for that.

17         THE COURT:  Thank you for that, sir.

18         THE DEFENDANT:  Ah, it's -- I'm in a -- position and

19  you all know that, because the members are looking for things

20  that are very important to them, special -- special -- they're

21  that special -- ah, they have special needs, they're looking for

22  nutrient-dense food, which is what you've talked about.

23         And there are certain things that are hard to find and

24  that's why we'd come to the farm.  It's hard to find that in the

25  public store, that's why they come to the farm.  It's not that

1  our prices are cheaper.  And for some reason, they like coming

2  to the farm.

3          And you've heard that before, so I'm not -- I'm not

4  sure, it's not that we're competing with the store, it's

5  actually higher but for some reason, they come to the farm.  The

6  relationship, the trust.

7          So, I'm -- I'm in hard position and the -- the new

8  testimony in James, it tells us, if they have special needs, if

9  they need help, we should help them with that.  There's people

10 out there with cancer, ah, heart disease and -- and they're

11 hoping for something and they come to me, can you help me?  And

12 they have been educated, they want good food and it's a hard

13 position.  And I have a hard time to say, no, for some reason.

14         I guess, it could be money, which I have been possibly

15 accused of making too much money and -- and it's not fair that

16 I'm doing that and I'm not abiding by everything, but it's --

17 it's not all about money.

18         It's just that I'm making a living for our family, for

19 the farmers and it's helping the people and building a trust in

20 special needs and I would -- if it would be all for money, I

21 would not allow my members to get thirty days to pay their

22 invoice.  If it -- if it were all about money, I would request

23 the money to be paid upfront.  I'm not sure if that makes any

24 sense to you or not.

25         So, it's not all about money, it's the relationship,

1    the trust, the need -- it's importance of getting food out

2    there.   It's -- it's not that we're competing with the -- with

3    the big corporations, it's just the special needs and that's my

4    goal.  And I -- I don't like to let them down on that.

5         But the time has come, where I see that I might need

6    to be there and I just have to surrender, maybe find -- find

7    something else.  I have a hard time agreeing to -- to get a

8    license, because it will interfere with a lot of other things,

9    that we do, it will.

10        But I can -- I can lay that aside and then, not get a

11   license and just stop doing the -- doing the meat.  I have

12   plenty of other things to do.  And that is -- I'm going to take

13   the position, that's just what I have to do, if -- if that's the

14   only choice I have.

15        Ah, I don't like this intent -- or the tension that

16   every -- causes the community, it's hard on the community, but I

17   guess, I just have to thank the members, I'm sorry, I can't do

18   that.

19        And about the websites, we've been educating them, the

20   coordinators -- I don't have a computer on the farm to -- to

21   operate our website, we've been educating, there has been a

22   three-man board named.  And if I may mention, the one name, the

23   first name, Tom, which -- (indiscernible) has come on board and

24   so, that's -- we'd like to help James.

25        And we have -- ah -- we are concerned about the

1  community, we're concerned about the members, they want to help

2  us find a happy medium, but for -- for me, they're coming from

3  -- that the meat is -- I guess, I'm just gonna have to say, I'm

4  just gonna have to discontinue the meat, if that's -- can do

5  with just a license for various reasons.

6         Ah, I -- I would -- I was hoping that there would be

7  some constitutional rights -- the privileges, but maybe those

8  don't exist in America any more.  The -- the way I understand,

9  ah, but they might not exist in this -- I don't know.  I think

10  things are just -- I don't know, I -- I want to be a farmer, not

11  a -- a political or -- I'd just like to be a true farmer.  So, I

12  struggle with why we can't be true farmers.

13         The Bible teaches us, that we're -- we're here to take

14  care of the animals, God created the animals and we're here to

15  take care of them and -- and they're here for -- to fulfill our

16  needs.

17         And I -- I -- if the USDA had the permission to

18  continue to -- to knock down private right to contract and you'd

19  give the permission that it's illegal, that's fine, but I'd just

20  like to bring to your attention, if they continue that mission,

21  they'd -- to a bad end, where the food might not be available.

22  And Joe Biden, I think, even acknowledged that, food shortages

23  are coming.

24         So, I don't know -- I know your concern is about

25  keeping the food supply safe, which I respect, I -- I agree with

1 that a hundred a percent, we need to keep it safe, but which is

2 more important, if -- if there is no food around, how -- which

3 is more -- how can we keep it safe?  So, I think, it's important

4 that we'd have -- be allowed -- the private right to contract as

5 many constitutional writings that, we should be allowed to do

6 this, but maybe, you don't agree with that.  And maybe, God

7 wants the food shortage to occur.

8         So, we'd turn our face to him, so we'd thank him more

9 for what we have -- the Old Testament -- does say, that -- if

10 we'd turn to his faith and we ask for his help as his servants,

11 that (indiscernible) -- and the food will be -- so, I hope we

12 don't have to see a future of this, I'm concerned about that,

13 the way things are going, I'm very concerned.

14         And my customers are as well, my members, they're

15 extremely concerned about that.  And they're just -- they want

16 to do whatever they can with it.

17         And for me, the way it looks now, I'd have to step

18 back and -- and hopefully, God will provide one way or another.

19         The -- ah, as far as the -- the USDA license, it looks

20 very cheap, it looks almost free to what I've been hearing in

21 the newspaper writings, that the USDA or the Pennsylvania

22 Department of Ag., is offering fifty thousand to a $100,000.00

23 for a farmer to -- for someone to get started processing meat.

24 They did admit, though, there's shortages of -- of -- the

25 processing time, there is a shortage.

1    And that's true, if you'd come out to the country, the

2  farmers are looking for a market, they're looking for

3  processors, the processors are almost booked -- booked out for a

4  year.   And even with the offer that the USDA -- or PDA --

5  making, I haven't heard -- will do that processing.  The --

6  (indiscernible) -- are extremely hard.

7    So, with that said, I -- I'm just concerned, for me, I

8  want to stand back, I'd like -- I don't have -- I don't want to

9  put you in more -- any more misery.  I appreciate you doing this

10  part with me, ah, but I apologize for all the grief I've -- to

11  everyone.

12    I would just say, let's -- let's look out for -- for

13  the members, that invested (indiscernible).  We'd need to look

14  out, I guess, your position is -- and maybe, we'd need to look

15  out for the corporation and that's fine, too.  But the truth

16  will rise to the top.

17    And I don't know what God has in store for us, but

18  thank you for letting me take the time to talk to you --

19    THE COURT:  Certainly, sir.

20    THE DEFENDANT:  -- I appreciate it very much.

21    THE COURT:  And if you don't mind, I'll respond to

22  some of the things you've said.

23    Absolutely, you should have the right to run your

24  business and I hope you make unlimited amounts of money, because

25  it means, you're providing a service to those customers, who are

1   buying your food.  So, this is not about you not making whatever

2   money you can possibly make, because you're trading that --

3   people are giving you their money because you're giving them,

4   product that they value as -- as being as valuable as that money

5   that they're giving to you.

6          So, the more successful your business is, it means,

7   the better you're doing it and the better the products you're

8   giving out to them.

9          And in no place is business less regulated than the

10  United States and I should say that carefully, but no place is

11  business more effective, more thriving, more able to provide the

12  rest of the world, than the United States.

13         And you are also correct that there is a coming food

14  shortage as reflected in the inflationary pressures on food

15  right now, the price of food is skyrocketing.

16         The -- but the lack of slaughterhouses and the lack of

17  -- of processors, *et cetera,* the argument has tried -- it has

18  been made -- that it's because of the efficiencies of these

19  large corporations forcing out the small ones, that is a very

20  interesting argument.  But it doesn't seem to have anything to

21  do with the regulations, it seems to have to do with the

22  efficiencies of scale, that if they have these huge processing

23  plants, they can -- the efficiencies of those scales means, they

24  can sell the product at a lower price.  And it's very tough for

25  the -- for the smaller processor and the smaller slaughterhouse,

1  *et cetera* to compete with that.

2      So, that's a real issue, that's been brought to the

3  forefront.  You are a smaller processor, but a very efficient

4  one, you just seem to have -- and this is based on my experience

5  here -- a very unique market and a very loyal customer base.

6  And that loyal customer base, probably, would not be overly

7  impacted by rising prices.  In other words, if you were forced

8  to raise your prices because of rising costs, likely, your

9  customers would remain loyal to you and continue to buy your

10  product.

11      The other thing is, you seem to have a special ability

12  to control your costs, because of the way you run your business,

13  so you're not as subject to some of the costs that other

14  producers might be subject to.

15      I -- when I heard Mr. Flanagan testify that it would

16  be easy for you to come into compliance, it just raised, again,

17  in my mind, why is this so hard?  Nobody wants you to stop doing

18  what you do, you just need to come in to compliance.  And to

19  you, it seems to be, this very large, insurmountable, almost

20  fatal to your business type of requirement.

21      I heard Mr. Flanagan say, it would not be that hard

22  and in fact, it might even increase your business, increase the

23  ability to provide product to your customers and allow others to

24  use it to have a compliant slaughterhouse would not be that

25  hard.

1    When I hear him say that, you don't believe that, I

2  don't think, because you think this is fatal, that the only

3  option, you can't go that way and become compliant, so you have

4  to just shut down.

5    And that means, all of this time, and all of this

6  effort, we've put in over all of these years, ends in for

7  naught.  It ends in not being able to achieve our ultimate

8  purpose, which was to allow you to operate your business, just

9  make sure it was in compliance, so that the -- well, you'd meet

10  both interests, your interest as an American, as a -- as a

11  farmer, as a person, who wants to provide your product to your

12  customers.

13    And the Government's limited interest -- the

14  Government has a very limited interest in your business, that is

15  food safety and there may be other regulations having to do with

16  emissions from trucks and things like that, but the issue that

17  we're here right now, is -- it is focused almost entirely on

18  food safety, proper packaging, proper notifying your customers

19  of what you're selling them, *et cetera*.

20    Rules and regulations that, yes, that tended increase

21  over time rather than decrease, it's rare you see the Government

22  decrease rules and regulations or requirements in the food-

23  safety area, although I'm sure Mr. Flanagan could testify about

24  that much more accurately that I could.

25    So, I hear Mr. Flanagan testify and he says, you

1   haven't been in compliance, you haven't seemed to try at all.

2   You did for a short period of time, when you used another

3   processor.   He says, you could come in to compliance easily.

4           And I assume by easily, it still would cost you money,

5   but look what it's costing you here.   I don't know how much

6   money, it would cost you, but it seems that you are successful

7   enough that the cost would be a reasonable investment for what

8   your ultimate return would be based on that investment.

9           So, investment in becoming compliant would, likely,

10  Number 1, not interfere with your ability to sell the very

11  product, you want to sell.

12          Number 2, making it more profitable.

13          And, No. 3, let you enjoy your business rather than

14  have this hanging over your head, the way it has for years now.

15          And that just the idea of removing that stress, 'cause

16  I think, that's what you're doing with a lot of this -- this

17  constant stress, all these people having to be here today, all

18  because we keep, arguably, caving in.

19          I know, you've got a lot of people, who would look at

20  this and say, why has the Government not done more to require

21  Miller's Organic Farm to become compliant with the law, because

22  we've always been focusing on allowing you to conduct your very

23  unique business, but still bring you in to compliance.   So,

24  we've let it go for a long time -- we've let it go for a long

25  time.

1    So, you would think, when you say to me, forget it,

2  I'm -- I don't want to sell meat anymore, I don't want to do any

3  slaughtering, *et cetera*, I would say, great, finally, this case

4  is over, an injunction is entered, pay your money and we're out

5  of here.

6    But that was never the intent, so I'm not -- I'm not

7  -- while I'm encouraged with your willingness to want to be in

8  compliance, even if it means, shutting down, that never was our

9  goal.  So, it doesn't make me feel as though this is -- this is

10  a great answer to this problem.  And so, I don't know whether

11  you really want -- want to or that you believe you have to shut

12  down, I just don't know.

13    But I will tell you what I am going to do, I am going

14  to first allow, Mr. Lafuente to ask you any questions he wishes

15  to ask you.  And then, I'll ask the Assistant United States

16  Attorney and then, see what you want to do, fair?

17    (No verbal response at 2:57 p.m.)

18    THE COURT:  Mr. Lafuente, do you have any client --

19  any questions for your client?

20    MR. LAFUENTE:  A few.  Can --

21    THE COURT:  We can hear you, you may proceed, sir.

22    MR. LAFUENTE:  Okay, thank you.

23                 <u>DIRECT EXAMINATION</u>

24  BY MR. LAFUENTE:

25  Q.  Mr. Miller, now -- you said some very interesting -- I've

1  been on this case for -- for a long time now, right?

2  A.   True, yes.

3  Q.   And I've actually gotten to meet a lot of your -- your

4  members and we've -- we've had lots of conference calls with all

5  of them and we all know, that they really value your product,

6  right?

7  A.   Yes, yes, sir.

8  Q.   I mean, it's -- and it's very important to them, it's --

9  some of these people, it's medicine for them, right?

10  A.   Yes, sir.

11  Q.   And then that's your -- your big motivation is that you

12  really like, -- you were just now quoting your -- your Biblical

13  verse, that you feel that this is, you know, a religious

14  prerogative, you -- you're duty bound to help these people,

15  because they need you, right?

16  A.   That's right.

17  Q.   Okay.

18        Now, let me ask you this -- I'm going to ask you a

19  tough question here.

20        Part of these regulations, was starting to keep

21  records, right --

22  A.   Yes.

23  Q.   -- you understand that, right?

24  A.   Yes.

25  Q.   And you haven't done that, right?

1  A.   Not to the degree that they would like.

2  Q.   Right.

3       And here's -- here's -- my question is, the records,

4  themselves, they don't assess, the density of the -- they don't

5  assess, the food, itself, right?

6  A.   They what?

7  Q.   And do you understand that the reason for those records, is

8  so that the Government -- the Government has a job to do, they

9  have to make sure, that -- that they protect the public against

10 people putting food out there, that can harm them, right?

11 A.   That's right, I think, it's a --

12 Q.   You understand --

13 A.   Yeah, and I think, it's important --

14 Q.   Right.

15 A.   -- I think, it's important that the USDA builds a good

16 reputation, so they would go to them, rather than to the farm.

17 Q.   Exactly.

18      Now -- and -- and you and I both -- and nobody in this

19 courtroom has accused you of hurt -- hurting anybody, you

20 understand that, right?

21 A.   That's right, yes.

22 Q.   Because you provide a good product --

23 A.   Yes.

24 Q.   -- right?  A necessary product?

25 A.   Correct.

1    Q.    Okay.

2          Now, here's my point, Amos, your product is so

3    important to other people, that it doesn't take a whole lot to

4    put records together, don't you think that it's important,

5    valuable --

6    A.    Yes.

7    Q.    -- it's important to get to these people, that you can keep

8    those records, you can come in to compliance because there is a

9    way for you to do it, Amos, you've done it before, do you

10   remember that?

11   A.    Yes.

12   Q.    What's the problem now, I mean, all you'll -- the last time

13   that we did this, you were able to put the records together, you

14   were able to sell that product, you liquidated it and we got

15   past it, right?

16   A.    Right.

17         If it goes to the Meat Division, then we'd have to put

18   off with lots of other things, that the members want to as well,

19   so that's the stickler.  We went through that before.

20   Q.    But -- and I have not explained to you, that there is

21   nothing stopping -- the PDA or anyone else -- from coming onto

22   your farm and shutting down the rest of your business right now,

23   do you understand that?

24   A.    Sure.

25   Q.    But they haven't done that, have they?

1    A.    That's right.

2          Well, they've been in there trying to --

3    Q.    You said --

4    A.    -- I talked to them about the whole situation.  I have

5    talked to them about the whole situation and --

6    Q.    But --

7    A.    -- they are aware of it.

8    Q.    -- but you're still operating, sir, isn't that right?

9    A.    The what?

10   Q.    You're still operating, they haven't shut you down?

11   A.    That's good, that's correct.

12   Q.    Yeah and that's -- that's my point, Mr. Miller, isn't it

13   true -- I understand that maybe, you believe, that if you'd come

14   in to compliance and if you'd play ball with the Government's

15   way, I know, you believe that that's gonna shut your business

16   down, right?

17   A.    Well, I heard from one of the other court hearings and I

18   don't want to accuse Judge Smith, but he said, there's more

19   rules coming down the road, so that makes it more discouraging

20   than ever to even get a license.

21         So, I don't know if farmers are appreciated or not,

22   but I don't think they will be till the future has arrived and I

23   -- I wish we wouldn't have to see that.

24   Q.    Okay, but -- but Mr. Miller, here's my -- I guess, my point

25   is, you haven't even tried to apply for the license, right?

1  A.   I've -- I've read it thoroughly, I've discussed it, I've

2  talked through it, I -- yes, I -- I studied them, ah, so we've

3  been there.

4        It's just that when --

5  Q.   Well --

6  A.   -- when you sign in, ah, you're -- you give them the

7  little finger, they'll take the whole hand.  And that's --

8  Q.   Okay, but hold on a second, Mr. Miller.

9  A.   -- that's the --

10  Q.   You're speculating right there, okay, you don't know that

11  for a fact, do you?

12  A.   Ah --

13  Q.   I mean, there are other Amish farmers, who do -- who are

14  federally inspected, for instance, Belmont, isn't that right?

15  A.   Well, there have been many happenings and many things that

16  happened that did not work out for guys.

17        And even other organizations were put under the USDA,

18  came in and they're out of business now, so I'm not sure how

19  long they'd want to continue this, I --- I think it's important

20  that --

21  Q.   And you --

22  A.   -- it's important that the -- someone goes out there and

23  educates people how to plant seed, how to water their plants,

24  ah, is anyone -- the future, I think, it would be more wise for

25  the USDA to go to the top skyscrapers, where people live and

1   bring some top soil on top of their roofs, you would have

2   something to eat in the future, because Joe Biden, already -- ah

3   -- mentioned and I think, it's important that they support small

4   farms, rather than put them out of business, regularly.

5               And there's plenty of --

6   Q.   But it --

7   A.   -- there's plenty of constitutional right --

8   Q.   -- the --

9   A.   -- there's plenty of constitutional rights that we -- we

10  should be allowed to be farmers, yes?

11  Q.   Well, but here's -- but the -- Mr. Miller, they're not

12  violating your constitutional rights, they're giving you every

13  opportunity to -- to provide your product, do you not -- do you

14  not see that?

15  A.   (No verbal response.)

16  Q.   They want you to produce your product, they want you to

17  continue to produce, because you have that right --

18  A.   Well, you --

19  Q.   -- do you not understand that?

20  A.   -- you have to take the whole picture, Steve, I guess, you

21  -- you and I need to -- ah -- talk to our customers, I was

22  trying to get ahold of you --

23  Q.   Well --

24  A.   -- for the past week and I haven't had any response, I'm

25  not sure, if you got my messages or my faxes --

1  Q.   Yeah, I -- you and I have been playing phone tag, because

2  I've been calling you back, too and I understand that.

3  A.   We'd need to have a personal --

4  Q.   But you --

5  A.   -- conversation about this.

6  Q.   But here's -- here's my -- here's my point, Amos.

7       You know, if they wanted to put you out of business,

8  they could have done it five years ago and they -- they have

9  not, they have bent over backwards, because they want to see you

10 succeed, okay.

11      So, it's not true that they're violating your

12 constitutional rights or that they're invading your private

13 right of contact.

14      All they want you to do, is to come in to compliance

15 and that means, do things, like, keep some proper records, so

16 that way, in case somebody does get sick, they'd have a way to

17 trace it, do -- do you not understand that?

18 A.   Is there a private right to contact?

19 Q.   Yeah, well, you're -- you're doing it now, aren't you?

20 A.   (No verbal response.)

21 Q.   I just -- Mr. Miller, I -- I know and I've known you for

22 many years and you -- you are under a lot of pressure, are you

23 knot?

24 A.   Yes.

25 Q.   You get a lot of pressure from all kinds of people and from

1   every different direction, I've seen it, isn't that right?

2   A.    That's right.

3   Q.    You know --

4   A.    And -- and our members want all the food that we have, not

5   just some of it, so if we don't comply, there's gonna be a big

6   list of things that would have to come --

7   Q.    But you --

8   A.    -- off, so --

9   Q.    And --

10  A.    -- so, they'd have to support --

11  Q.    -- but isn't it --

12  A.    -- that, getting the farm's ID, they've supporting the farm

13  and they spend a lot of -- of their earned -- hard earned money

14  to support the farm and if they see a lot of our items have to

15  come off the list, they will not be happy.

16  Q.    Okay.  But -- but -- let me -- let me ask it this way:

17         Is it true that your members just don't want anything

18  that says, federally inspected on it, is that a true statement?

19  A.    What's that?

20  Q.    Do your members, no matter what -- even if it's coming from

21  your farm or not, you members' big priority is that they don't

22  want something that says that it's federally inspected, is that

23  correct?

24  A.    Yeah.

25         Their reputation is not the best, that's why.

1    Q.    Okay.

2          And so, that's the reason why you don't want to be the

3    license, is that correct?

4    A.    That's -- that's right.

5    Q.    Even though you understand that with the federally-

6    inspected license, you'd still be able to produce meat, the way

7    that you produce it?

8    A.    Ah, not necessarily.

9    Q.    Well, how --

10   A.    Maybe -- maybe --

11   Q.    -- and what --

12   A.    -- maybe, the meat but not the other items.

13         So, there's other things for me to do --

14   Q.    You could --

15   A.    -- I don't have to be a farmer, I don't have to do this,

16   there is many other things I can do.

17   Q.    Okay.

18         MR. LAFUENTE: I have no further questions, your Honor.

19         THE COURT:  Thank you very much.

20         Assistant United States Attorney Sullivan, you may

21   question Mr. Miller.

22         MR. SULLIVAN:  Your Honor, if I could address my

23   initial comments to Mr. Lafuente?

24         THE COURT:  Certainly, sir.

25         MR. SULLIVAN: Mr. Lafuente, as you know, I am not --

1    I'm saying this to Mr. Miller in this courtroom as well -- I am

2    not a criminal AUSA, I'm in the Civil Division, if any sort of

3    criminal proceeding were to start here, I would not be on that

4    criminal matter.  And I just want to mention that in no way by

5    citing the statutes am I threatening prosecution in any way, I

6    would not be involved in that process.

7          But I'd just want to note that under the Federal Meat

8    Inspection Act and the Poultry Products Inspection Act, there is

9    strict liability and misdemeanor liability for prohibited act

10   and we've talked about, you know, moving detained product, *et*

11   *cetera*, that include those prohibited acts similar to under the

12   Federal Drug and Cosmetics Act, it includes things, like, mis-

13   branding and (indiscernible), of course.  And then, you know,

14   there's also felony liability if there is an intent as well.

15         There is also, of course, 18 USC, 4013, which says, a

16   court of the United States shall have the power to punish by

17   fine or imprisonment or both at its discretion, such contempt of

18   its authority and none other as, three, disobedience or

19   resistance to its lawful writ, process, order, rule decree or

20   comment.

21         And then, there is also a -- a statute, the one big

22   criminal case I've had with a client conspiracy case against a

23   medical-device company under 18 USC, Section 371 and that says

24   that:

25         if two or more persons conspire to defraud the United

1       States or any agencies thereof in any manner or for any

2       purpose and one or more of such persons do any act or

3       affect the object of the conspiracy, each shall be fined

4       under this title or imprisoned, not more than five years

5       or both.  If, however, the commissions of which is the

6       object of the conspiracy is a misdemeanor only, the

7       punishment for such conspiracy shall not exceed the

8       maximum punishment provided for such misdemeanor.

9           So, I'm just reciting those statutes because before I

10   ask any questions, I just wanted to give some effect to my

11   additional, sort of, Fifth Amendment warning to Mr. Miller.  And

12   give you an opportunity to counsel him on the record or off the

13   record as to whether to answer any questions that I may ask.

14          So, as -- I just wanted you to weigh in on that before

15   I -- I give him that warning.

16          MR. LAFUENTE:  Well, I'll allow him to have that

17   warning, it's -- it's important.  But I do want -- he's going to

18   make his own decision as well.

19          MR. SULLIVAN:   Okay.

20                        CROSS-EXAMINATION

21   BY MR. SULLIVAN:

22   Q.   Mr. Miller, just as the judge stated, you have the right,

23   even though I'm a civil AUSA, there is -- there is always the

24   possibility that there could be criminal prosecution -- you have

25   the right not to answer any of my questions.  Everything that's

1   being stated today is being transcribed by a court reporter on

2   the record and could be used in a later proceeding.  So, I will

3   leave it up to you whether you'd want to answer my questions or

4   not, but I have several questions, I would pose to you, unless

5   you don't wish to answer them.

6           Ah, my first question is, you still own and operate

7   Miller's Organic Farm?

8   A.   (No verbal response.)

9           MR. LAFUENTE:  Ah, hold -- hold on second.  I didn't

10  hear his response.

11          MR. SULLIVAN:  He did not respond.

12          THE COURT:  But, I think, to the earlier question --

13          MR. LAFUENTE:  Ah, I didn't --

14          THE COURT:  -- you do wish to answer the questions --

15  you do wish to --

16          THE WITNESS:  I --

17          THE COURT:  -- answer the questions of the Assistant

18  United States Attorney?

19          THE WITNESS:  Probably, not.

20          THE COURT:  Probably not?

21          THE WITNESS:  Yes.

22          THE COURT:  All right.

23          That's the response -- the response was, probably not,

24  so, Assistant United States Attorney Sullivan is going to ask

25  the question and allow Mr. Miller to give whatever response, he

1   wishes to.

2           MR. SULLIVAN:  Well, if Mr. Miller is telling me

3   definitely, he's not going to answer any question I ask --

4           THE COURT: Well, he probably doesn't --

5           MR. SULLIVAN:   -- well, I'll -- I'll still put it on

6   the record for adverse intent purpose -- purposes, all right.

7   BY MR. SULLIVAN:

8   Q.   Mr. Miller, do you still own and operate Miller's Organic

9   Farm?

10  A.   I do not wish to answer any questions of --

11  Q.   Mr. Miller, are you fam -- you've cited the Book of James,

12  are you aware that, the author in that book refers not just to

13  words, but to actions and the importance of actions and words?

14  A.   I didn't understand the general question at this period of

15  time.

16  Q.   And does the author of that book refer to the importance of

17  community, not just of rights, but of community and our duties

18  to one another?

19  A.   (No verbal response.)

20  Q.   No answer.

21          Mr. Miller, is your wife, Rebecca, a co-owner of

22  Miller's Organic Farm with you?

23  A.   (No verbal response.)

24  Q.   Mr. Miller has not answered.

25          Mr. Miller, who pays the taxes for the Miller's

1   Organic Farm business to the IRS for the year, 2021?

2   A.   (No verbal response.)

3   Q.   No answer.

4         Mr. Miller, if you were to cease doing business as

5   Miller's Organic Farm, would you be transferring ownership to

6   another group of your meat and poultry establishment?

7   A.   (No verbal response.)

8   Q.   No answer.

9         Mr. Miller, if you were to cease doing business as

10  Miller's Organic Farm, would you re -- continue doing business

11  in the meat and poultry sector under another name?

12  A.   (No verbal response.)

13  Q.   No answer.

14        Mr. Miller, are you associated with Sunrise View Farm,

15  P.O. Box 68, Bird-in-Hand, Pennsylvania?

16  A    (No verbal response.)

17  Q.   No answer.

18        Mr. Miller, what limited liability companies or

19  corporations and alter egos, do you do business under?

20  A.   (No verbal response.)

21  Q.   No answer.

22        Mr. Miller, do you do business under the name, AB

23  Farm, LLC?

24  A.   (No verbal response.)

25  Q.   No answer.

1               Mr. Miller, was that business formed in 2020?

2     A.    (No verbal response.)

3     Q.    No answer.

4               Mr. Miller, do you do business under Miller Camel

5     Farm, LLC?

6     A.    (No verbal response.)

7     Q.    No answer.

8               Mr. Miller, was that business formed in 2020?

9     A.    (No verbal response.)

10    Q.    No answer.

11              Mr. Miller, do you do business under the name, Miller

12    Creek Buffalo?

13    A.    (No verbal response.)

14    Q.    No answer.

15              Mr. Miller, does each of those businesses have its own

16    checking account?

17    A.    (No verbal response.)

18    Q.    No answer.

19              Mr. Miller, what activity has Bird-in-Hand Meats

20    engaged in since February of 2022?

21    A.    (No verbal response.)

22    Q.    No answer.

23              Mr. Miller, do you still own the property -- the farm

24    -- at 672 Mill Creek School Road in Bird-in-hand, Pennsylvania?

25    A.    (No verbal response.)

1    Q.   No answer.

2              Mr. Miller, who is the tenant or are the tenants, if

3    any, at the 672 property?

4    A.   (No verbal response.)

5    Q.   No answer.

6              Mr. Miller, do you have any current line of credit?

7    A.   (No verbal response.)

8    Q.   No answer.

9              Mr. Miller, have you moved any of the previously USDA

10   detained or U.S. Marshal Service arrested meat or poultry

11   products at any of your properties?

12   A.   (No verbal response.)

13   Q.   No answer.

14             Mr. Miller, what happened to the approximate -- 1500

15   pounds of products that FSIS/USDA detained on the 648 property

16   and the 672 property with bright-red detainer tags on September

17   8th, 2021?

18   A.   (No verbal response.)

19   Q.   No answer.

20             Have you sold or distributed any of that product?

21   A.   (No verbal response.)

22   Q.   No answer.

23             Have you done anything with the detainer tags on those

24   products?

25   A.   (No verbal response.)

1    Q.   No answer.

2          Mr. Miller, please tell us about the three-member

3    board of governors that you referred to in your recent

4    submission to the Court?

5    A.   (No verbal response.)

6    Q.   No answer.

7          Can you tell us, who the members are of that board?

8    A.   (No verbal response.)

9    Q.   No answer.

10          Can you tell us what the functions are of those

11   individuals?

12   A.   (No verbal response.)

13   Q.   No answer.

14          Do those individuals have any independent authority to

15   make any decisions or are they just counselors to you?

16   A.   (No verbal response.)

17   Q.   No answer.

18          Do any of those individuals have any specialization in

19   the law or compliance?

20   A.   (No verbal response.)

21   Q.   No answer.

22          Mr. Miller, would you be willing to put a temporary

23   manager in place at Miller's Organic Farm to manage the meat and

24   poultry operation?

25   A.   (No verbal response.)

1   Q.   No answer.

2        Mr. Miller, if you were to shut down your meat and

3   poultry operations at Miller's Organic Farm, how do you propose

4   that the Government verify that you have, in fact, shut down

5   those operations?

6   A.   (No verbal response.)

7   Q.   Mr. Miller, do you have any issue -- no answer -- Mr.

8   Miller, do you have any issue with Mr. Lapsley continuing in his

9   role as the Court's appointed expert under Federal Rule of

10  Evidence 706 in this case?

11  A.   (No verbal response.)

12  Q.   No answer.

13       Mr. Miller, do you dispute any of the testimony that

14  Mr. Lapsley or Mr. Flanagan gave today about your denials of

15  access to them on the occasions that they identified?

16  A.   (No verbal response.)

17  Q.   No answer.

18       Mr. Miller, what has happened with the good-faith

19  $50,000.00 payment that you had promised to make to the Court's

20  registry before this hearing?

21  A.   (No verbal response.)

22  Q.   No answer.

23       (Pause at 3:15 p.m.)

24       MR. SULLIVAN:  Your Honor, I have no further questions

25  at this time.

1          THE COURT:  Well, but the one answer, I do need an

2   answer to, in my original order of 10, March, I had ordered that

3   you pay $250,000.00 in a civil contempt sanctions fine and

4   $55,065.72 to reimburse FSIS -- FSIS - for its costs of

5   investigation.

6          And you had, subsequent to that time, you had

7   requested additional time to pay those funds, which I granted,

8   but it was provided that you made a good-faith payment of

9   $50,000.00 within one week, that one week has come and gone, it

10  was Friday, March 18ᵗʰ that was due.

11         But that fifty thousand not paid in to court and I'll

12  tell you, why that becomes a real issue here, it's because all

13  that money you paid in, was going to be used to pay the costs of

14  investigation and Mr. Lapsley's fees and then, whatever was left

15  over, was going to be returned back to you.

16         Well, if we don't have that money and Mr. Lapsley

17  works, he submits an invoice, we've got no funds within which to

18  pay him.  So, two questions:

19         One is, where is that $50,000.00?

20         And the second is, how much more time do you need to

21  make any additional payments?

22         THE DEFENDANT:  Well, Steve -- we went back and forth

23  with Steve, first of all, Friday came and I wasn't quite sure

24  where to send this money to.

25         THE COURT:  Okay.

1          THE DEFENDANT:  Ah, so Steven was -- went back and

2    forth and they finally gave an address or gave me an option send

3    it to Philadelphia or to Steven and Steven wired it to their --

4    their -- ah, I sent -- I sent Steve a check, a $50,000.00 -- ah

5    -- three-day express.

6          And I guess, it happened to be the wrong address on

7    one of his forms from maybe, years -- I'm not sure, how I got

8    that address, but it was on there, so it went to that address

9    and it was signed for and I -- I was trying to get ahold of

10   Steve about that, if -- if he can --

11         MR. LAFUENTE:  So, do you -- I can verify that, he did

12   -- Mr. Miller sent me a copy of the -- of the tracking number

13   with the FedEx, it was sent FedEx, but he sent it to my prior

14   residence, which I don't know how he got that address, but he

15   sent it to my previous residence, I don't live there anymore.

16         Ah, I asked him to cancel that check and send me

17   another one, he insisted that I'd go by that house and retrieve

18   the one that he already sent which I went ahead and tried to do,

19   but I'm not -- but nobody -- nobody answered.  And that's where

20   we are.

21         THE COURT:  Okay.

22         THE DEFENDANT:  Yeah, I didn't -- I didn't know that

23   you went over there, that's the answer I was waiting for, that

24   you tried to get over there and I haven't -- I was trying all

25   week to get ahold of you.

1          MR. LAFUENTE:  Yeah, I -- and that's what I was

2     telling you, you know, the better thing to do -- the more

3     expedient to do was to cancel the check and issue another one.

4          THE DEFENDANT:  Yeah, well, I -- I can do that, I just

5     wanted to confirm, that you did try to go there and retrieve it

6     and you were not able to find anything, is that right?

7          MR. LAFUENTE:  Correct.

8          Well, the -- they didn't answer, nobody was home when

9     I went there.

10         THE DEFENDANT:  Yeah.

11         Well, I can -- I can send another one, I just need --

12    the address and I'll send it overnight, I -- I want -- I want

13    this satisfied, because the check is --

14         MR. LAFUENTE:  And -- and -- I sent you that and I

15    told you that my address is on my letterhead and the fact is

16    that, I think, it's at the top, it's on the letterhead.

17         THE DEFENDANT:  Okay.

18         Well, just make sure it's --

19         MR. LAFUENTE:  It's on --

20         THE DEFENDANT:  -- make sure they fax that to me, so I

21    have it correct, again, I am not sure where that paper got to,

22    but I want to make sure that gets satisfied.  I appreciate you

23    giving me the time to do that fifty thousand, I really do.

24         THE COURT:  Certainly, sir, all right.

25         Here is the way, it looks like the way forward to me,

1   is that Mr. Miller has been trying to consult with Mr. Lafuente,

2   but he has been unsuccessful.  It looks like that $50,000.00,

3   attempts were being made to get that put into the Court's

4   registry from which we can pay out amounts -- the amounts that

5   are due.

6           And it sounds like, if Mr. Miller is going to be

7   consulting with Mr. Lafuente, Mr. Lafuente would be able to

8   consult with Assistant United States Attorney Sullivan about

9   exactly what Mr. Miller desires to do here, whether he desires

10  to shut down, whether he desires to get the permit, how long it

11  would take, to what extent can Mr. Lapsley assist with that, to

12  what extent can Mr. Flanagan assist him with that.

13          I know everyone is -- is now very skidderish about the

14  way forward only because it has not been overly successful,

15  except for a very brief times when we've been able to use the

16  different slaughterhouse, *et cetera*.

17          We've got two cases outstanding, we've got to resolve

18  the other one with the arrested product and so, any discussions

19  should include both of that.

20          What I would suggest is that, we schedule a telephone

21  conference for a week from Friday, by that time, the $50,000.00

22  should be in the Court's registry, by that time, Mr. Lafuente

23  should have been able to consult with Mr. Miller and then,

24  consult with the Assistant United States Attorney Sullivan to

25  see if some amicable way forward can be achieved and if it

1    cannot be, then we'll decide the way forward based on the -- the

2    positions of the respective parties.

3              Mr. Lafuente, does that sound like a way forward to

4    you?

5              MR. LAFUENTE:  Yes, sir.

6              I -- I like that a --

7              THE COURT:  Mr. Miller, would that work for you?

8              THE DEFENDANT:  Yes.

9              THE COURT:  And Assistant United States Attorney

10   Sullivan, do you believe that would work for the Government?

11             MR. SULLIVAN:  Your Honor, I -- I think, our position

12   is that, you know, we can make any additional argument or

13   suggest a way forward at that point, certainly.

14             But that by that point, the $55,065.72 reimbursing

15   FSIS's costs for this activity many months ago, should also be

16   paid and apparently, there is a good deal of money even in the

17   Go-Fund-Me sites, but Mr. Miller --

18             THE COURT:  Mr. Miller, could you -- could you pay by

19   next Friday, the -- both the $55,065.72 plus that fifty thousand

20   dollars in -- a down payment on that civil contempt fine, which

21   would be a total of -- you've probably done it in your head

22   already.

23             (Pause at 3:21 p.m.)

24             THE COURT:  One hundred and five thousand dollars --

25   $105,065.72, can you have that paid by next Friday?

1          THE DEFENDANT: It would be very difficult.

2          THE COURT:  Remember, you have in the Go-Fund-Me

3     accounts, $160,000.00.

4          THE DEFENDANT:  If that would all be available, it has

5     a lot of the costs and attorneys, like, Paul said, there's a lot

6     of different costs involved.  Chris Carusone took a lot of that,

7     so -- not all of that is available to be honest.

8          And if -- if push comes to shove, I can scratch --

9     scratch my surplus.

10          THE COURT:  That would be a very good-faith gesture to

11     get that money in, I am going to order it, but it would be a

12     very good-faith gesture to get that in by next -- not this

13     coming Friday -- but the following Friday.

14          And that also give you time to -- to discuss with Mr.

15     Lafuente, what you'll want to do here, so he can discuss with

16     the Assistant United States Attorney, what -- what you want.

17     The United States -- the Assistant United States Attorney will

18     know what they want, maybe, the two are not that far apart.

19     But certainly, the one thing we do know, is we've got

20     investigation costs and fees that need to be paid.  So, that

21     $105,065.72 is very important.

22          MR. SULLIVAN:  Your Honor, I would just add that that

23     goes to two different locations, we've provided wiring

24     instructions -- payment instruction -- to Mr. Lafuente and Mr.

25     Flanagan delivered those to Mr. Miller, but the $55,065.72 gets

1  paid to the -- to my office and then that goes to the treasury

2  to reimburse FSIS.  The $50,000.00 would go to the Court's

3  registry, so there are two different locations.

4          THE COURT:  And Mr. Lafuente, you're -- you're aware

5  of that?

6          MR. LAFUENTE:  Yes, sir.

7          THE COURT:  And you can assist Mr. Miller in that

8  respect?

9          MR. LAFUENTE:  Certainly.

10          THE COURT:  Okay.

11          Mr. Miller, do you have any questions for me?

12          THE DEFENDANT:  I just -- my members are wondering

13  when this inventory can be moved back to the -- 'cause they're

14  anxious for their food and I just need to educate or I need to

15  communicate with them, 'cause I'm under -- I don't know, the

16  whole nine yards about ten days to release after the inventory

17  -- ah, is completed, how many days they have to release it, I

18  don't know that.

19          So, I just need to have communication with my members,

20  they're anxious for this meat that's in inventory.  I'd just

21  like to have a clarification on that.

22          THE COURT:  Well, do make sure Mr. Lafuente is aware

23  of that concern you have, so that he can address that concern

24  with the Assistant United States Attorney.  I don't know the

25  answer to that.

1      I know that, Mr. Lapsley, you've done an inventory of

2  what's on the premises now, you're talking about inventory

3  that's been moved off the premises?

4      THE DEFENDANT: No, the inventory that, George Lapsley

5  took, I think it was ten days to have it released after -- after

6  invent -- or approved, I don't know, I'd just like to have a

7  clarification on that.

8      THE COURT:  All right.

9      I don't have that clarification, I don't know if

10  people have it available now, or whether that would have to be

11  discussed.

12      MR. SULLIVAN:  Well, we -- we have not received an

13  inventory from Mr. Lapsley yet and that -- that then, triggers

14  the next step, I believe, once we get the inventory from Mr.

15  Lapsley.

16      (Pause at 3:25 p.m.)

17      MR. SULLIVAN:  Mr. Safian from FSIS is actually, on

18  the phone, apparently and I -- if your Honor would like him to

19  weigh in briefly --

20      THE COURT:  Certainly.

21      MR. SULLIVAN:  -- I would like him to do so.

22      Mr. Safian, are you on the line?

23      MR. SAFIAN:  Yes, this is Scott.

24

25      MR. SULLIVAN:  And your name is Scott Safian, S-a-f-i-

1    a-n, right?

2          MR. SAFIAN:  That's correct.

3          MR. SULLIVAN:  And your position, again, is with

4    FSIS?

5          MR. SAFIAN:  I am the Director of the Enforcement

6    Operation stuff.

7          MR. SULLIVAN:  And you've testified in this case

8    previously, right?

9          MR. SAFIAN:  Yes.

10          MR. SULLIVAN:  Would you, kindly share your views on

11    what Mr. Miller is proposing -- or what he is asking about?

12          MR. SAFIAN:  Ah, I -- as far as the fines, if there is

13    a need to provide a timeline, I think that's acceptable.  Our --

14    our concern, still, I think remains the whereabouts of the

15    detained product.

16          It became fairly clear to us from Mr. Lapsley's

17    testimony and the information we received previously, that that

18    product has, either, been moved or the whereabouts are unknown

19    and we're still concerned about getting access to verify that.

20    And also with respect to verifying the inventory --

21          MR. SULLIVAN:  Would you like --

22          MR. SAFIAN:  -- and --

23          MR. SULLIVAN:  I'm sorry, would you be requesting the

24    Judge to order that you'd be allowed to access the farm, before

25    the hearing in two weeks to determine the location of the

1   detained product?

2       MR. SAFIAN:  Yeah, I -- I think that's essential to

3   us.

4       And -- and to verify the inventory, the way the order

5   was created, Mr. Lapsley was supposed to create with Mr. Miller,

6   the inventory.  Once we have those records, we'll do a -- a

7   paper review, which shouldn't take, you know, more than a day or

8   two to sort of make sure that it was drafted in accordance to

9   the order.  I'm fairly confident that Mr. Lapsley followed that.

10      But then our plan would be to go on site, you know,

11  verify the inventory yourself and then, be assured that it could

12  be released for sale.

13      But again, that detained product has been a concern

14  because -- as I believe, Mr. Flanagan testified, we did find

15  some product labeled in the same manner as product was returned

16  in commerce.

17      MR. SULLIVAN:  So, does your ability to meaningfully,

18  you know, counsel me on FSIS's position before our next call

19  with the Judge, depend on whether Mr. Lapsley is able to get out

20  the written inventory before then and you're able to go to the

21  site to start verifying that?

22      MR. SAFIAN:  Yeah, that -- but that's essential to us.

23      And again, particularly, that -- that detained

24  product, I mean that as Mr. Flanagan testified, that just really

25  hasn't happened before.  We've had some instances where product

1   has been moved, you know, due to perhaps, some confusion and

2   misunderstanding by the owners.  But never moved offsite, never

3   sold, never sold, never no matter, where we haven't been able to

4   identify it and be sure that it's still under proper detention.

5          And so, that -- that is a big concern for us.

6          MR. SULLIVAN:  And I'll ask the Judge, if he would be

7   willing to ask Mr. Lapsley about the timing of this inventory,

8   but before that, do you have anything else you'd want to add?

9          MR. SAFIAN:  No, that's -- that's really our main

10  concern, I appreciate that.

11         MR. SULLIVAN:  And, so, your Honor, I would just

12  wonder if your Honor might be able to ask Mr. Lapsley when he

13  believes, he'll have an inventory to the parties?

14         THE COURT:  So, my understanding is, in answer to Mr.

15  Miller's question as to the release of inventory, if Mr. Lapsley

16  gets the inventory that he's done to Mr. Safian and he has to go

17  out and inspect the product, himself and that then, the product

18  could be released?

19         MR. SULLIVAN:  Ah, I -- I believe -- and Mr. Safian,

20  correct me, if I'm wrong -- that once we'd get the inventory,

21  then FSIS has a right under the Judge's order and under the law,

22  to go in and to verify that inventory.  And then, FSIS makes the

23  determination about what the appropriate next step is for the

24  inventory, right?

25         MR. SAFIAN:  Right.

1          Mr. Flanagan -- yes -- yes, that is correct.

2          Mr. Flanagan or another investigator would go out

3     onsite and then, yeah.  The idea was to allow that product then

4     to be sold by Mr. Miller.  Of course, there were some record-

5     keeping requirements, I don't know whether that is going to be

6     met, I guess, we can worry about that depending on where --

7     where things are going to go with Miller going forward.

8          THE COURT:  All right.

9          MR. SULLIVAN:  And would you be making a determination

10    whether the product is still in good condition and appropriate

11    for sale?

12         MR. SAFIAN:  Yeah, there would be some, our -- our

13    understanding is, that it's largely almost all frozen product,

14    so we don't expect any concerns with -- with that issue, but

15    yeah, that would be something that they would check.

16         THE COURT:  And Mr. Lapsley, how long would it take

17    you to get the written inventory to Mr. Safian?

18         MR. LAPSLEY:  End of business, Thursday, sir.

19         End of business, Thursday, sir --

20         MR. LAPSLEY:  Yes.

21         THE COURT:  -- was the answer.

22         Is that going to be -- give you adequate time to get

23    out there and -- and confirm, whatever you'd need to confirm, so

24    that on our telephone conference a week from Friday, we might

25    have some answer?

1    MR. SAFIAN:  Ah, Mr. Lapsley has dealt with Mr.

2 Flanagan, so we're fine with him providing the inventory

3 directly to Mr. Flanagan.

4    If we had it Thursday, we could make our best effort

5 to have it com -- our initial review completed by Monday.  Mr.

6 Flanagan could and another investigator, I think, assuming

7 they're available, could probably be onsite at Mr. Miller's

8 Tuesday, provided he gives us access to do what we need, then,

9 yeah, we should be able to be prepared for a call the following

10 -- by Friday.

11    THE COURT:  Okay.  Mr. Lapsley.

12    MR. LAPSLEY:  Well, we don't miss this, I mean --

13    (Mr. Lapsley is not speaking at a microphone at 3:30

14 p.m.)

15    THE COURT:  You'd have permission to send it to both

16 Mr. Safian as well as Mr. Flanagan, as well as Mr. Miller and

17 Mr. Lafuente, of course and the Assistant United States

18 Attorney.

19    MR. LAPSLEY:  Good, thank you, sir.

20    THE COURT:  Absolutely, sir.

21    Mr. Miller, does that answer your question about the

22 inventory and getting it out?

23    THE DEFENDANT:  Yes.

24    THE COURT:  And you will fully cooperate with, not

25 only Mr. Lapsley, but Mr. Flanagan and Mr. Safian, so they can

1   do what they need to do get --

2           THE DEFENDANT:  Yes, I would like to.

3           THE COURT:  -- that inventory moving?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Okay.  All right.

6           I'm going to schedule the telephone conference for a

7   week from Friday.

8           Mr. Miller, of course, I would expect you to

9   participate along with Mr. Lafuente and Assistant United States

10  Attorney Sullivan.

11          Mr. Lapsley and Mr. Flanagan and Mr. Safian, it would

12  be great to have you available on that phone call.  By the time,

13  we've reached that date, a hundred and five thousand dollars and

14  sixty-five -- $105,065.72 should have been dispersed, fifty

15  thousand to the Court's registry, the $55,065.72 to FSIS.

16          And it's very important, because so far, there's been

17  a real issue with those payments being made and it obviously is

18  a -- a gesture of, your willingness to comply with the orders.

19  I was very encouraged when I had received this latest document

20  from you.

21          I'm very encouraged with what I hear today, not that

22  you'd want to give up, but that you don't want to be in non-

23  compliance.  And I am very encouraged that you want to engage

24  with Mr. Lafuente again to allow him to assist you in this

25  regard, because that makes it a lot easier to deal with this

1   Assistant United States Attorney in trying to come up with a

2   solution.  But it's in your best interests, it meets the

3   interest of -- of  the Department of Agriculture.

4           Mr. Miller, do you have any questions for me?

5           THE DEFENDANT:  Well, I know, they were wondering

6   about the three-man board, I mean, actually, the -- as you know,

7   I'm -- I'm -- I look at nature, because it's not saying, no to

8   my members.

9           So, I have a -- a three-man board, that I've --

10  they've volunteered to come on board and if you wanted to make

11  them testify as to why they're helping me and what they're

12  concerns are, if you want that evidence -- that evidence that we

13  work together as a community --

14          THE COURT:  Right.

15          THE DEFENDANT:  -- so, can Mr. Durmaz come up?

16          THE COURT:  Sure, absolutely.

17          Sir, are you going to testify for us?

18          MR. DURMAZ:  Yes, sir, I --

19          THE COURT: Oh, absolutely, if you would please

20  approach the witness stand and just raise your right hand to

21  swear or affirm.  You may just go right around there

22  (indicating).  And if you'd just raise your right hand.

23          BARRY DURMAZ, DEFENSE WITNESS, SWORN.

24          THE WITNESS:  Yes.

25          THE COURT:  Thank you very much, sir.  And sir, please

1  be seated.

2          And sir, would you please state your full name,

3  spelling your last name for the record?

4          THE WITNESS:  My name is Barry Hasson Durmaz, the last

5  name is D-u-r-m-a-z.

6          THE COURT:  Okay.

7          Now, normally, you're asked questions, this might be a

8  time, where it would be appropriate to allow you to testify in a

9  narrative form.

10          Mr. Miller, did you want to ask questions of Mr. Du --

11  It's Durmaz, correct?

12          THE WITNESS:  Durmaz, yes, sir.

13          THE COURT:  Did you want to ask questions of him and

14  he'll respond, I assume, Mr. Lafuente, you're not familiar with

15  this witness, correct?

16          MR. LAFUENTE:  Correct.

17          THE COURT:  Okay.

18          THE WITNESS:  Well, he just doesn't remember but we

19  have spoken and --

20          THE COURT:  No, I mean, he's not -- he's prepared to

21  ask you questions.

22          THE WITNESS:  Correct.

23          THE COURT:  Mr. Miller, did you have any questions for

24  the witness or do you want him to be allowed to just -- to

25  explain to the Court, what he knows?

1        MR. SULLIVAN:   Ah, I'm -- either way --

2        THE COURT:  Well --

3        MR. SULLIVAN:   -- I mean, he -- whatever he prefers.

4        THE COURT:  Which would you prefer, sir?

5        THE WITNESS:  I'm sorry, what was the --

6        THE COURT:  Just talk in a narrative or have Mr.

7    Miller ask you questions?

8        THE WITNESS:  Well, I'd like to submit that, Amos is

9    being accused to speculation earlier by his defense attorney,

10   ah, really, that's what the -- the Federal Meat Inspection Act

11   and the Poultry Act, it is really speculation out there, because

12   it's prognosticated what might happen before anything has

13   happened, before anything has happened.

14       And, ah, it will be interesting to see if there is

15   going to be a meeting of the minds, ah, after this conference

16   call, because there is conflicting interests here.

17       True law is that which, your Honor, never changes,

18   it's always been fundamentally wrong to do a few things, such as

19   murder, steal, bear false witness, ah, just a few things,

20   really, ten ultimately -- ten -- ten Commandments, so that

21   that's how we know true law, it's always been wrong to do these

22   things, historically.

23       And -- ah -- that's the position I believe, that Amos

24   is standing in, it's that it's a tight area to navigate, these

25   compliance laws.

1        And he could comply, you know, that's -- that's

2    something he could do according to his conscience but then what

3    is happening by that -- and I believe, this is where he's coming

4    from -- is that, again, the right to contract or the right to

5    earn a living is not an absolute right, it is subject to

6    something else.  And that is a regulatory body agency that the

7    USDA and this particular Act.

8        And so, that would be contrary to the spirit behind

9    the letter of the law.  The spirit of our law, they're in '76,

10    the declaration of '76, just a few things of life, liberty and

11    the pursuit of happiness.

12        And so the question, does a man have an absolute right

13    only until he would injure his neighbor, that's -- that's --

14    then, he's abused his liberty.   But -- ah, true law in this

15    country is a man or a woman's right to govern themselves and

16    there is no evidence that's been brought forward, that he has

17    injured anybody, only a failure to compliance.

18        And I -- and I heard that clearly today and I don't

19    think there would be argument that that is the case, that it's

20    an issue of compliance, not just somebody has been wronged or

21    injured and so, that is speculation and I understand that that

22    is what we're -- and Amos understands that.

23        He's asked me with a couple of other gentlemen to --

24    you know, counsel him in the right ideas.  And he's coming to an

25    awareness of that.

1      It is -- it is important to establish true law,

2   because then, that's the basis for injustices, right.  And so,

3   ah, yes, an issue of compliance is what this is about, but it is

4   good to have on the record, your Honor, that -- ah -- we are

5   here as men and the membership of -- of the farm to do good on

6   the land.  It is -- it is the king's land, our -- our answering

7   the king, the true law here.

8      And to be a judge, it is a noble position, an

9   honorable position, ah, a very elevated position.  And --ah --

10  since Mr. Miller mentioned the Book of James and the Assistant

11  United States Attorney did as well in rebuttal in that book, we

12  have twice, a perfect law of liberty, because I -- until there

13  is an injured party, ah, we're free to do good as is

14  overwhelming evidence by the customer base, ah, from Miller's

15  Organic Farm, overwhelming.

16     I've gone back and reading the records from 2016, it's

17  -- okay, from all of these -- ah -- and appreciate your

18  graciousness on behalf of Miller's Organic and customers, ah,

19  there's -- there's an issue of control and power and -- ah --

20  the contest is, right makes might.  But when we're dealing with

21  a large federal, ah, administrative agency, the might of that

22  agency is what makes right, see.

23     Ah, so Amos is under force and threat of force, if he

24  doesn't comply and that really is a red flag to know, this is

25  not true law and it isn't -- regulatory law, it is compliance

1   law, but there is a presumption being made here, that we're --

2   Amos has and Miller's Organic has a relationship with the USDA,

3   okay, and that's -- that's a presumption that's in modern

4   lawyering, modern legal -- ah -- training, there is a

5   presumption that's the law that's being accused of, ah, accused

6   of breaking --

7           (Static at 3:40 p.m.)

8           THE WITNESS:  -- that it applies to Amos Miller,

9   because true law protects the relationship.  He has a

10  relationship with his customers, with his suppliers and evidence

11  would need to be brought forward, that there is injury there,

12  okay, that's what true law does, it protects those

13  relationships.

14          In contrast with the USDA and the -- the Federal Meat

15  Act, there can be -- the relationship doesn't matter, it -- it's

16  not a concern, only comply, okay.

17          So, if Amos is willing to accept the consequence as he

18  has so stated and maybe, it's gonna be subject to change, he'll

19  be a man of proven character, if he accepts the heavy hand of

20  law that -- that forbids the liberty to govern itself, okay.

21          (Static continues.)

22          THE WITNESS:  So, it's healthy to make that contract

23  when we're talking about law -- law -- and did it come from our

24  -- law giver and his law, as long as he's not there to love his

25  neighbor, that's what America is about, he's a free man.

1     But if the heavy hand of compliance law is brought

2     forward, ah, that's -- that's how that law has to be

3     administered, it is by force and threat of force.  Okay, because

4     again only a few things have been fundamentally wrong, always.

5     And that's -- that's very liberating and he has been

6     and the customers of Miller's Organic Farm, your Honor, we are

7     here to do good things on the land and we're in a time when that

8     good is being evil spoken of, okay.

9     (Static continues at 3:42 p.m.)

10     THE WITNESS:  So, that's a good position to be in, to

11     stand, the conscience knows, ultimately, what is good and what

12     is evil --

13     THE COURT:  I'm going to interrupt you there for a

14     moment, sir.

15     THE WITNESS:  Yes, sir.

16     THE COURT:  Mr. Miller has indicated to this Court

17     through a written writing, that he does not want to be held in

18     criminal contempt and that he certainly doesn't want to lose his

19     farm, so much so, that he wanted to appoint three volunteers,

20     who were going to form a committee to assist him in being

21     compliant with those regulations, I believe, you are one of

22     those members, is that correct?

23     (No verbal response and static continues at 3:43 p.m.)

24     THE COURT:  Are you one of three?

25     THE WITNESS:  Yes, we -- we had a meeting and we --

1    I'm still learning from Amos, what role he may have me play to

2    assist him and that's --

3            (Static continues.)

4            THE WITNESS:  -- slow and incremental, he has a lot of

5    -- there's a lot of people, who want to help and there's some

6    times, when I'm with him -- (indiscernible and static

7    continues.) -- maybe not -- the best of --

8            THE COURT:  That's an understatement.

9            THE WITNESS:  Okay, yeah.

10           And I -- I wasn't encouraged by the (indiscernible)

11   either, quite frankly.  Okay.

12           But I think, if we can have open communications for

13   understanding, you see, what -- ah -- understanding, excuse me.

14           True law asks the question, what is the idea behind

15   the Federal Meat Act, well, I heard it today, your -- your

16   Honor, and that's food safety.  So, if that is the concern, that

17   could be addressed without question, food safety and -- and

18   bringing the evidence forward, that there is a violation of food

19   safety, because I've seen it.

20           (Static continues at 3:43 p.m.)

21           THE WITNESS:  Now, compliance-wise, yes but that is

22   preemptive, that is -- that is regulation, because there is

23   nothing that's gone wrong, ah, but yes.

24           Amos has graciously asked me to be of service to him,

25   your Honor and --

1          THE COURT:  And do you think, you can assist?

2          THE WITNESS:  Well, I -- ah, I'm a student of our --

3     what's good about our country for twenty-seven years, true law,

4     your Honor.  I am a student of the law and -- ah -- I

5     understand, that in law school comparative law is not taught,

6     it's just law, but we're -- we're dealing with Roman civil

7     administrative law versus law that goes back to our declaration,

8     the Magna Carta, 1215 and even to the resurrection of the Lord,

9     Jesus Christ.

10         He is the one that says, if a man doesn't work,

11    gentlemen, then he should not eat and that man, Amos Miller, is

12    a hardworking man.  His reputation proceeds him all over this

13    country.  I am reading the comments, ah, I'm assisting in other

14    ways and that does help bolster a man, that his conscience is

15    not -- he's getting positive affirmation, your Honor.

16         And so -- ah -- answer questions?

17         (Static continues at 3:45 p.m.)

18         THE COURT:  Well, you've answered.

19         Mr. Miller, do you have any questions for this --

20         THE DEFENDANT:  (No verbal response.)

21         THE COURT:  Mr. Lafuente, do you have any questions?

22         MR. LAFUENTE:  I have no questions.

23         THE COURT:  Assistant United States Attorney Sullivan?

24         MR. SULLIVAN:   Yes, just briefly.

25                        <u>CROSS-EXAMINATION</u>

1  BY MR. SULLIVAN:

2  Q.   Mr. Durmaz, first of all, thank you so much for coming in

3  and speaking today, you're quite articulate and what you've

4  shared is very helpful.

5        And by the way, comparative law was part of my law

6  school, we did learn Roman law, the Napoleonic Code and European

7  law --

8  A.   Okay.

9  Q.   -- code law, ah --

10       THE COURT:  Natural law.

11  Q   -- it was very enlightening.

12       (Laughter and static continue at 3:45 p.m.)

13  Q.   And we certainly -- the U.S. Attorney's office, would

14  welcome your guidance and input and assistance to Mr. Miller and

15  helping him going forward.

16       And I -- I know, you spoke about the spirit of the

17  law, which is really important to us, I mean, we often have to

18  exercise discretion as to whether we'd enforce certain things

19  we've certainly done that in this case.

20       There are various options that have been available to

21  us and we've, at least, tried not to exercise all of them and to

22  use restraint here.  And Montesquieu of course in the 18th

23  Century, when our founders were writing the Declaration and --

24  and they read Montesquieu -- wrote the spirit of the law, so

25  that's always been, you know and important part of the whole

1   legal scheme.

2          And certainly, in the Declaration after the mention of

3   life, liberty and the pursuit of happiness follows the language:

4          That to secure these rights, laws and instituted

5       among me.

6          So, there is the contemplation of law.

7          And here, the Federal Meat Inspection Act and the

8   Poultry Products Inspection Act, both have public policy

9   statements in them, so we see the spirit of the law in writing

10  that Congress has said, this is what should be animated, you

11  know, inspiring these laws, inspiring the agency going forth and

12  informing, how that should happen.

13         And here, Mr. Miller, of course, sells to folks

14  throughout the country.  So, the community that's at issue is

15  the nation, really, because his customers are throughout the

16  country and their representatives are the ones, who have written

17  these laws, that -- that the agency is responsible for

18  enforcing.  And these are, generally, applicable laws.

19         So, what the agency has been seeking here, is just to

20  apply the same laws in the same way they are applying them to

21  every other farmer, every other meat and poultry products that

22  are processed throughout the country, whether Amish, other Amish

23  farmers, whether Horow (ph), whatever, these are, generally,

24  applicable laws, Mr. Miller is not being singled out, the agency

25  is not saying, oh, you've violated, therefore, we are applying

1    this differently to you.

2         The agency is saying, we are seeking to do with Mr.

3    Miller, what we're seeking to do with everyone and what everyone

4    else is doing, so that there is a level playing field.  And it

5    -- and the agency has been willing to work with Mr. Miller to

6    find ways to accomplish what he is seeking to accomplish,

7    whether it be regarding citric acid or whatever, so that he can

8    be a successful -- ah -- enterprise going forward and that's

9    been the aim and the goal and the Judge, certainly, and my

10   office have supported that throughout.

11        But I'd just have -- have a few questions about the

12   board, are you -- you've said, that Mr. Miller hasn't really

13   gone through what your functions would be going forward, is that

14   right?

15   A.   There's been --

16        (Static continues at 3:48 p.m.)

17   A.   -- (indiscernible) -- and -- ah -- so, that's -- he's good

18   to mention that there's a lot of pressure, a lot of demands, a

19   lot of people are looking to him, there is a lot riding on this

20   with his suppliers, who also it affects their livelihood.

21        So, ah, it's been a recent development to come

22   together as -- as this, so it's actually, still developing, so I

23   can't really state too much, only that, you know, we had a

24   meeting at the farm and -- he's opening up some -- make it a

25   local, safe -- farm and others, even Mr. Lafuente -- Lafuente --

1    (Indiscernible and static continues at 3:49 p.m.)

2    A.    -- and we got the -- and -- but I think, there's something

3    that we have -- by having local support, a local presence,

4    because quite frankly, the -- you know, the USDA is not local

5    and they have -- they did start -- it's a top down organization

6    and so, there's conflict here with the bottom up organization of

7    a man's family and his family business and then -- then the

8    people that are freely associating with him.  Okay.

9         So -- ah, if I could, Mr. Sullivan, about the accepted

10   public policy in the agencies, ah, you know, what is your

11   understanding of when -- when authority is delegated, which the

12   people gave through the Constitution, is there any provision

13   there, that they can sub-delegate now with agencies that can be

14   to the detriment to the people -- to the authority --

15        THE COURT:  We can't -- we can't get into philosophy

16   here, where --

17        THE WITNESS: Okay.

18        THE COURT:  -- you two have a discussion about the

19   philosophy, I'm sure the Assistant United States Attorney

20   Sullivan would enjoy it and I know, you would enjoy it.

21        THE WITNESS:  Okay.

22        THE COURT:  What I want to ask you is, Mr. Miller

23   submitted a notice of -- it appears that he's referring to his

24   own error, in that, he became very defiant and he was concerned,

25   it was leading him on a path that was going to destroy the farm

1    and maybe, it would destroy him personally, hurt his family,

2    hurt his community and hurt his customers.

3           And in this document, this notice of error, which is

4    Document No. 156, he wrote that:

5           He has formed an independent three-member board of

6        governors to oversee the operations of the farm, including

7        sales and shipment and Mr. Miller's decisions on all sales.

8           And what he was talking about there is just want he

9    talked about here, that he was torn between his conscience and

10   his customers in complying with the law and he wanted someone to

11   be in between those to help him when his conscience was such

12   that he was going to violate the law and potentially, destroy

13   his farm, *et cetera.*

14          So, that this board would oversee decisions and all

15   sales to make sure, he remained in compliance to assure the

16   Court that the order -- and those are my prior orders that have

17   been entered -- that the order would be strictly followed.

18   These new board members are volunteers with integrity, that are

19   concerned that Miller's Organic Farm not be closed.

20          Are you ready to take on that role as one of these

21   three board -- three-member board that was formed by Mr. Miller

22   to be a board of governors to assist him in both meeting the

23   needs of his customers while at the same time, becoming and

24   remaining compliant with any regulations?

25          THE WITNESS:  Actually, your Honor, there is a good

1    portion of that, I'm already doing.  I have --

2                THE COURT: Good.

3                THE WITNESS:  -- so, ah -- the current price list,

4    which is the -- we're in the month of April, ah, I am

5    responsible for working with Amos' brother, John, that the only

6    meat products that are available for sale is the water buffalo,

7    which is not part of the sanctions that are put on here, they're

8    under the --

9                (Static continues at 3:52 p.m.)

10               THE COURT:  Where does the water buffalo come from --

11   where does water buffalo come from?

12               THE WITNESS:  (No verbal response.)

13               THE COURT:  You actually raise water buffalos?

14               THE DEFENDANT:  We do.

15               THE COURT:  Wow, okay.

16               Where are -- where are they native to?

17               THE DEFENDANT:  What's that?

18               THE COURT:  Where are they native to, where do you

19   find them in nature?

20               THE DEFENDANT: (No verbal response.)

21               THE COURT:  They're not -- they're not native to

22   America, are they?

23               THE DEFENDANT:  Ah, they're more down south in -- in

24   the warmer climates.

25               THE COURT:  Okay, all right.

1          That just seemed like an unusual --

2          THE DEFENDANT:  I --

3          THE COURT:  -- an unusual --

4          THE DEFENDANT:  -- I -- Italy --

5          THE COURT:  -- food.

6          THE DEFENDANT:  -- Italy raises them, like, ah --

7   like, we do beef over here.

8          I mean, I -- I asked Paul, what -- when is beef going

9   to be there, they have chuck.

10         THE COURT:  Okay.

11         THE WITNESS:  Yes, just to affirm, your Honor.

12         Yes, I am more than delighted to assist Amos and --

13  so, you know, it's relatively new, but yes, the thing -- see,

14  one of the things I'm learning about Amos is, you know, part of

15  his culture, the Amish community -- first of all, for him to put

16  that kind of thing in writing, that's saying something, because

17  as I've come alongside to do some -- help with the business

18  development, ah, I've put some things to him that I'd like him

19  to fill out.

20         Well, he's just a simple farmer and that's what he's

21  telling me, you know, it's just -- so, I can understand the

22  pressure -- excuse me.

23         (Static continues at 3:53 p.m.)

24         THE WITNESS: You know, to be precise, there have been

25  some things committed to and haven't been fully realized to the

1    Court's satisfaction -- to your satisfaction, but I do want to

2    help him and I'm appreciating this opportunity.

3          This is an opportunity to get on the record, the

4    really true law.  And quite frankly, the spirit of the law, is

5    not the written regulations, it is something much more

6    fundamental than that.  And without that spirit of the law, we

7    do have death, we have economic death rationale.

8          And -- and what Amos was testifying earlier, you know,

9    the bigger picture is, what's going on in our country, the

10   manipulations, that -- that's a key word, too.  The

11   manipulations that you can be in business or you can -- you

12   know, the food supply out there, your Honor, a lot of things are

13   being manipulated, ah, our money supply.

14         Your Honor, I have record and evidence that the courts

15   of this land are to be -- ah -- that the courts -- the

16   proceedings of courts are to be -- according to -- ah, when

17   we're talking about the -- the fines and the payments and the

18   dollars, ah, what is a dollar, okay.

19         And George Washington signed the U.S. Mint Act of

20   1789, I believe, it is, that are our currency, our -- a dollar

21   is 371 and quarter grams of silver, okay.

22         Now, our -- our current American liberties, they're

23   actually, more than that, they're about four hundred and some

24   grams, which is fine, that's more than.

25         But we've got a fundamental problem here, just

1   administratively, with our currency and financing everything

2   with debt notes, so this case, you know, can you bring -- can

3   bring in some things, some other things to light, but we've got

4   some serious problems here, your Honor.

5          And again, I'm thankful for this opportunity that Amos

6   would like for me to, you know, say a few words, ah, I think,

7   good can come out of this, I know good can come out of this.

8          Now, whether he wants to comply, that remains to be

9   seen, but I believe he is gonna stand in true law -- true law.

10  We have conflicts of law and philosophy, to your point.

11         And -- ah -- the true American is not someone, who

12  does comply with everything, it is somebody, who is self-

13  governed, it's somebody, who is more self-governed, than

14  governed externally.  And so, that's why there has to be a

15  bloody plaintiff, there has to be an injured party, that is our

16  common-law heritage.  The Roman civil law doesn't require an

17  injury party, which is what we have here, all right.  So, that's

18  the comparative law that I'm -- ah -- referring to.

19         And so, as long as we know this -- we know this, then

20  we don't have to get bent out of shape and overly emotional,

21  we'd just stand on principled law, that never changes.

22         And this country is, based -- we're just not clear on

23  what America is and that is, we are a self-governed nation, but

24  -- ah -- we've not been that way for several generations.

25         I am even studying the history of the USDA, the

1  gentleman that got that started with the -- the farmlands that

2  were desolate and -- ah -- they didn't revamp practices on -- on

3  their farming and whatnot.

4        If somebody wants to voluntarily, avail themselves to

5  those services, I think, okay.  And then, within the

6  administration to regulate yourselves, okay.  But now, ah, to

7  bring that to the --

8        (Sneezing at 3:57 p.m.)

9        THE WITNESS:  -- private business owner and operator

10  for force and threat of force, that is no American.  It's --

11  it's -- so by the letter of the law, one can be -- ah -- so,

12  yeah -- economic death and whatnot.

13        And so, but the spirit gives life and I would -- I

14  would -- I would take as much time as necessary to demonstrate

15  that the -- the Meat Act and all of that, that's not the spirit,

16  that's actually, the letter of the law.

17        So, if there's going to be a debate about that, ah --

18        (Coughing continues at 3:58 p.m.)

19        THE WITNESS:  -- that's done.

20        THE COURT:  But I have to caution you there --

21        THE WITNESS:  Yeah.

22        THE COURT:  -- but you are going to assist Mr. Miller

23  in complying with the law as it is now written.  Well, there's

24  natural law, you called it true law, *et cetera* with the -- what

25  he's calling upon for you and you can have the philosophy that

1    you're -- you believe, self-governing, just to self-govern your

2    family, self-govern your community, *et cetera*.

3          But at the end of the day, what he's calling upon you

4    to do, as I understand it from his writing, is notwithstanding

5    that philosophy, he is in jeopardy right now, he is in --

6    arguably, in contempt and there are potential contempt

7    consequences.

8          He recognizes, he got in -- I believe -- he got in

9    with that Prairie Star, it led him to be in an even much worse

10   way as this -- as this case is concerned.  And with potential

11   ramifications that could be very harmful to him, his family, his

12   farm, his customers, *et cetera*.  He now recognizes it, he may

13   not agree with the regulation, but he wants to be in compliance

14   with the regulation.  To the extent he can continue to operate

15   and be in compliance.

16         If he can't, my understanding today, was he was just

17   going to shut down those areas that he can't come into

18   compliance with the regulation, nobody is asking him to do that.

19         And your job is to help him, when he has questions

20   about doing something that his conscience says, I want to take

21   care of my customers, but it's going to violate the law, you are

22   to stop him from doing that.  You have to say, no, we have to

23   stay in compliance with the regulations, that's how I read what

24   he's submitted here.

25         That's my request for you, can you do that, because

1   he's suggesting, this is the -- this is one piece of evidence

2   that he wants to be in compliance, but he does not want to run a

3   afoul of the law, even though he may not agree with the law.

4           As he said, he wants to be a farmer, he wants to be

5   left alone, he probably doesn't want to pay taxes, most of the

6   other people in this courtroom don't want to pay taxes, either.

7           And if you'd look back to the Constitution, income

8   taxes were supposed to be outlawed, nobody wants to pay taxes,

9   we all know we have to until the law is changed and the laws

10  change through our elected representatives, *et cetera*, that's

11  our government's structure, we follow and so we have to follow

12  those rules and regulations, that -- to the extent they are

13  unconstitutional -- they're going to be challenged in the

14  Supreme Court and the Supreme Court has got to say, they're

15  unconstitutional.  And if that doesn't work, you've got to take

16  it public -- a political solution.  That is elect

17  representatives to go into the Legislature and to change the

18  law.

19          But we're not talking about changing the law here,

20  we're talking about Mr. Miller being compliant, so he never has

21  to see me again, so that I'm just part of his history, not part

22  of his future, because there is nothing good about me being part

23  of his future, there is just nothing good about it.  He doesn't

24  want a legal case, he doesn't want this hanging over his head,

25  he doesn't want to pay attorney's fees, he doesn't want to have

1   to pay inspection fees, *et cetera.*  He wants it all to go in

2   towards a productive business.

3          So, that's where he's bringing your conscience, your

4   integrity, *et cetera,* back to a person, who has a like mind, as

5   far as the role of Government, the role of the individual --

6   individual accountability -- *et cetera.*  He's of like mind, I

7   believe with you, which means he is comfortable with you and the

8   advice you might give him, but that advise -- the advise he's

9   seeking is advice that would keep him in compliance, that's what

10  this says.  And I'm assuming that's what he's looking for from

11  you, somebody he trusts, somebody of like mind, who

12  nevertheless, will help him in exercising his conscience to not

13  run afoul of the regulations.

14         THE WITNESS:  If that's what Amos Miller wants, then I

15  would like to have him, you know, I'd like to have -- be more

16  clear about that, okay.  And see -- you know, what -- you know,

17  that's, we're -- revealing to me, ah --

18         THE COURT:  And I'm going to give you a copy of this

19  to take with you and read it at your leisure.

20         THE WITNESS:  Yes, sir.  Thank you, your Honor.

21         THE COURT:  And then, you can talk with Mr. Miller

22  about it, but you will see in that document, it is Mr. Miller

23  saying, I'm tired of this, I don't want further court cases, I

24  want to become compliant or if I can't -- today, he said, to

25  shut down.

1          THE WITNESS:  Yes.

2          THE COURT:  Nobody is asking him to shut down, except

3     to the extent he's got to be compliant as long as he is

4     operating.

5          So, you play -- I think, I'm correct in saying -- you

6     play an important role in helping him as he --

7          (Static at 4:02 p.m.)

8          THE COURT:  -- in this courtroom today -- he can make

9     this right.  Okay.

10          Mr. Flanagan didn't think it would be that hard to

11     become compliant -- maybe, it is hard, I don't know, it has been

12     for the last several years, but we've given him as much rope as

13     we can give him, but there is a time when that will end and I

14     must take appropriate action to ensure that the regulations are

15     being followed.

16          But we've done everything we can up to this point to

17     make sure, he's able to serve his customers, the last few months

18     have been very bad, because he got under the influence of --

19          THE WITNESS:  Hm-hmm.

20          THE COURT:  -- people that were just a bad influence

21     and that's what I'm about, that's Prairie Star.

22          THE WITNESS:  Yes, your Honor, if I could ask --

23          THE COURT:  So, I want you to talk to him about that,

24     as you read that --

25          THE WITNESS:  Yes, sir.

1          THE COURT:  -- talk to him about it to make sure, I'm

2   not wrong --

3          THE WITNESS:  Hm-hmm.

4          THE COURT:  -- and what your role is with -- with

5   respect to that.

6          THE WITNESS:  Yes.

7          And I will appreciate that and we will do that, I

8   trust.

9          Is it unreasonable to get anything that substantiates

10  what compliance looks like in the way of hours that's required

11  on the business, itself and -- and related -- that's where I

12  believe Amos is coming from and he is listening to others, who

13  have privately complained -- it's in the Lancaster -- the farmer

14  magazine, ah, newspaper, that you know, there's grant money, ah,

15  fifty or a hundred thousand dollars to get a meat-processing

16  plant going.  But there seems to be some -- very unattractive,

17  ah, things about that.

18         And that would be helpful to going in with full

19  disclosure, like, really, what does compliance mean besides the

20  application and getting the license, really, what does it look

21  like?  I know, I would appreciate that and I think that would be

22  helpful --

23         THE COURT:  The -- the reason I smile is, I know,

24  you're just getting involved with this, but for years --

25         THE WITNESS:  Yes.

1              THE COURT:  -- Mr. Flanagan and Mr. Safian, the U.S.

2    -- the Pennsylvania -- have been trying to explain what

3    compliance is, literally, for years.

4              THE WITNESS:  Okay.

5              THE COURT:  But I am sure, they will continue to try

6    to make sure, he understands what is necessary --

7              THE WITNESS:  Hm-hmm.

8              THE COURT:  -- to be in compliance and we've got Mr.

9    Lapsley assisting as well.

10             So, I'm quite certain --

11             (Static at 4:04 p.m.)

12             THE COURT:  -- I can't tell you as I sit here today.

13             THE WITNESS:  Yes, sir.

14             THE COURT: But you're right, you need to know what

15   you're dealing with --

16             THE WITNESS:  Yes.

17             THE COURT:  -- what do you mean by compliance, but I

18   am sure, you can get that information --

19             THE WITNESS:  All right.  I'll pursue that, your

20   Honor.  Thank you.

21             THE COURT:  -- all right.

22             If there are no other questions for the witness, I

23   will allow Mr. -- it's Durmaz, correct?

24             THE WITNESS:  Durmaz.  It's Turkish, so I -- that's

25   all right, it's a little --

1              THE COURT:  -- Mr. Durmaz to step down.

2              And Mr. Miller, did you have any other questions for

3    Mr. Durmaz?

4              THE DEFENDANT:  (No verbal response at 4:05 p.m.)

5              THE COURT:  You are welcome to step down, sir and you

6    can join Mr. Miller.

7              (Witness excused.)

8              THE COURT:  I'll get that order out.  I will get

9    everyone on the phone, a week from Friday, hopefully, by then,

10   the money will be -- have properly been deposited in the two

11   locations.

12             Counsel will have been able to talk with each other.

13   Mr. Miller will have be able to coordinate with Mr. Lafuente, so

14   he can coordinate with Assistant United States Attorney

15   Sullivan.

16             Mr. Durmaz can get an idea of what his

17   responsibilities are to assist Mr. Miller as it comes to the

18   actual operation of the business along with the two other

19   members of that board.

20             Assistant United States Attorney Sullivan, anything

21   further?

22             MR. SULLIVAN:  Just if your Honor could emphasize to

23   Mr. Miller, that there -- under the current orders, there is to

24   be no selling of amenable meat or poultry products until further

25   order of the Court to the contrary.  And that there is not to be

1   any additions to the amenable meat and poultry inventory.

2            THE COURT: And you understand that, Mr. Miller?

3            THE DEFENDANT: (No audible verbal response.)

4            THE COURT:  That's a yes.

5            And Mr. Lafuente, do you have anything further?

6            MR. LAFUENTE:  Nothing further, your Honor.

7            THE COURT:  Mr. Miller, anything further, sir?

8            THE DEFENDANT: (No verbal response.)

9            THE COURT:  All right.

10           This matter is adjourned, everyone have a good

11   afternoon.

12           DEPUTY CLERK: All rise.

13           (Adjourned in this matter at 4:06 p.m.)

14                              *  *  *

15

16

17

18

19

20

21

22

23

24

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GEORGE DAVID LAPSLEY | | | | |
| By Sullivan | 11 | | | |
| By Mr. Lafuente | | 35 | | |
| By Mr. Sullivan | | | 39 | - |
| | | | | |
| PAUL J. FLANAGAN | | | | |
| By Mr. Sullivan | 41 | | | |
| By Mr. Lafuente | | 54 | | |
| By Mr. Sullivan | | | 56 | |
| By Mr. Lafuente | | | | 61 |
| | | | | |
| | | | | |
| BARRY DURMAZ | | | | |
| Narrative | 112 | - | - | - |

* * *

<u>C E R T I F I C A T E</u>

    I, a court-appointed transcriber, certify that the foregoing is a correct transcript from the electronic-sound recording of the proceeding in the above-entitled matter.


Date: <u>April 24, 2022</u>

Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270